# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

STANLEY FITZPATRICK,

                :

        Petitioner,                  Case No. 1:06-cv-356

                        :        District Judge Susan J. Dlott

     -vs-                       Chief Magistrate Judge Michael R. Merz

MARGARET BRADSHAW, Warden,

                :

        Respondent.

---

## REPORT AND RECOMMENDATIONS

---

This capital habeas corpus case is before the Court for decision on the merits.

Petitioner was indicted on June 19, 2001, by the Hamilton County Grand Jury on one count of aggravated murder of an individual under thirteen years of age under Ohio Revised Code § 2903.01(C) and two counts of aggravated murder with prior calculation and design under O.R.C. § 2903.01(A). Count one included the under thirteen years of age specification, O.R.C. § 2929.03 (A)(9), while the second and third counts included the specification of purposeful killing or attempt to kill two or more persons under O.R.C. § 2929.04(A)(5). Petitioner was also indicted on one count of attempted murder under O.R.C. § 2923.02(A) and aggravated robbery under O.R.C. § 2911.01. Each of these counts included a firearm specification. Petitioner was further indicted on one count of aggravated burglary under O.R.C. § 2911.11(A)(1) and one count of aggravated robbery under O.R.C. § 2911.01 (A)(1).

Fitzpatrick's case went before a Hamilton County jury on February 4, 2002. After jury

selection and opening statements, Petitioner asked for a jury waiver and changed his plea to guilty on all charges. His case proceeded before a three-judge panel. On February 11, 2002, the panel accepted Fitzpatrick's plea of guilty on all counts and specifications. Upon completion of the mitigation phase, the judges returned a sentence of death on each of the aggravated murder counts, concurrent nine years in prison for the other four felonies, and two consecutive three year terms for the firearm specifications.

## Procedural History in State Courts

The Ohio Supreme Court summarized the facts as follows:

> Appellant, Stanley Fitzpatrick, murdered his girlfriend, Doreatha Hayes, her 12-year-old daughter Shenay, and a neighbor, Elton Rose. While leaving the crime scene, he attempted to kill a police officer. Fitzpatrick pleaded guilty to three counts of aggravated murder with death specifications. He appeals his convictions and death sentence.

> Prior to the murders, Fitzpatrick lived with Doreatha and Shenay Hayes at 867 Chicago Avenue in the village of Lincoln Heights. On Thursday, June 7, 2001, Fitzpatrick killed Shenay and Doreatha. On June 10, 2001, he confessed these crimes to his cousin Marvin Thomas.

> Fitzpatrick told Thomas that 12-year-old Shenay had come home and caught him smoking crack. Fitzpatrick claimed that Shenay had attacked him with a knife and was accidentally stabbed in the ensuing altercation. The coroner later testified that Shenay had been stabbed three times in the back of the neck and once near her ear.

> As Shenay gasped for breath, Fitzpatrick ran into the next room. A few minutes later, he came back and struck Shenay repeatedly in the head with an ax handle, fracturing her skull, "so that he wouldn't hear the sounds that she was making." At some point, Fitzpatrick wrapped a ligature around Shenay's neck. Nevertheless, according to Fitzpatrick, she was still "making sounds" when Fitzpatrick wrapped her in a blanket and a carpet and put her in a bedroom closet. Shenay died of the combined effect of the stab wounds, blows to the head, and strangulation.

> Later that evening, Fitzpatrick beat Doreatha Hayes to death. He told

Marvin Thomas that, after Doreatha came home, "we got into it as usual." Fitzpatrick said that during the argument, he hit her in the head with an ax handle or an ax. She fell to the floor, and he hit her repeatedly in the face. When Doreatha stopped making noises, Fitzpatrick moved her body to another bedroom and placed a mattress on top of it.

An autopsy showed that Doreatha had at least 13 "chop wounds": five on her head, five on her left forearm, one on her right wrist, and one on each hand. Doreatha's wounds were consistent with her having been struck with State's Exhibit 12, a hatchet that police later found in the basement of 867 Chicago Avenue. Blood on the hatchet, and on a hammer also found at 867 Chicago Avenue, had a DNA profile matching Doreatha's.

At approximately 10:30 p.m. on June 9, Fitzpatrick walked across Chicago Avenue and rang the doorbell of Elton and Betty Rose. Looking through the window, Mrs. Rose recognized Fitzpatrick standing on her front porch, and, calling through the door, she asked him what he wanted. Fitzpatrick said, "It's Doreatha's boyfriend. * * * Doreatha would like to see your husband. She said to tell him to come over to the house." Mrs. Rose summoned her husband, Elton Rose ("Rose"). Rose went across the street with Fitzpatrick and entered 867 Chicago Avenue, where Fitzpatrick killed him.

Rose died from lacerations of the brain caused by blunt-impact injuries to his head. He sustained numerous lacerations and skull fractures caused by at least ten separate blows to the back and right side of his head. These injuries were consistent with Rose having been struck with the blunt side of State's Exhibit 12, the hatchet. Blood on the hatchet had a DNA profile consistent with Rose's.

Five or ten minutes after he had left with Rose, Fitzpatrick rang the Roses' doorbell again. He told Mrs. Rose, "Your husband wants you to come across the street." When Mrs. Rose asked why, Fitzpatrick had no answer, and Mrs. Rose did not believe him, so she said, "Go tell my husband to come to the door."

Fitzpatrick turned away from Mrs. Rose. He appeared to be "looking around * * * to see if there was anyone watching him." Suddenly, he "took off," back across the street.

Just then, at 10:50 p.m., Sergeant Deangelo Sumler of the Lincoln Heights Police Department drove up in his cruiser. Sumler had been

dispatched to 867 Chicago Avenue in response to a "silent 911" call. Sumler saw Mrs. Rose and noted that she looked "distraught," so he pulled over to talk to her.

Mrs. Rose pointed out Fitzpatrick standing on the sidewalk in front of 867 Chicago Avenue. Fitzpatrick approached Sumler and said, "Come on in, he needs some help." Sumler asked Mrs. Rose what was going on. She replied, "My husband is over there." Fitzpatrick repeated that "he needed some help" and ran inside 867 Chicago Avenue. Sumler followed Fitzpatrick into the house.

When he went in, Sumler saw Fitzpatrick pointing a .38-caliber revolver at him. Although Sumler had not drawn his gun, Fitzpatrick told him to drop it. Sumler raised his hands. He then backed up to the door, pushed it open, and ran outside. Fitzpatrick fired twice at Sumler.

Sumler sought cover behind a large metal trash container. Fitzpatrick came out, aimed at Sumler, and fired a third shot. Sumler fired back. Fitzpatrick then got into Sumler's cruiser and drove off.

Fitzpatrick abandoned the stolen cruiser after driving into some bushes. He then entered the home of Montika Pitts. When Pitts encountered him inside her home, she asked what he wanted. Fitzpatrick's response was to scream at Pitts and then grab her throat. They scuffled, and Fitzpatrick shoved Pitts outside. When Pitts re-entered her home, to protect her child, who was asleep in the house, Fitzpatrick fled. Later, Fitzpatrick robbed Marjorie Duff of her car at knifepoint. He then fled in Duff's car, which was later found abandoned in Cincinnati.

As mentioned previously, on June 10, 2001, Fitzpatrick confessed to committing the murders to his cousin Marvin Thomas. Thomas then called the Hamilton County Sheriff's Department. He told a detective that Fitzpatrick was in a motel in Sharonville, Ohio.

Police officers went to Fitzpatrick's motel room and spoke with him through the door. Fitzpatrick eventually surrendered. Duff's car keys were found in Fitzpatrick's room.

Later that day, Detective Patrick Dilbert interviewed Fitzpatrick at the Hamilton County Sheriff's Department. Fitzpatrick waived his *Miranda* rights and agreed to speak with Dilbert. Fitzpatrick told Dilbert that "he'd been up for several days smoking crack," that he

lived at 867 Chicago Avenue, and that he had been either fired, suspended, or placed on probation by his employer on June 5.

A grand jury indicted Fitzpatrick on one count of aggravated murder under R.C. 2903.01(C) (child murder) and two counts of aggravated murder under R.C. 2903.01(A) (prior calculation and design). Each aggravated murder count carried a single death specification. The specification to Count One (the Shenay Hayes murder) alleged that Fitzpatrick had purposefully caused the death of a person who was under the age of 13 and that Fitzpatrick had been the principal offender. See R.C. 2929.04(A)(9). The specification to Count Two (Doreatha Hayes) alleged that the murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more people. See R.C. 2929.04(A)(5). The specification to Count Three (Elton Rose) also alleged a course of conduct. The indictment also included one count of attempted murder (Deangelo Sumler), two counts of aggravated robbery (Sumler's cruiser and Marjorie Duff's car), and one count of aggravated burglary (Montika Pitts's residence).

Fitzpatrick initially pleaded not guilty. He requested a jury trial, and a jury was seated. However, during the defense's opening statement, Fitzpatrick decided to change his plea to guilty. Counsel recommended against a guilty plea, but Fitzpatrick told counsel that if they did not stop the proceedings, he would.

Fitzpatrick's remarks to the trial judge made clear his insistence on pleading guilty:

"What I told you, I want it done. I don't want to wait till no lunch or the next day or nothing."

* * *

"I told them what I wanted to happen, and that save you some tax money or whatever, you know. * * * Seriously. Tell the jury or whatever, they don't have to go through this, be cut right down. * * * You ain't got to sit here and put my family through this * * *, you know."

* * *

"This is - just make it over with, man."

* * *

5

"I just told you what I wanted to do. I plead guilty. I killed them, but I don't remember what happened to Doreatha and Shenay."

Defense counsel informed the court that the defense had discussed Fitzpatrick's competence with two psychiatrists and a psychologist, and had reviewed medical records from two other psychiatrists. The defense was unable to find any basis to assert that Fitzpatrick was incompetent.

After Fitzpatrick signed a jury waiver, the jury was discharged and a three-judge panel was selected. The panel went over each count in the indictment with Fitzpatrick, explaining the maximum sentence for each charge. The court explained to him that by pleading guilty, he would waive his rights to a jury trial, to confront witnesses before a jury, to present witnesses in the guilt phase, and to hold the state to its burden of proving guilt beyond a reasonable doubt to a jury, and his privilege against self-incrimination. The court noted that Fitzpatrick would be entitled to confront witnesses that testified for the prosecution, present witnesses in a penalty phase (if there was one), and that the prosecution would have to prove to the three-judge panel that he was guilty beyond a reasonable doubt of the aggravated murders and specifications. Fitzpatrick said he understood the court's explanations, had consulted with his counsel, was satisfied with his counsel's work, and wished to plead guilty. The court then allowed him to withdraw his earlier plea and enter a plea of guilty to all counts and specifications in the indictment.

The state then presented evidence, as required by R.C. 2945.06 ("If the accused pleads guilty of aggravated murder, a court composed of three judges shall examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly"). See *State v. Green* (1998), 81 Ohio St.3d 100, 1998 Ohio 454, 689 N.E.2d 556. Witnesses included Detective Dilbert, Sergeant Sumler, Betty Rose, Montika Pitts, Marjorie Duff, and Dr. Robert Pfalzgraf, Chief Deputy Coroner of Hamilton County. Also testifying were Anthony Barner, who was Shenay Hayes's father, and Deputy Sheriff David Linder, an evidence technician.

The panel found Fitzpatrick guilty of all charges and specifications. The panel then held a mitigation hearing. The state reintroduced its evidence from the plea hearing. Fitzpatrick presented three witnesses and made an unsworn statement, and the state called one rebuttal witness. After the mitigation hearing, the panel sentenced Fitzpatrick

to death.

Fitzpatrick appealed from the judgment and sentence to this court as an appeal as of right.

*State v. Fitzpatrick*, 102 Ohio St. 3d 321, 321-325 (2004).

In his direct appeal to the Ohio Supreme Court, Fitzpatrick raised the following:

Proposition of Law No. 1

The conviction of capital murder and other offenses by a three judge panel following an invalid waiver of the Defendants [sic] right to trial by jury prejudicially violates the Defendant's Sixth Amendment right to trial by jury, his Fourteenth Amendment right to due process of law, and the death sentence imposed upon the Defendant violates the Defendant's Eighth Amendment right to be free from cruel and unusual punishment, requiring reversal of the convictions and sentences.

Proposition of Law No. 2

The convictions and sentences, including the death sentence, for multiple counts of aggravated murder, which convictions and sentences are based upon a guilty plea which was not knowing, intelligent and voluntary, violates the right of the Defendant to due process of law under the Fourteenth Amendment, and the right to be free from cruel and unusual punishment, secured to him by the Eighth Amendment, and similar rights guaranteed to the accused by Art. I, §§ 9 and 16 of the Ohio Constitution.

Proposition of Law No. 3

A death sentence for aggravated murder obtained through use of repetitive, cumulative, photographs of the corpses of the deceased, the net prejudicial effect of which far outweighed their probative value, must be reversed as violative of the Eighth Amendment prohibition against cruel and unusual punishment, and of the fundamental fairness required by the due process clause of the Fourteenth Amendment, as well as their counterparts in the Ohio Constitution.

Proposition of Law No. 4

Where the State fails to establish beyond a reasonable doubt that aggravation outweighs mitigation beyond a reasonable doubt, the death penalty is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.

Proposition of Law No. 5

Where one accused of capital murder has pleaded guilty to the charges and capital specifications, the introduction of gruesome photos of the corpses of the victims during the sentencing proceedings is irrelevant to the existence of the aggravating factor of a course of conduct involving multiple homicides, and the imposition of the death sentence by a trial court following admission of such evidence violates the right of the accused to due process of law under the Fourteenth Amendment, and to his right to be free from cruel and unusual punishment under the Eighth Amendment.

Proposition of Law No. 6

The Eighth Amendment requirement of reliability in capital sentencing is violated where the sentencing opinion of the trial court fails to state the reasons why aggravation outweighs mitigation, and relies upon the nature and circumstances of the offense as an aggravating circumstance, as well as other nonstatutory aggravating circumstances.

Proposition of Law No. 7

Section 2929.04(A)(9) of the Revised Code creates an unconstitutional aggravating circumstance, as it merely repeats an element of the underlying aggravated murder, and a death sentence based thereon violates the Defendant's right to due process under the Fourteenth Amendment, and to be free from cruel and unusual punishment under the Eighth Amendment, as well as Art. I, §§ 9 and 16.

Proposition of Law No. 8

Appellant Fitzpatrick was denied his right to a fair trial by an impartial jury in his capital case as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the trial court failed to excuse for cause jurors whose statements during voir dire indicated that they could not be fair and impartial.

Proposition of Law No. 9

Appellant Fitzpatrick's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the improper excusal of prospective jurors.

Proposition of Law No. 10

The trial court erred in failing to suppress Fitzpatrick's statement to the police and photograph identification by witness thus violating his rights under the Fifth Amendment of the United States Constitution, and Article One, Sections Ten and Fourteen of the Ohio Constitution.

Proposition of Law No. 11

The trial court erred in granting the State's motion in ordering blood, hair and saliva for DNA testing when there was insufficient evidence showing that these samples were actually needed.

Proposition of Law No. 12

The Ohio Death Penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

(Return of Writ, Doc. No. 26, Apx. Vol. 3 at 44.)

After reviewing the merits of Fitzpatrick's propositions of law, re-weighing the

aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the Ohio Supreme Court affirmed the death sentence. *State v. Fitzpatrick*, 102 Ohio St. 3d 321 (Ohio 2004). Fitzpatrick sought review by *certiorari* in the United States Supreme Court, which declined to consider the case. *Fitzpatrick v. Ohio*, 545 U.S. 1436 (2005).

Fitzpatrick then filed an application to reopen his Ohio Supreme Court appeal under Ohio Supreme Court Practice Rule XI § 5(A) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992), ineffective assistance of appellate counsel. (Return of Writ, Doc. No. 26, Apx. Vol. 3 at 327.) The application was denied on February 16, 2005. *State v. Fitzpatrick*, 105 Ohio St. 3d 1436 (2005).

On November 22, 2002, Fitzpatrick filed his Petition for Post-Conviction Relief under Ohio Revised Code § 2953.21 in the Hamilton County Court of Common Pleas, pleading the following causes of action:

> First Ground for Relief
>
> Petitioner Fitzpatrick's convictions and sentences are void and/or voidable due to the trial court allowing excessive security measures to be used throughout Petitioner's trial, thus violating his right to a fair and impartial trial, due process, the presumption of innocence, and the right to counsel. U.S. Const. Amends. V, VI, VIII, IX, and XIV; Ohio Const. Art. I, §§ 1, 2,5, 9, 10, 16, and 20; Holbrook v. Flynn, 475 U.S. 560 (1986).
>
> Second Ground for Relief
>
> Petitioner's convictions and sentences are void and/or voidable because the trial court failed to conduct a competency hearing regarding Petitioner's competence to waive his Sixth Amendment constitutional right to a speedy trial thus failing to ensure that his waiver was knowing, intelligent and voluntary.

Third Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the trial court failed to conduct a competency hearing concerning Petitioner's waiver of his Sixth Amendment right to a trial by jury. The colloquy conducted by the trial court was insufficient to guarantee that Petitioner made a knowing, intelligent and voluntary waiver of that right. As such, Petitioner's constitutional rights were denied, and he was thereby prejudiced.


Fourth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because the trial court failed to order a competency hearing and allowed Petitioner to plead guilty when Petitioner was exhibiting unusual behavior and was under influence of a combination of prescribed medicines, including psychotropic medications. As such, Petitioner's constitutional rights were denied and he was thereby prejudiced.


Fifth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because he was denied effective assistance of counsel at his capital trial. Petitioner's counsel failed to reasonably investigate Petitioner's competence to waive his Sixth Amendment constitutional right to a speedy trial and failed to request a competency hearing when Petitioner waived that right in order [sic] ensure that his waiver was knowing, voluntary and intelligent. Drope v. Missouri, 420 U.S. 162 (1975); State v. Were, 94 Ohio St. 3d 173 (2002). Counsel allowed the waiver although they were aware that Petitioner was exhibiting psychological problems. As a result, Petitioner was deprived of the effective assistance of counsel, and was thereby prejudiced by his counsel's errors. U.S. Const., amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I §§ 1, 2,5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

Sixth Ground for Relief

Petitioner's sentences are void and/or voidable because he was denied the effective assistance of counsel at his capital trial [when

trial counsel permitted Petitioner to appear in restraints] in violation of his rights as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20. Strickland v. Washington, 486 U.S. 668 (1984).

## Seventh Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because he was denied the effective assistance of counsel at his capital trial. Petitioner's counsel failed to ensure that his waiver of his constitutional right to be tried by a jury at his capital trial was knowing, voluntary and intelligent. State v. Otte, No. 76726, 2002 WL 69139 (Cuyahoga Ct. App. Jan. 25, 2001). Counsel allowed the waiver although counsel was aware Petitioner was exhibiting unusual behavior and was under the influence of a combination of prescribed medications. As a result, Petitioner was deprived of the effective assistance of counsel and was thereby prejudiced by his counsel's errors. U.S. Const. amends V, VI, VIII, IX, and XIV; Ohio Const. art I §§ 1, 2,5,9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984)..

## Eighth Ground for Relief

Petitioner's convictions and sentences are void and/or voidable because he was denied the effective assistance of counsel at his capital trial. Petitioner's counsel failed to reasonably investigate his competence to proceed at trial and failed to request a competency hearing when Petitioner sought to plead guilty in order to ensure that his plea was knowing, voluntary and intelligent. Drope v. Missouri, 420 U.S. 162 (1975); Dusky v. United States, 362 U.S. 402 (1960); State v. Otte, No. 76726, 2002 WL 69139 (Cuyahoga Ct. App. Jan. 25, 2001). Counsel allowed the plea although counsel was aware that Petitioner was exhibiting unusual behavior and was under the influence of a combination of prescribed medicines, including psychotropic medications. As a result Petitioner was deprived of the effective assistance of counsel and was thereby prejudiced by his counsel's errors. U.S. Const. amends., V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2,5,9,10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

## Ninth Ground for Relief

Petitioner Fitzpatrick's convictions and/or sentences are void and/or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial due to counsel's failure to investigate and present mitigating evidence. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 466 U.S. 668 (1984).

Tenth Ground for Relief

Petitioner's sentences are void and/or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial due to counsel's failure to investigate and present mitigating evidence. As a result, Petitioner was prejudiced. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9,10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

Eleventh Ground for Relief

Petitioner's death sentences are void and/or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial due to counsel's failure to obtain and utilize the expert services of a mitigation specialist. As a result, Petitioner was prejudiced. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art I. [sic] §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

Twelfth Ground for Relief

Petitioner Fitzpatrick's sentences are void and/or voidable because he was denied effective assistance of counsel at the penalty phase of his trial due to his counsel's failure to utilize an addictions expert. Petitioner was prejudiced as a result. U.S. Const. amends V, VI, VIII, IX and XIV; Ohio Const. art I, §§ 1, 2, 5,9,10, 16, 20, and 39; Strickland v. Washington, 466 U.S. 668 (1984); Ake v. Oklahoma, 470 U.S. 68 (1985); C.P. Sup. R. 20 (IV)(D);O.R.C. § 2929.024.

Thirteenth Ground for Relief

The judgment and sentence against Stanley Fitzpatrick are void and/or voidable because the death penalty as administered by lethal

injection violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law. U.S. Const. amends. V, VIII, IX, XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, 20; <u>Ohio Adult Parole Authority v. Woodard</u>, 523 U.S. 272 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in the capital cases).

Fourteenth Ground for Relief

Petitioner Fitzpatrick's judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the constitution. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2,5,9,10, 16, and 20.

Fifteenth Ground for Relief

Petitioner Fitzpatrick's judgment and sentence are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in his Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as resented in grounds for relief one through fourteen have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the United States and Ohio Constitutions.

(Return of Writ, Doc. No. 26, Apx. Vol. 4 at 45.)

The Court of Common Pleas for Hamilton County found that Fitzpatrick was not entitled to relief on any of his claims and denied the petition for post-conviction relief. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V at 338.) Fitzpatrick filed a notice of appeal with the Court of Appeals from the denial of post-conviction relief on October 30, 2003. (Return of Writ, Doc. No. 26, Apx. Vol. 6 at 3.) On appeal he raised the following:

Assignment of Error No. I

The trial court erred in dismissing Appellant's grounds for relief in the postconviction petition when he presented sufficient operative

facts and supporting evidentiary material to merit discovery and an evidentiary hearing.

Assignment of Error No. II

The trial court erred when it denied Petitioner's post-conviction petitioner without first affording him the opportunity to conduct discovery.

Assignment of Error No. III

The trial court erred when it overruled Appellant's two motions for funds to employ experts.

Assignment of Error No. IV

The cumulative error of Appellant's substantive claims merit reversal or remand for a proper postconviction process.

(Return of Writ, Doc. No. 26, Apx. Vol. 6 at 59.)

The court of appeals affirmed the decision of the court of common pleas. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 (Ohio App. 1st Dist. 2004). He then appealed to the Ohio Supreme Court which declined to review the judgment of the lower courts. *State v. Fitzpatrick*, 105 Ohio St. 3d 1499 (2005).

**Proceedings in this Court**

Fitzpatrick filed his Notice of Intention to seek habeas relief in this Court on July 26, 2005, and followed with the Petition on June 9, 2006 (Doc. No. 17). He filed an Amended Petition on June 23, 2006 (Doc. No. 22). Fitzpatrick pleads ten grounds for relief as follows:

**First Ground for Relief**

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Guilty Plea despite overwhelming documentation and information making it impossible for the Trial Court to constitutionally find that Mr. Fitzpatrick was competent and capable to enter a knowing, voluntary or intelligent Guilty Plea. Const. Amends. V, VI, VIII and XIV.

**Second Ground for Relief**

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Jury Waiver despite overwhelming documentation and information making it impossible for the Trial Court to have constitutionally found that Mr. Fitzpatrick was competent and capable of entering into a knowing, voluntary or intelligent Jury Waiver. Const. Amends. V, VI, VIII and XIV.

**Third Ground for Relief**

The excessive security measures used throughout Mr. Fitzpatrick's Trial violated his right to a fair and impartial trial, due process, the presumption of innocence, and the right to Trial Counsel. U.S. Const. Amends. V, VI, VIII, IX, and XIV.

**Fourth Ground for Relief**

The errors and omissions of Trial Counsel at Guilt Phase violated Mr. Mr. [sic] Fitzpatrick's constitutional right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

**Fifth Ground for Relief**

The errors and omissions of Trial Counsel during the Penalty Phase of Trial Violated Mr. Fitzpatrick's right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

**Sixth Ground for Relief**

The Trial Court's failure to conduct a competency hearing concerning Mr. Fitzpatrick's waiver of his Sixth Amendment right to Trial by Jury, his Guilty Plea, and his waiver of his Sixth Amendment right to a Speedy Trial deprived Mr. Fitzpatrick of his constitutional rights. Const. Amends. V, VI, VIII, and XIV.

### Seventh Ground for Relief

The trial court's acceptance of Mr. Fitzpatrick's partial waiver of mitigation without ensuring that it was made knowingly, intelligently, and voluntarily and that Mr. Fitzpatrick was competent to waive that right violated his constitutional rights. Const. Amends. V, VI, VIII, XIV

### Eighth Ground for Relief

The trial court's erroneous weighing of aggravating circumstances against the mitigating factors and consideration of the nature and circumstances of the offense as an aggravating circumstance deprived Mr. Fitzpatrick of his right to due process and a fair sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### Ninth Ground for Relief

Ohio Rev. Code § 2929.04(A)(9) as an aggravating circumstance to Ohio Rev. Code § 2903.01 C) is unconstitutional as it repeats an element of the underlying aggravated murder. U.S. Const. Amend. VIII, XIV.

### Tenth Ground for Relief

Execution by lethal injection violates Petitioner's constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law.

(Amended Petition "Petition," Doc. No. 22.)

Respondent filed a Return of Writ on September 1, 2006, (Doc. No. 26) and Petitioner

filed a Traverse on November 6, 2006. (Doc. No. 30.)

Discovery was granted an evidentiary hearing on the fourth and fifth grounds for relief which was held before this Court on October 29-30, 2007. (Decision and Order Granting Petitioner's Motion for Discovery, Doc. No. 41);(Decision and Order Granting in Part and Denying in Part Petitioner's Motion for Evidentiary Hearing, Doc. No. 49);(Decision and Order on Reconsideration of Petitioner's Motions to Expand the Record and For An Evidentiary Hearing, Doc. No. 51); (Evid Hrg. Trial Tr. 10/29/07, Doc. No. 75); (Evid Hrg. Trial Tr. 10/30/07, Doc. No. 76.)  The parties then briefed the merits. (Brief Regarding Order on Motion for Extension of Time [sic], Doc. No. 80); (Brief by Respondent, Doc. No. 82); (Reply to Respondent's Answer to Post Hearing Brief, Doc. No. 83.)

**Standard of Review and Generally Applicable Law**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed and took effect on April 24, 1996.  Fitzpatrick filed his petition on June 9, 2006 (Doc. No. 17).  As Fitzpatrick's petition was submitted after the Act was signed it is subject to its provisions.  28 U.S.C. § 2254(d) as amended by the AEDPA, provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim-

        (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

        (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Any factual finding made by the state court is presumed to be correct and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). A state court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court applies a rule that contradicts the governing law as set forth by the Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nonetheless arrives at a result different from Supreme Court precedent. *Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from the Supreme Court] but unreasonably applies it to the facts of the particular state prisoner's case," "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new

context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407-08.

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the petitioner is "actually innocent." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). To meet the "actual innocence" standard, the petitioner must demonstrate that "it is more likely than not that no reasonable fact finder would have found petitioner guilty beyond a reasonable doubt" or "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Schlup v. Delo*, 513 U.S. 298 (1995)(articulating the necessary standard to prove actual innocence of the crime in which the petitioner was convicted); *Sawyer v. Whitley*, 505 U.S. 333, 336, 350 (1992)(setting forth standard which applies the *Schlup* "actual innocence" standard to the sentencing phase of the trial.)

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977). *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainright v. Sykes*, 433 U.S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998) *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

. . . .

> Second, the court must decide whether the state courts actually enforced the state procedural sanction, *citing County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,*785 F.2d at 138.

The general governing standard for effective assistance of counsel is found in *Strickland*

*v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential.
> . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and

> to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

> As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694; *see also Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally* Annotation, 26 ALR Fed 218.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988). Counsel must be appointed on appeal of right for indigent criminal defendants. *Douglas v. California*, 372 U.S. 353 (1963); *Anders v. California*, 386 U.S. 738 (1967); *United States v. Cronic,* 466 U.S. 648 (1984). The right to counsel is limited to the first appeal as of right. *Ross v. Moffitt*, 417 U.S. 600 (1974); *Lopez v. Wilson*, 426 F.3d 339 (6th Cir. 2005). The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key

issues").  Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986).  However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland,* 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002).  "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

> In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), the court wrote that ... the following considerations ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.
> (1) Were the omitted issues 'significant and obvious'?
> (2) Was there arguably contrary authority on the omitted issues?
> (3) Were the omitted issues clearly stronger than those presented?
> (4) Were the omitted issues objected to at trial?
> (5) Were the trial court's rulings subject to deference on appeal?
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> (7) What was appellate counsel's level of experience and expertise?
> (8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Manifestly, this list is not exhaustive, and neither must it produce a correct "score"; we offer these inquiries merely as matters to be considered.

171 F.3d at 427-28 (6th Cir. 1999)(citations omitted).

## Analysis

### First Ground for Relief

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Guilty Plea despite overwhelming documentation and information making it impossible for the Trial Court to constitutionally find that Mr. Fitzpatrick was competent and capable to enter a knowing, voluntary or intelligent Guilty Plea. Const. Amends. V, VI, VIII and XIV.

1.      Trial Court Accepted Mr. Fitzpatrick's Guilty Plea At A Time Mr. Fitzpatrick Suffered From Hallucinations, Delusions, Paranoia And Related Psychiatric Problems.

2. At The Time The Trial Court Accepted Mr. Fitzpatrick's Guilty Plea, It Chose To Ignore Ready Access To Hamilton County Justice Center Records On Mr. Fitzpatrick That Paralleled That Of A Mental Institution's

3. The Trial Court Accepted Mr. Fitzpatrick's Guilty Plea As One Of Many In A Pattern Of Instances In Which Trial Counsel And The Trial Court Chose To Prioritize Securing As Many Waivers From Mr. Fitzpatrick Over Mr. Fitzpatrick's Severe Confusion And Compromised Psychiatric State
   A. Speedy Trial Waiver Over Mr. Fitzpatrick's Concession That He Did Not Understand The Matter Before Him

   B. Challenging Prosecution's Suggestion And Recommendation That Trial Counsel File A Competency Motion

   C. Accepting Mr. Fitzpatrick's Jury Waiver Without regard For Mr. Fitzpatrick's Severe Mental Confusion And Distress

   D. Securing Mr. Fitzpatrick's Guilty Plea In Outcome Determinative Fashion

In this ground for relief Petitioner asserts trial court error in its failure to conduct a competency hearing prior to accepting his guilty plea in order to determine if his plea was made knowingly, intelligently, and voluntarily.[1]  Respondent counters by stating that only portions of this claim were raised on appeal. (Return of Writ, Doc. No. 26 at 23.)  Fitzpatrick challenged on direct appeal that his guilty plea was not knowing, voluntary, or intelligent; he did not however, raise the argument that he was incompetent. *Id.*; *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 326-330 (2004).  However, Fitzpatrick did raise this claim in terms of competence on post-conviction relief. (Return of Writ, Doc. No. 26 at 24.)  The court found that the claim had been raised on direct appeal and was now barred by *res judicata*. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V at 341.)  This finding was erroneous as Fitzpatrick did

---

[1] The Court notes, however, that in the Petitioner's Third Ground for Relief, he argues the opposite in that, "[a]fter opening statements, Mr. Fitzpatrick decided to plead guilty, a constitutional right that the trial court tried to prohibit Mr. Fitzpatrick from exercising." (Traverse, Doc. No. 30 at 60.)

not raise a claim alleging trial court's error in its failure to have a competency hearing to determine if he was able to plead guilty. He merely claimed that for various reasons his plea was not knowing, intelligent, or voluntary. Fitzpatrick then raised the claim on his appeal his post-conviction relief proceedings to the First Appellate Court of Ohio. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at **26-31(Ohio App. 1st Dist. 2004). Again the court found the claim to have been barred by *res judicata* and stated:

> Fitzpatrick submitted in support of his postconviction claims outside evidence in the form of visitor logs from the Hamilton County Justice Center, his medical records while incarcerated there, and the affidavit of his capital-litigation expert. Fitzpatrick offered the visitor and medical records to show that, following the proceeding in which he had waived his speedy-trial right, he had asked to see a psychiatrist; that he had subsequently been prescribed medicine, the types and dosages of which had been continuously adjusted throughout the proceedings leading to his jury waiver and pleas; and that the psychiatrists upon which counsel had relied in concluding that he was competent to waive a jury trial and to plead guilty had not based their opinions of his mental state on current clinical assessments. This evidence, he asserted, coupled with the evidence of record, his competency to waive his speedy-trial and jury rights and to enter guilty pleas. Thus, he contended, counsel had incurred a duty to request, and the court had incurred a duty to conduct, a hearing into the matter.

> Again, this outside evidence did not preclude application of the doctrine of res judicata to bar the challenges presented in Fitzpatrick's second, third, and fourth claims. The visitor and medical records were available to the defense at the time of Fitzpatrick's trial, and the attorney's affidavit was essentially a "notarized argument" that could have been made at trial or on appeal. Thus, Fitzpatrick could have presented at trial or on appeal a challenge to the trial court's failure to conduct a competency hearing to determine the knowing, intelligent, and voluntary nature of his speedy-trial and jury waivers and his guilty pleas. We, therefore, hold that his second, third, and, fourth claims were subject to dismissal under the doctrine of res judicata.

*Id*. at **29-31.

Ohio's *res judicata* rule, as enunciated in *State v. Perry,* 10 Ohio St. 2d 175, 226 N.E. 2d 104 (1967), has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule. *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994); *Van Hook v. Anderson*, 127 F. Supp. 2d 899 (S.D. Ohio 2001). Applying the *Maupin* analysis, the Court concludes that Fitzpatrick failed to raise this claim with regard to trial court error for failing to determine if he was competent to plead, at the appropriate time under the Ohio *res judicata* doctrine. This failure was held against him by the Ohio courts, and that the Ohio *res judicata* rule is an adequate and independent state ground of decision.

Petitioner attempts to argue cause and prejudice to overcome this default. (Traverse, Doc. No. 30 at 53.) As cause he argues ineffective assistance of trial and appellate counsel. *Id*. Attorney error amounting to ineffective assistance of counsel does constitute cause. *Murray v. Carrier,* 477 U.S. 478, 488 (1985); *Howard v. Bouchard,* 405 F.3d 459, 478 (6th Cir. 2005); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999); *Gravley v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996). However, the same case holds that the exhaustion doctrine "generally requires that a claim of ineffective assistance of counsel be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default in federal habeas proceedings." 477 U.S. at 489; *Ewing v. McMackin,* 799 F.2d 1143, 1149-50 (6th Cir. 1986). The ineffective assistance claim cannot be presented as cause if it also was procedurally defaulted in the state courts, unless one of the standard excuses for procedural default exists, to wit, actual innocence or cause and prejudice. *Edwards v. Carpenter,* 529 U.S. 446 (2000)*, overruling Carpenter v. Mohr*, C-2-96-447 (S.D. Ohio 1997), aff'd., 163 F.3d 938 (6th Cir. 1998). Because claims of

ineffective assistance of appellate counsel are based on a different legal theory from the underlying claims, a 26(B) application or a parallel application in the Ohio Supreme Court, does not preserve the underlying claims from default. *Garner v. Mitchell,* 502 F.3d 394 (6th Cir. 2007), *citing White v. Mitchell,* 431 F.3d 517, 526 (6th Cir. 2005); *Bailey v. Nagle,* 172 F.3d 1299, 1309 n. 8 (11th Cir. 1999); and *Levasseur v. Pepe*, 70 F.3d 187, 191-92 (1st Cir. 1995). The state courts found Petitioner's ineffective assistance of trial counsel claims to be barred by *res judicata* and they are procedurally defaulted. *See infra* Fourth Ground for Relief at 62; *see infra* Fifth Ground for Relief at 79. The state courts dismissed Petitioner's ineffective assistance of appellate counsel motion on the merits. However, he does not allege ineffective assistance of appellate counsel as an independent claim on habeas review. The Court looks to the last state court disposition providing reasons for the decision. *Couch v. Jabe,* 951 F.2d 94, 96 (6th Cir. 1991); *Harris v. Reed,* 489 U.S. 255 (1989). The state court found his ineffective assistance of appellate counsel claim to be without merit and this Court will not re-evaluate the claim as it has not been presented for our review. As the claim is not now before us, it cannot serve as cause to excuse the underlying procedural default.

In the alternative, this Court turns to the merits. Many of Petitioner's trial ineffective assistance of trial counsel and trial court error claims hinge on his competency. For the ease of the Court in addressing portions of Petitioner's First, Second, Fourth, Fifth, Sixth, and Seventh Grounds for Relief, the standard of competency will be addressed here. Additional facts particular to a certain claim will further be addressed in that ground for relief.

"As a by product of the ban against trials *in absentia*;[sic] the mentally incompetent defendant, though physically present in the courtroom, is in reality afforded no opportunity to

defend himself." *Drope v. Missouri*, 420 U.S. 162, 171 (1975) *quoting* Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832, 834 (1960). For this reason the Supreme Court has set forth the standard for determining whether or not a defendant is competent as whether he or she "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - - and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. 162, 172 (1975). Furthermore, even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused incompetent. *Drope*, 420 U.S. at 181. *Godinez v. Moran* extended the standard for competence to stand trial to competence to plead guilty or to waive the right to assistance of counsel. 509 U.S. 389 (1993).

A determination of competence is a factual finding, to which the habeas court must defer, absent clear and convincing evidence to the contrary. *Thompson v. Keohane*, 516 U.S. 99, 110-111(1995); *State v. Stanley*, 121 Ohio App. 3d 673 (1997)(court may include its own observations in evaluating competency.) Furthermore, a competency determination is necessary only when a court has reason to doubt the defendant's competence. *Godinez v. Moran*, 509 U.S. 389 (1993); *Drope*, 420 U.S. at 180-181; *Pate v. Robinson*, 383 U.S. 375, 385 (1966). The Supreme Court has not prescribed a general standard with respect to the nature or quantum of evidence necessary to require resort to such hearing. However, in determining whether there was a "*bona fide doubt*" as to competence and need for further inquiry, the *Pate* court looked at evidence of defendant's irrational behavior, his demeanor at trial, counsel's opinion, and any prior medical opinion on competence to stand trial as all being relevant factors. *Pate v.*

*Robinson*, 383 U.S. 375 (1966); *Drope*, 420 U.S. at 180.

As with the Illinois and Missouri courts in *Pate* and *Drope*, Ohio sets forth a statutory scheme to protect the right to a fair trial. Ohio Revised Code § 2945.37(G) states that "[a] defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial . . . ." Furthermore, Ohio Revised Code § 2945.37(B) sets forth that "in a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial,"[2] and O.R.C. § 2945.371 sets forth who may perform evaluations, the time frame, what information must be included in a written report, and possible findings or recommendations.

In waiving rights, once competency has been established, the Court must also consider that "[a] plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'" *Bousley v. United States*, 523 U.S. 614, 618 (1998); *Godinez v. Moran*, 509 U.S. 389, 400 (1993) [3] *citing Parke v. Raley*, 506 U.S. 20, 28-29 (1992). A plea is voluntary if the accused understands the nature of the charges against him and the constitutional protections that

---

[2] Rest of section states, "If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion."

[3] *Godinez v. Moran*, 509 U.S. 389 at ftn 12 (differentiating that competency is an inquiry into the defendant's mental capacity, whether or not he has the ability to understand the proceedings, whereas the "knowing and voluntary" inquiry is used to determine if the defendant actually *does* understand the significance and consequence of a particular decision and whether that decision is made freely or under coercion.) *Citing Drope v. Missouri*, 420 U.S. at 171; *Faretta v. California*, 422 U.S. 806, 835 (1975).

he is waiving. *Henderson v. Morgan*, 426 U.S. 637 (1976). A plea is knowing and intelligent if it is done "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

At the onset of this case, defense counsel informed the trial court that Fitzpatrick's competency might be at issue. There was evidence that he was suffering from both auditory and visual hallucinations which included a conversation with the devil and may have been suffering from anxiety, depression, paranoia, and mental confusion.[4] (Petition, Doc. No. 22 at 25-26.) Defense counsel requested a pre-trial conference to present the testimony of Sgt. Thomas Boeing, who had been informed by Marvin Thomas, cousin of Fitzpatrick, that Fitzpatrick told him [Marvin Thomas] that he "had [done] some crack with the devil . . . . devil sat across the table from him and said, I'm just as real as God." [5] (Petition, Doc. No. 22 at 29); (Trial Tr. Vol. 3 at 33-38.) He also stated, however, that the officers that conducted the post-arrest interview of Fitzpatrick indicated that he seemed capable of making intelligent decisions, was aware of what was going on, and after having been *Mirandized* he invoked his right to counsel. (Trial Tr. Vol. 3 at 37-38.) Additionally, it is noted that based on his own personal contact with Petitioner, Sgt.

---

[4] Petitioner makes the argument that Hamilton County Sheriff's Department determined that Fitzpatrick's mental state was questionable and as such, forced him to appear at all proceedings in a stun belt. There is no citation in the Petition as to where in the record that is stated. The determination to have Petitioner wear a stun belt may have been the direct result of his outbursts and threats in the courtroom.

[5] The Court notes that throughout his Petition Petitioner characterizes this pre-trial conference and witness as having been convened by the State out of concern for Fitzpatrick's competency to stand trial, " . . . . the Prosecutor requested that Trial Counsel and the Trial Court convene to consider Mr. Fitzpatrick's competency to stand Trial . . .(Tr. 34.)" and "[t]he Prosecutor then presented to Trial Counsel and the Trial Court a witness to testify regarding Mr. Fitzpatrick's statements that he was forced by the devil to do crack cocaine and was very depressed (Tr. 39.)" (Petition, Doc. No. 22 at 29, 38, 49-50). This is an inaccurate characterization. It was **defense counsel** that filed a motion for a pre-trial conference on this matter for the purpose of securing testimony from Sgt. Boeing as it related to the possibility of incompetency being filed. (Trial Tr. Vol. 3 at 31-34); (Return of Writ, Doc. No. 26, Apx. Vol. 1 at 46, 48-52); (Evid. Hrg Trial Tr. 10/29/07, Doc. No. 75 at 133-135); (Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 12-13.)

Boeing did not have concerns as to incompetency but rather noted that Fitzpatrick looked tired and depressed, which was not unusual given the situation. *Id*. at 39-40.

Defense counsel also requested court funds for an expert in the field of mental heath, specifically Dr. Cooper, citing their need for assistance in evaluating Fitzpatrick. (Trial Tr. Vol 4 at 73-74);(Return of Writ, Doc. No. 26, Apx. Vol. 2 at 102-108.)  The funds were granted and the trial court ordered that Dr. Cooper's examination should include a conclusion as to "the present mental condition of the defendant." (Return of Writ, Doc. No. 26, Apx. Vol. 2 at 116-118.)  After having spoke with their experts and reviewing past records, defense counsel did not feel that competency was an issue, specifically telling the trial court:

> The Court and I just had a discussion this morning regarding his competency.  I have indicated to the Court I don't have any indicia that he's incompetent at this time.  That's based on conversations I have had with Dr. Emmett Cooper, as of approximately 9:30 last night.  Also, conversations I have had with Dr. Hawkins, and also reviewing medical records from Dr. Dunsieth and Dr. Newton, who are all psychiatrists.
>
> In addition, I have had discussions with Dr. Bob Tureen, who is a psychologist.  And, again, I see nothing at this point which is an indicia of competency.  So I cannot stand before the Court and suggest that he's incompetent.

(Trial Tr. Vol. 10 at 903-904.)  Prior medical opinions are one of the relevant factors to be considered in determining whether there is need for further inquiry into the competence of a defendant. *Drope*, 420 U.S. at 180 (1975).

Another factor that can be considered is the opinion of counsel.  "Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, an expressed doubt in that regard by one with "the closest contact with the defendant" is unquestionably a factor which should be taken into account." *Drope v.*

*Missouri*, 420 U.S. 162, ftn 13 (1975), *citing United v. States ex rel. Rizzi v. Follette*, 367 F.2d 559, 561 (2nd Cir. 1966). Mr. Cutcher represented to the trial court that he had known defendant for the past eight months and it was his opinion that defendant was able to fully understand the proceedings and waive his rights. (Trial Tr. Vol 12 at 980-981.) This was in addition to trial counsels' other representations to the court that they felt Fitzpatrick was competent. (Trial Tr. Vol 10 at 881-882, 884-886, 903-904). Furthermore, the trial court specifically asked the State if they felt Fitzpatrick was incompetent and wanted a court evaluation. They responded that based on representations from the Sheriff's Department, who had custody of Fitzpatrick, that they had no evidence of incompetency and would not contest the matter and request a hearing.[6] (Trial Tr. Vol. 10 at 906.)

It is undisputed that Petitioner was on a variety of medications, including both anti-anxiety and anti-psychotic, at the time of trial. It has been held, however, that the mere fact a defendant is on medication does not make him incompetent or invalidate his waiver of rights *per se*. *Otte v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *58, ftn. 9 (N. D. Ohio 2008)(addressing claim that trial court failed to inquire whether or not Otte was on medication at the time of his jury waiver); *Filiggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006); *Godinez v. Moran*, 509 U.S. 389 (1993); *See also*, O.R.C. § 2945.37(F)(stating that the court shall not find a defendant incompetent to stand trial solely because the defendant is receiving or has received treatment as a voluntary or involuntary mentally ill patient under Chapter 5122 or a voluntary or involuntary mentally retarded resident under Chapter 5123 of the Revised Code or because the defendant is receiving

---

[6] This is contrary to Petitioner's proposition in his Petition that "the Prosecutor effectively recommended for Trial Counsel to move forward on a competency motion for Mr. Fitzpatrick" and that "trial counsel, in response, disregarded the Prosecutor's concern for Mr. Fitzpatrick's mental competency." (Petition, Doc. No. 22 at 29.)

or has received psychotropic drugs or other medication, even if the defendant might become incompetent to stand trial without drugs or medication.)  This factor without additional evidence, and for the reasons set forth below, does not suffice to show that Petitioner was incompetent.

It should also be noted at this point that the trial judges were in a position to witness Fitzpatrick's behavior and demeanor throughout his trial.  The record reflects that Fitzpatrick had outbursts during a portion of the trial and then requested to be absent from the proceedings. Petitioner argues that this is evidence of irrational behavior and should be taken into account. However, the record does not reflect whether these outbursts appeared to be the product of frustration at his situation or a result of irrational behavior due to incompetency.  A determination of competence is a factual finding, to which deference must be paid. *Thompson v. Keohane*, 516 U.S. 99, 110-111(1995); *State v. Stanley*, 121 Ohio App. 3d 673 (1997)(court may include its own observations in evaluating competency.)

The Court turns to the claim before us, whether the trial court erred in accepting Fitzpatrick's guilty plea as it was not competent, knowing, intelligent, or voluntary.  As discussed above, the trial court had many factors before it to consider whether competency was at issue and a hearing was necessary, including: the judge's ability to assess first hand the behavior and demeanor of the defendant, representations made by counsel, and medical opinions. Fitzpatrick has not presented clear and convincing evidence that he was not competent, in that he had sufficient ability to consult with counsel with a reasonable degree of rational understanding - - and had a rational and factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. 162, 172 (1975).

Furthermore, Fitzpatrick's guilty plea was made knowingly, intelligently, and

voluntarily. Before accepting Fitzpatrick's guilty plea, the panel of judges extensively questioned him in an attempt to explain thoroughly the charges against him, the possible sentences, and the rights he would waive by entering a guilty plea and to determine if his waiver was valid in that it was competent, knowing, and voluntary. *Pate v. Robinson*, 383 U.S. 375 (1966); *Boykin v. Alabama*, 395 U.S. 238 (1969); *Godinez v. Moran*, 509 U.S. 389, 400 (1993). The judge began by reminding Fitzpatrick the serious nature of pleading guilty, trying to ensure that he understood the nature of his plea and informing him that, "[i]f you don't understand something sir, please feel free to stop me, ask myself or the judges as a whole, a question. If you have any questions of your attorney you can certainly do that at any time. You understand that?" (Trial Tr. Vol. 12 at 952.)

The trial judge asked Fitzpatrick to confirm his age, his level of education, and whether or not he could read. Petitioner responded that he was a high school graduate and was literate. (Trial Tr. Vol. 12 at 962.) The judge also asked if Fitzpatrick had received a copy of the indictment, had a chance to look it over and discuss it with his attorneys. *Id*. at 952-953. Fitzpatrick responded affirmatively and indicated that he understood the charges against him. *Id*. The court then went through each count and specification to ensure that Fitzpatrick did in fact understand what he was being charged with and to give him the opportunity to raise any questions or ask for clarification. *Id*. at 954-958. Fitzpatrick indicated that this plea was being made by his own free will. No threats or promises had been made to him in an attempt to get him to plead and that he understood that by pleading guilty he would make a complete admission of guilt. *Id*. at 953-954, 965. The court then explained the possible range of sentencing. Again, Petitioner indicated that he understood the information. *Id*. at 958-962. Petitioner further

indicated that he had read and gone over with his attorneys the Plea of Guilty document, that it was his signature on the document, and that he was not under force or duress when he signed it, but that it had been signed voluntarily. *Id*. at 963-964.

Judge Dinkelacker went on to explain to Petitioner his constitutional rights and what he would be forfeiting if he pled guilty. These rights included the right to have a jury trial on the guilt or innocence phase, right to confront witnesses and cross-examine, right to subpoena witnesses on his own behalf, right to make the State prove guilt beyond a reasonable doubt with the understanding that a panel of judges still must find guilt beyond a reasonable doubt and that if there is a second phase then the burden is still on the State to prove that the aggravating circumstances outweigh the mitigating factors. *Id*. at 967-970, 972, 973, 974. When Petitioner was asked if he understood each and every one of these rights, he responded yes. *Id*. Finally the court asked Fitzpatrick if he had consulted with his attorneys about his decision to plead guilty, he responded that he had and that he was satisfied with the work they had done in his case. *Id*. at 978-979.

Next Petitioner attempts to show that the medication had an effect on his ability to waive his constitutional rights. (Traverse, Doc. No. 30 at 30-34.) It is undisputed that Petitioner was on a variety of medications, including both anti-anxiety and anti-psychotic, at the time of trial. This alone, however, is not enough to invalidate his waiver of his rights. *Otte. v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *58, ftn. 9 (N.D. Ohio 2008); *Filiggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006); *Godinez v. Moran*, 509 U.S. 389 (1993); O.R.C. § 2945.37(F). The three judge panel considered the prescription medication and questioned Fitzpatrick on its effects on his decision to plead guilty prior to accepting his plea. The discussion was as follows:

Judge Dinkelacker: All right, sir, I know we've talked about this a little bit before, but for the record, have you taken any type of medication while you've been over in the Justice Center?

Defendant Fitzpatrick: I take medication from the time I get up until the time I go to sleep.

Judge Dinkelacker: I appreciate that, sir. I want to make sure that we have an understanding where you are.

Any of the medications that you take, sir, that caused you to not be able to understand what's going on here today?

Defendant Fitzpatrick: It stops me from hearing voices and seeing things.

Judge Dinkelacker: I'm sorry, I did not - -

Defendant Fitzpatrick: Stops me from hearing voices and seeing things.

Judge Helmick: Stops- -

Judge Dinkelacker: Stops you. All right. So the medication, what you're telling us, is good for you. It helps you. Is that correct?

Defendant Fitzpatrick: Yes

Judge Dinkelacker: Is there anything about the medicine that causes you to not be  - - to not be able to understand what's going here today?

Defendant Fitzpatrick: Yes.

Judge Dinkelacker: What is that?

Defendant Fitzpatrick: No. No.

Judge Dinkelacker: Okay. Why don't up [sic] take a second, step back, and Mr. Wenke, Mr. Cutcher, talk to him for a second if he has a question.

Mr. Wenke: I just had asked him a couple of questions as to whether or not the medicine was affecting his ability to understand things

today, and he said it was not. But, also, if there is any questions that he has for us, we could stop. I think he indicated he doesn't want to do that right now.

Judge Dinkelacker: Okay.

Mr. Wenke: So he does not have any questions.

Judge Dinkelacker: I appreciate that, Mr. Wenke. And if- - we want to make sure, okay, the medicine is not causing you to do something you don't want to do, and we want to make sure the medicine is helping you to understand as opposed to hurting you to understand. You understand where I'm coming from?

Defendant Fitzpatrick: Yes.

Judge Dinkelacker: Is that your understanding of what the medicine is doing for you? It's helping you, not hurting you?

Defendant Fitzpatrick: Yes.

Judge Dinkelacker: Anything about that medication, Mr. Fitzpatrick, that causes you to not - - not to be able to understand what's going on here today?

Defendant Fitzpatrick: No.

(Trial Tr. Vol. 12 at 975-978.) In considering the above exchange, there is no reason to believe

that Petitioner was not capable of making a knowing, intelligent, and voluntary waiver despite

the fact he was on prescription medication. There is nothing in the trial record to suggest

whether the drugs produced side effects in Fitzpatrick rendering him incompetent to waive his

rights, and if there were side effects, if they continued to affect his nervous system at the time of

trial or if he had developed a tolerance for them. Petitioner appeared to be alert and oriented to

person, time, and place during his proceedings.[7] He appeared to be thinking rationally and it is

---

[7] During the evidentiary hearing on the fourth and fifth grounds for relief, ineffective assistance of trial counsel, Dr. Cooper expressed concern that this combination of drugs in this large amount would cause severe drowsiness. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 77-80.) Dr. Dunsieth also testified that due to the combination of drugs there

not noted that he exhibited any symptoms or side effects outwardly (ie- drowsiness, motor disturbances, disoriented, etc.). The trial court asked Petitioner if the drugs were affecting him or his decision to waive jury trial. He told the panel of judges that the medication was not affecting his decision, and he did not cite to adverse side effects, but rather only mentioned its benefits. (Trial Tr. Vol. 12 at 975.) Furthermore, counsel opined that while Fitzpatrick was on prescription medication, in his opinion it did not seem to be affecting his client adversely. Petitioner has failed to meet his burden that the medication affected him. *Houk v. Otte*, 2008 U.S. Dist. LEXIS 10296 at *56 [8] citing *Filiaggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006); *see also Hoffman v. Jones*, 159 F. Supp. 2d 648 (E. D. Michigan 2001)(listing various factors a court can consider in determining whether or not medication is affecting a defendant's competency.) Finally, it is noted that the trial court was in a position to judge Fitzpatrick's demeanor during the exchange.

Next Petitioner asserts that the fact that the questions were outcome determinative in requiring only yes or no answers rendered the plea meaningless. (Petition, Doc. No. 22 at 31.) "There is no requirement that in order to rely on a defendant's answer in a guilty plea colloquy to conclude that a defendant pleaded guilty knowingly and voluntarily, those answers must be lengthy and all encompassing; a straightforward and simple "Yes, your Honor" is sufficient to bind a defendant to its consequences." *United States v. Walker*, 160 F.3d 1078, 1096 (6th Cir. 1998); *see also United States v. Gardner*, 417 F.3d 541, 544 (6th Cir. 2005); *Blackledge v.*

---

is a possibility that Fitzpatrick had been impaired. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 10.) Neither doctor testified however, as to whether or not Fitzpatrick experienced any of these side effects.

[8] Also stating that there is no constitutional requirement that a trial court inquire whether a defendant is taking prescribed medication at the time of his or her jury waiver. *Otte v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *footnote 9(N. D. Ohio 2008).

*Allison*, 431 U.S. 63, 73-74 (1977). Furthermore, during the exchange with Fitzpatrick, the Court specifically asked if he had any questions of his counsel or the court concerning this matter. Finally, it should be noted that the trial judge was in a position to better assess the credibility of the waiver, whether or not Fitzpatrick seemed competent throughout the proceedings and this particular exchange. Based on the evidence before us, the manner in which the colloquy was conducted was sufficient to establish a knowing, voluntary waiver.

Again, the same standard above applies to whether or not a defendant is competent to waive his right to a speedy trial. For the seasons set forth above, Fitzpatrick was competent to waive this right. Furthermore, it was made knowingly, willingly, and voluntarily. Ohio's statutory requirement that a waiver of speedy trial is effective only if expressed in writing or in open court comports with the constitutional right to a speedy trial. *State v. King*, 70 Ohio St. 3d 158, 160 ; *State v. O'Brien*, 34 Ohio St. 3d 7 (1987); O.R. C. § 2945.71. There are citations in the record of exchanges between the judge and trial counsel for Petitioner as to whether or not Fitzpatrick had been explained his rights and understood what he was waiving. (Trial Tr. Vol. 2 at 23-24); (Trial Tr. Vol. 3 at 27-28); (Trial Tr. Vol. 4 at 47, 53.) Counsel contended that they had explained to Fitzpatrick his right to be tried within 90 days but because of the amount of motions and preparation needed in this case, they would need additional time to prepare for trial. Fitzpatrick indicated to them that he understood and would waive his right to speedy trial. (Trial Tr. Vol. 3 at 27-28.) On one occasion counsel told the trial court that Fitzpatrick had specifically requested a continuance. (Trial Tr. Vol. 4 at 47, 53.) Additionally, before accepting the waiver of speedy trial, the trial judge asked Fitzpatrick if he in fact understood his rights and signed the form to waive speedy trial. (Trial Tr. Vol. 3 at 28-31.) Fitzpatrick first responded in the

negative, but after again being explained his rights he stated that he understood. *Id.* Additionally the trial court was in the position to witness Petitioner's demeanor as he was making this waiver. *But see Drope v. Missouri*, 420 U.S. 162, 181 (1975)(Discussing Petitioner's absence at trial made it difficult for both judge and defense counsel to judge Petitioner's demeanor, observe him in the context of the trial, and determine if he was able to cooperate with his attorneys and understand the nature of the charges against him.)

There is nothing on the record to suggest that he was not competent to make this decision. While there are a couple times were Petitioner seemed confused after the court and/or defense counsel explained what was being said or what a term meant Fitzpatrick appeared to understand. These moments do not amount to evidence that Fitzpatrick was not competent, rather just that he did not understand or agree with what had just been asked.

Petitioner's claim regarding trial court error in its acceptance of his jury waiver despite overwhelming evidence of incompetency will be addressed in the next ground for relief. The first ground for relief is without merit. The decision of the state court was neither contrary nor an unreasonable application of federal law.

### Second Ground for Relief

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Jury Waiver despite overwhelming documentation and information making it impossible for the Trial Court to have constitutionally found that Mr. Fitzpatrick was competent and capable of entering into a knowing, voluntary or intelligent Jury Waiver. Const. Amends. V, VI, VIII and XIV.

1.      Trial Court Accepted Mr. Fitzpatrick's Jury Waiver At A Time Mr. Fitzpatrick Suffered From Hallucinations, Delusions, Paranoia And Related Psychiatric Problems.

2.      At The Time The Trial Court Accepted Mr. Fitzpatrick's Jury Waiver, It Chose To Ignore Ready Access To Hamilton County Justice Center Records On Mr. Fitzpatrick That Paralleled That Of A Mental Institution's

3.      The Trial Court Accepted Mr. Fitzpatrick's Jury Waiver As One Of Many In A Pattern Of Instances In Which Trial Counsel And The Trial Court Chose To Prioritize Securing As Many Waivers From Mr. Fitzpatrick Over Mr. Fitzpatrick's Severe Confusion And Compromised Psychiatric State

      A.      Speedy Trial Waiver Over Mr. Fitzpatrick's Concession That He Did Not Understand The Matter Before Him

      B.      Challenging Prosecution's Suggestion And Recommendation That Trial Counsel File A Competency Motion

      C.      Securing Mr. Fitzpatrick's Guilty Plea In Outcome Determinative Fashion

Petitioner alleges trial court error in its failure to hold a competency hearing before accepting his jury trial waiver. (Petition, Doc. No. 22 at 33); (Traverse, Doc. No. 30 at 40.) Respondent counters by stating that only portions of this claim were raised on appeal. (Return of Writ, Doc. No. 26 at 23.)  On direct appeal Fitzpatrick claimed that his jury waiver was not knowing, voluntary or intelligent, he did not however, raise the argument that he was incompetent. *Id.*; *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 325-328 (2004).  Fitzpatrick did raise this claim in terms of competence on post-conviction relief. (Return of Writ, Doc. No. 26 at 24.) The court found the claim to be barred by *res judicata*. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V at 340.)  Again, as with the analysis on the first ground for relief, this finding was erroneous as Petitioner did not allege trial court error in its failure to hold a competency hearing to determine if he was competent to waive his rights, in

addition to such waiver being intelligent, knowing, and voluntary.  On appeal, however, the

court once again held it was barred by *res judicata* as Petitioner failed to support the claim with

proper evidence outside the record. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058, **26-31

(Ohio App. 1st Dist. 2004).  As per the discussion in the first ground for relief, this claim is

procedurally defaulted. *See supra* First Ground for Relief at 27-30.


      In the alternative, the Court turns to the merits.  The right to trial by jury is a fundamental

right. *Duncan v. Louisiana*, 391 U.S. 145, 154 (1968).  Like the right to plead guilty as discussed

above, a defendant may waive his right to a jury trial providing that the waiver is valid in that it

was made knowingly, intelligently, and voluntarily. *Edwards v. Arizona*, 451 U.S. 477, 482

(1981).  Furthermore, the waiver, in addition to reflecting the defendant's "express and

intelligent consent," must be consented to by the government and permitted by the court. *Patton

v. United States*, 281 U.S. 276, 312 (1930); *Adams* v. *United States ex rel. McCann*, 317 U.S.

269, 281 (1942); O.R.C. § 2945.05;[9] Ohio Crim R. 23(A).[10]

In arguing that his decision to waive trial by jury was not competent, knowing and voluntary, Petitioner cites to several factors. He argues both trial court and counsel failed to advise him of his right to trial by jury, that the drugs affected his rational decision making, and that his one word answers given during the colloquy did not establish a knowing and intelligent waiver. (Traverse, Doc. No. 30 at 45-53.) The first portion of this claim, whether Fitzpatrick was legally competent to waive his right to a jury trial, was fully addressed in the first ground for relief. *See supra* First Ground for Relief at 30-42.

In turning to whether the waivers were made knowingly, intelligently, and voluntarily, Petitioner makes the argument that counsel failed to fully discuss the jury waiver with him. To the contrary, however, both counsel and Fitzpatrick represented to the court that they had discussed the right to a jury trial and the ramifications of a waiver. (Trail Tr. Vol. 10 at 888, 910-

---

[9] O.R. C. § 2945.05 Defendant May Waive Jury Trial

> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I ........., defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."
>
> Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

[10] Ohio Crim. R. 23(A) Trial by Jury

> In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney . . . .

912.)  Petitioner has not offered any additional information to show that counsel failed to inform him of this right.

While the Constitution does provide for a trial by jury, it does not require the trial court to explain the jury system and its method of obtaining a verdict to constitute a knowing and intelligent waiver. *Otte v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *footnote 10 (N. D. Ohio 2008), *citing Haliym v. Mitchell*, 492 F.3d 680 (6th Cir 2007).  While "[t]here is no constitutional requirement that a court conduct an on the record colloquy with the defendant prior to the jury trial waiver," in this case the trial court preserved the record by doing so, and this Court now turns to the record to examine the exchange. *United States v. Martin*, 704 F.2d 267, 274 (6th Cir. 1983); *see also Otte*, 2008 U.S. Dist. LEXIS 10296 at ftn 10; *Haliym*, 492 F.3d 680 .  The colloquy is as follows:

> The Court: Please be seated.  Thank you.
>
> For the record, State of Ohio versus Stanley Fitzpatrick. Case Number B0104117.
>
> For the record obviously, Mr. Cutcher, Mr. Wenke, you represent Mr. Fitzpatrick; is that correct?
>
> Mr. Wenke: Yes, your Honor.
>
> Mr. Cutcher: Yes, your Honor.
>
> The Court: Sir, you're Stanley Fitzpatrick; is that correct, sir?
>
> The Defendant: Yes.
>
> The Court: Okay.  Sir, I'm holding in my hand an entry which is captioned, "Entry on Waiver of Trial by Jury."  Do you recognize that form, sir?
>
> The Defendant: Yes.

The Court: You've seen that before; is that correct?

The Defendant: Yes.

The Court: Have you read it over, sir.

The Defendant: Yes.

The Court: Do you have any questions about anything that's on this?

The Defendant: No.

The Court: I'm sure your attorney went over it with you; is that correct?

The Defendant: Yes.

The Court: Do you have any questions of them about anything that's on this form, sir?

The Defendant: No.

The Court: Okay. Do you have any questions of me about anything that's on that form?

The Defendant: No.

The Court: Okay. And, sir, there is a line that says "Stanley Fitzpatrick," and above that line there is a signature. Is that, in fact, your signature?

The Defendant: Yes.

The Court: Okay. Did you put that signature on there voluntarily?

The Defendant: Yes.

The Court: Nobody made you sign it; is that correct?

The Defendant: No.

The Court: Okay. That's what you want to do; is that correct?

The Defendant: Yes.

The Court: All right. So what you're telling me, Mr. Fitzpatrick, is that you knowingly, intelligently, and voluntarily waive your right to a trial by jury, and you want this case tried to a three-judge-panel; is that correct?

The Defendant: Yes.

The Court: You talked to your attorneys about that situation?

The Defendant: Yes.

The Court: And after doing that, you're telling me here in open court, without any duress that that's what you want to do; is that correct?

The Defendant: Yes.

The Court: Do you have any questions at this point, of myself or your attorneys, in regard to this situation?

The Defendant: No.

The Court: Okay. Is it your understanding then, Counsel, that that's what he wishes to do at this time? Mr. Wenke?

Mr. Wenke: Yes, your Honor.

The Court: Okay. Mr. Cutcher?

Mr. Cutcher: Yes, your Honor.

The Court: All right. Thank you. Is there anything you want to put on the record at this point, Mr. Wenke?

Mr. Wenke: Judge, that he's taken [sic] medication right now, respidol, which helps him actually to think more clearly and to sleep better.

So, I know the Court sometimes asks whether or not that would affect his decision. In my communications with Stan, I don't think that it has, but I just wanted to bring that to this Court's attention as well.

The Court: I appreciate that. In the form of plea, I always do that. Perhaps with this situation, you're right, maybe I should do that. You understand what your attorney just said?

The Defendant: Yes.

The Court: Okay. Is there anything about the medication that you're taking while you're in the Justice Center, that has caused you to not be able to understand what's going on here today?

The Defendant: No.

The Court: Okay. And I'm not trying to put you on the spot, Mr. Fitzpatrick, but what you're telling me, everything that we've gone over, whatever you've read on this form, you understand all that; is that correct?

The Defendant: Yes.

The Court: And the medication does not interfere with that in any way?

The Defendant: No.

The Court: Thank you. I appreciate that, Mr. Wenke.

(Trial Tr. Vol. 10 at 910-914.) The court inquired as to whether or not he understood his rights and if he had any questions. Before accepting his guilty plea, the court again explained Fitzpatrick's constitutional rights in-depth, including the ramifications from waiving such rights, including trial by jury. (Trial Tr. Vol. 12 at 967-970, 972, 973, 974); *see supra* First Ground for Relief at 36-38. Again, when asked if he understood Petitioner answered in the affirmative. *Id*. at 967.

In an effort to further advance this claim, Petitioner argues that he was not able to waive this right due to the large amount of medications he was taking and their possible side effects. (Petition, Doc. No. 22 at 33); (Traverse, Doc. No. 30 at 48-51.) As discussed in the first ground for relief, evidence that a defendant is taking medication does not make him incompetent or invalidate his waiver of rights *per se*. *Otte. v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *58, ftn. 9

(N.D. Ohio 2008); *Filiggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006); *Godinez v. Moran*, 509 U.S. 389 (1993); O.R.C. § 2945.37(F). Petitioner has failed to meet his burden that the medication affected him. *Houk v. Otte*, 2008 U.S. Dist. LEXIS 10296 at *56 [11] citing *Filiaggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006); *see also Hoffman v. Jones*, 159 F. Supp. 2d 648 (E. D. Michigan 2001)(listing various factors a court can consider in determining whether or not medication is affecting a defendant's competency); *see supra* First Ground for Relief at 35, 38-41.

The next portion of this claim which argues that Petitioner's one word answers during the exchange with the court prior to his waiver, does not sufficiently demonstrate that Fitzpatrick's waiver was knowing, voluntary, or intelligent. (Petition, Doc. No. 22 at 39.) This Court has already considered this matter in the first ground for relief and no further analysis is needed. *See supra* First Ground for Relief at 41.

Finally it should be noted that prior to waiving his right to jury, Petitioner did in fact exercise his right to participate in the selection of a jury made up of twelve members of the community. In so far as he participated in this aspect, it can be inferred that he was aware of his right to jury trial when he choose to waive it after voir dire, seating a jury, and the commencement of his trial. This claim is without merit. The state court's decision was neither unreasonable nor contrary in its application of federal law.

### Third Ground for Relief

The excessive security measures used throughout Mr. Fitzpatrick's
Trial violated his right to a fair and impartial trial, due process, the

---

Also stating that there is no constitutional requirement that a trial court inquire whether a defendant is taking prescribed medication at the time of his or her jury waiver. *Otte v. Houk*, 2008 U.S. Dist. LEXIS 10296 at *footnote 9(N. D. Ohio 2008).

presumption of innocence, and the right to Trial Counsel. U.S. Const.
Amends. V, VI, VIII, IX, and XIV.

In his third ground for relief, Fitzpatrick argues that his constitutional rights were violated as a result of excessive security measures. (Petition, Doc. No. 22 at 41); (Traverse, Doc. No. 30 at 58.) Respondent counters by arguing that this claim is procedurally defaulted due to Petitioner's failure to raise the claim at the proper time. (Return of Writ, Doc. No. 34.) Petitioner raised this claim in his post-conviction relief proceeding and offered documentary support, such as copies of records from Hamilton County Justice Center that showed that he had not been violent while incarcerated, a copy of an instruction manual that the sheriff's office had issued to its Court Services Division outlining the purposes and uses of the stun belt, a notification form signed by Fitzpatrick advising him of the sheriff's requirement that he wear the belt and under what types of circumstances the belt might be activated, as well as the consequences of its activation. The state court addressed both the procedural aspects and merits of this claim in post-conviction relief.("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V at 339); *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at *13-*25 (Ohio App. 1ˢᵗ Dist. 2004). It found that the portion of the claim relating to being shackled throughout the guilt phase was both waived and barred by *res judicata. Id.* It stated that by entering a guilty plea, Fitzpatrick waived any claimed deprivation of constitutional rights that occurred before he entered his plea. *Id.* It further stated that because this information was contained in the record, and the evidence *de hors* the record submitted by Fitzpatrick was all available at time of trial, this claim should have been raised at trial or on direct appeal, and was now therefore barred by *res judicata. Id.* The state court further held that while the portion relating to being shackled throughout the sentencing phase was not waived, it was barred by *res*

51

*judicata* for the same reasons. *Id.*

Ohio's *res judicata* rule, as enunciated in *State v. Perry,* 10 Ohio St. 2d 175, 226 N.E. 2d 104 (1967), has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule. *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994); *Van Hook v. Anderson*, 127 F. Supp. 2d 899 (S.D. Ohio 2001). Applying the *Maupin* analysis, the Court concludes that Fitzpatrick failed to raise both the guilt and penalty portions of this claim at the appropriate time under the Ohio *res judicata* doctrine. This failure was held against him by the Ohio courts. For the foregoing reasons, this claim is procedurally defaulted.

In the alternative, this Court turns to the merits. In his appeal on post conviction to the court of appeals, the court addressed the issue by stating:

> Prior to trial, Fitzpatrick filed a "Motion to Appear at All Proceedings Without Restraints." The defense sought by the motion to dissuade the trial court from ordering that Fitzpatrick be restrained by shackles, arguing that his appearance in shackles would, prior to trial, taint the pool of prospective jurors and would, during trial, deny him the presumption of innocence. At a hearing on the motion, the trial court declined the state's invitation to leave the decision to Hamilton County Sheriff's Office personnel, noting that the law demanded that a criminal accused "not * * * be seen in restraints unless there [was] a situation that he had to be in restraints." The court then granted the motion upon its determination that Fitzgerald's [sic] appearance without restraints was "appropriate," "as long as [he] behaved in a fashion that complied with the sheriff's security needs."
>
> After a jury had been empanelled and counsel had made their opening statements, defense counsel approached the bench and advised the trial court that Fitzpatrick, during the state's opening statement, had demanded that he be permitted to plead guilty and had persisted in this demand despite counsel's explanation that he would still be eligible for the death penalty. The court took a recess, urging further

discussions between counsel and Fitzpatrick. When court convened, Fitzpatrick remained steadfast in his desire to plead guilty, asserting that the decision was his, and that he did not want to put his family through a trial. When the court stated its inclination to proceed with the trial, Fitzpatrick demanded to be removed from the courtroom so that he would not have to listen to any more "lies" about his role in the murders, and his increasing agitation prompted the court to warn him not to "mess with" the sheriff's deputies. Again, the court ordered a recess.

When court again reconvened, defense counsel changed their course, now advocating that Fitzpatrick be permitted to plead guilty and to be absent from further proceedings. The court, citing its concern with preserving Fitzpatrick's right to be present, stated that it was "inclined" to have him remain in the courtroom, provided that he "behaved" and conducted [him]self in a proper manner." Fitzpatrick responded, "Your Honor, how can I do that? I have got 50,000 volts attached to me. I have got this guy playing with the remote control. * * * I'm shackled up, man. I already look bad to the jury." Upon further inquiry by the trial court, Fitzpatrick confirmed that he "could not conduct himself in a proper manner," and that he "would be disruptive" and "might * * * * cause [himself] to jeopardize the safety of the participants in the trial as well as the [sheriff's] deputies," if the court compelled him to attend further proceedings. The court then, "for the protection of all involved, as well as the order of the proceedings * * * in th[e] courtroom," granted Fitzpatrick's request not to be present.

Fitzpatrick returned to the courtroom to enter his guilty pleas and for the penalty phase of his trial. The record does not disclose whether he was restrained during those proceedings by a stun belt. But it does show that, during each proceeding, the three-judge panel acceded to his request that his handcuffs be loosened from the ring that secured them to a belt at his waist.

* * * *

Placing restraints on a criminal defendant during his trial violates the Sixth Amendment if the restraints impede the defendant's ability to confer with counsel or to assist in his defense. And the use of restraints infringes upon the presumption of innocence if the restraints can be said to have affected how the defendant was perceived by those charged with determining his guilt.

The decision to restrain the defendant is committed to the sound discretion of the trial court. But the court, having been granted the authority, and thus been charged with the responsibility, to determine the need for restraints, may not delegate that responsibility to law enforcement authorities. And the court's exercise of its discretion is subject to certain guiding principles. Thus, the violent nature of the crimes for which a defendant is being tried will not alone justify the use of restraints. Moreover, restraints may be employed only under "unusual circumstances," only as a "last resort," and only when justified "by an essential state interest specific to each trial." Finally, a court may use restraints only when, upon consideration of "the [defendant's] actions both inside and outside the courtroom, as well as his demeanor while court is in session," it finds that restraints are necessary for the safe, reasonable, and orderly progress of the trial, such as when a defendant presents a danger of violence or escape.

A hearing on the need for restraints is "the preferred and encouraged practice," because it serves to facilitate meaningful appellate review. But a hearing is not mandatory, and with or without a hearing, a trial court's exercise of its discretion to use restraints may not be disturbed on appeal if the record discloses "facts and circumstances surrounding [the] defendant [that] illustrate a compelling need to impose exceptional security procedures * * *."

* * * *

*2. Restraint during the penalty phase of trial*
Fitzpatrick did not, by his guilty pleas, waive the challenges presented in his first and sixth postconviction claims to his restraint during the penalty phase of his trial. While a challenge to his restraint during the penalty phase did not implicate presumption of innocence, it did implicate the <u>Sixth Amendment</u> right to the effective assistance of counsel and the <u>Sixth Amendment</u> and due-process rights to be present at trial and to participate in one's defense.

With respect to the trial's penalty phase, the record showed that Fitzpatrick had provided the trial court with a reason to impose restraints when, in his exchange with the court concerning his guilty pleas, he had confessed to an inability to restrain himself. The record did not contain, and Fitzpatrick did not submit in support of his claims, evidence demonstrating that his appearance in restraints during the penalty phase of his trial had infringed upon his right to be present at trial or his right to participate in his defense. Nor did Fitzpatrick demonstrate a reasonable probability that, but for his counsel's failure to request removal of the restraints or a hearing on

54

> the need for restraints, the results of the penalty phase of the trial would have been different.
>
> Thus, Fitzpatrick failed to provide in support of the challenges to his restraint during the penalty phase of trial evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. Accordingly, the first and sixth claims were, in this final respect, subject to dismissal.
>
> We, therefore, hold that the common pleas court properly denied Fitzpatrick's first and sixth postconviction claims.

*State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at \*\*12-\*\*25 (Ohio App. 1st Dist. 2004).

The Supreme Court has long held that physical restraints on a criminal defendant during a trial, absent special need, violates the defendant's constitutional rights. *Illinois v. Allen*, 397 U.S. 337, 343-344 (1970); *Holbrook v. Flynn*, 475 U.S. 560, 568-569 (1986); *Deck v. Missouri*, 544 U.S. 622, 626 (2005). The concern is that if forced to appear in shackles a defendant may suffer prejudice in that it compromises the physical semblance of innocence, may undermine the defendant's ability to participate in his own defense, and may impair the "dignity and decorum of the judicial process." *Kennedy v. Cardwell*, 487 F.2d 101, 110 (6th Cir. 1973). Furthermore, the Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest-as the interest in courtroom security specific to the defendant."[12] *Deck v. Missouri,* 544 U.S. 622, 624 (2005); *Earhart v. Konteh*, 2007 U.S. Dist. LEXIS 63816 at \*23 (S.

---

[12] While *Deck v. Missouri* post-dates Fitzpatrick's trial and his alleged violation, the *Deck* court clearly held that the rule against visibly shackling a defendant without an extraordinary circumstance is premised on long established precedent. *Deck v. Missouri*, 544 U.S. 622, 627-629 (2005). Examples of this include: *Holbrook v. Flynn*, 475 U.S. 560, 568-569 (1986) (holding that requiring a defendant to appear in prison clothing in front of a jury is inherently prejudicial, and like shackling, should only be permitted where justified by an essential state interest); *see also Estelle v. Williams*, 425 U.S. 501, 505 (1976); *McKaskle v. Wiggins*, 465 U.S. 168, 188 (1984) (holding that a state defendant "may not normally be forced to appear in court in shackles); *see also Illinois v. Allen*, 397 U.S. 337, 344 (1970).

D. Ohio 2007).  Extraordinary situations, such as a possible danger of violence or escape, may

necessitate the use of physical restraints even if such security measures may infringe on and/or

deprive the defendant of a portion of his physical indicia of innocence. *Kennedy v. Cardwell*, 487

F.2d 101, 109 (1973).  The use of and degree of security restraints exercised over the defendant,

if deemed appropriate, is within the trial judge's discretion. *Payne v. Smith*, 667 F.2d 541, 544

(1981).  Due to the nature and inherent prejudice of shackling, "where a court, without adequate

justification orders a defendant to wear shackles that will be seen by the jury, the defendant need

not demonstrate actual prejudice to make out a due process violation.  The State must prove

'beyond a reasonable doubt that the shackling error complained of did not contribute to the

verdict obtained.'" *Deck* v. *Missouri*, 544 U.S. 622, 635 (2005) *quoting Chapman v.California*,

386 U.S. 18, 24 (1967); *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005).

As of present, the Supreme Court has yet to specifically address the use of stun belts as a

security restraint.  Many circuits, however, have determined that stun belts have the same

constitutional concerns as other methods of restraint and that the "[d]ecision to use a stun belt

must be subjected to at least the same close judicial scrutiny required for the imposition of other

physical restraints." *U.S. v. Waagner*, 2004 WL 1595193 at *4 (6th Cir. 2004); *United States v.

Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002); *Earhart v. Konteh*, 2007 U.S. Dist. LEXIS 63816

at *26 (S. D. Ohio 2007).  The Sixth Circuit has developed a four-prong test to be considered in

determining whether or not the use of shackles is appropriate.  The first is the defendant's record,

his temperament, and the desperateness of his situation; followed by the second which looks at

the state of both the courtroom and the courthouse.  Third, it considers the defendant's physical

condition; and finally, whether there is a less prejudicial but adequate means of providing

security. *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 785 (2007); *Larkin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005); *U.S. v. Waagner*, 2004 WL 1595193 at *4 (6th Cir. 2004) *citing Kennedy v. Cardwell*, 487 F.2d 101, 110-11 (6th Cir. 1973).

The record shows that the trial judge in this case granted Fitzpatrick's pre-trial Motion to Appear at All Proceedings Without Restraints. ("Defendant's Motion to Appear at all Proceedings Without Restraints," Return of Writ, Doc. No. 26, Apx. Vol. 1 at 252); ("Motion Granting Defendant's Motion to Appear at all Proceedings Without Restraints," Return of Writ, Doc. No. 26, Apx. Vol. 2 at 139.)  Furthermore a discussion was held in court during which counsel for both sides and the judge addressed this issue:

> The Court: As long as the defendant is behaving in a fashion that complies with the sheriff's security needs, certainly I believe it's appropriate for him to appear at all proceedings without restraints.
>
> Now, if he does things upstairs or over in the jail that causes the sheriffs to have some concern, then I will, quite frankly, comply with them, because they are the ones that have to throw out security.
>
> I have no problem granting the motion appearing at all proceedings without restraints as long as it coincides with the sheriff's security needs.
>
> Any problem with that, Mr. Wenke? Mr. Krumpelbeck?
>
> Mr. Wenke: No, Judge.
>
> The Court: Mr. Krumpelbeck? Mr. Dressing?
>
> Mr. Krumpelbeck: Your Honor, I agree with everything you said except the final ruling.  I think the best procedure is to overrule it, certainly, if there is any question.
>
> Again, I also concur with the defendant shouldn't be seated here in restraints unless something occurred.  But I believe that's the sheriff's policy.  That's what our concern is.  I don't know if for security purposes.  The sheriff's kind of got to make that call.

57

The Court: Well.

Mr. Krumpelbeck: I'm just asking you overrule it with the understanding that we're going to try to comply with it. Thank you.

Mr. Cutcher: I do think, your Honor, that if the sheriff has concerns, that he could address those to the Court, and the Court should make a ruling at that time rather than just saying hey, whatever you guys want to do is all right.

The Court: But in a sense, I mean, I do have to defer to a certain degree to whatever you guys say is all right. Because not only am I concerned about his safety, your safety, my staff's safety, and everybody else, including the deputies.

I think the law is pretty clear though, and the deputies are really - - I've never had any problem with the deputies as far as if they have a security problem they can come to me. But the law is pretty clear, also, that he's not supposed to be seen in restraints unless there is a situation that he has to be in restraints.
I'm going to grant the motion. Number 17 is granted

If- - again, if you all want to go back and tell your supervisors, really not a change in any policy. It's the policy you have right now. If you need to put a belt on him, put a belt on him. If you need to put shackles on him, put shackles on him. I'm not changing your policy.

If, in fact, he's doing fine, you don't have a security situation, he can sit there without restraints. Your normal procedure is what I'm asking you to follow. All right.

(Trial Tr. Vol. 5 at 222-224.)

The record is silent as to whether or not Fitzpatrick was wearing a stun belt during opening statements. Directly after the State's opening, defense counsel informed the court that Fitzpatrick wanted to change his plea to guilty. (Trial Tr. Vol. 10 at 868-871.) The court addressed Fitzpatrick, during which the judge advised him to take more time to consider his plea and to confer with his attorneys on the matter. *Id*. at 873. It was during this conversation that Petitioner had an outburst in which he accused the trial judge of lying, swore, asked to be

removed from the courtroom, and based on the admonishment in the record was "messing with the deputies." *Id.* at 874-877, 892. After taking a break, Petitioner again related to the court that he would like to waive his right to be present. *Id.* at 888. When the judge refused, citing Petitioner's best interest, Fitzpatrick informed the court that he would not be able to act in a proper manner if forced to remain in the courtroom and stated "Your Honor, how can I do that [behave and conduct self in proper manner]? I have got 50,000 volts attached to me. I have got this guy playing with the remote control . . . . I'm shackled up man. I already look bad to the jury." *Id.* at 889-890. This is the first reference to the stun belt since the pre-trial motion. The record is unclear as to whether Fitzpatrick had been placed in a stun belt from the on-set of the trial or during the break following his outburst which included verbal insults and either threats of or actual physical touching of at least one deputy.

"The Supreme Court has never directly addressed the question of whether a trial court's failure to hold an evidentiary hearing on a motion related to shackling denies a defendant a right to fair trial." *Bell v. Hurley*, 97 Fed. Appx. 11, 15 (6th Cir. 2004). However, in examining other Supreme Court cases concerning prisoner restraints, security, and prison garb, the Sixth Circuit stated that "based on *Allen* and *Holbrook*, the Supreme Court would require a particularized inquiry prior to permitting a defendant to be tried in shackles." *Id.* at **11. This Court recognizes that a hearing on the record is encouraged for appellate review, but is not mandatory. However, the Court joins other courts in advising that the best practice would be to hold a hearing so that factual disputes may be resolved and particularized inquiries and findings of facts surrounding the decision are made part of the record. *Kennedy v. Cardwell*, 487 F.2d 1001 (6th Cir. 1973); *Woodards v. Cardwell*, 430 F.2d 978 (6th Cir. 1970). In Fitzpatrick's case there is no

indication that another hearing was held to discuss the use of restraints, the behavior of Petitioner which caused concern to the court/sheriff's department, whether there was a safety risk or a risk of escape, or whether less restrictive means could have been employed (handcuffs, leg shackles) rather than a stun belt. The Court holds however, that even despite the lack of hearing on the matter, Petitioner's behavior did provide the trial court with a justifiable reason to restrain him via shackles and a stun belt. He does not point to any evidence of shackling prior to his outbursts.[13] Absent such evidence, this Court assumes that the trial court followed its own pre-trial order granting the motion to appear without restraints. It is not until after the opening statements, after counsel informed the court of Petitioner's change in plea, after his outburst and "messing with deputies," and after two recesses that a stun belt or shackling of any sort again appears on the record. (Trial Tr. Vol. 10 at 870-879.) Given the pre-trial order and Petitioner's behavior, it seems that the trial court had reason to find a need for heighten security and shackled Fitzpatrick at that time.

Regardless, even assuming Petitioner's constitutional rights were violated by the trial court, he was not prejudiced. Petitioner is not entitled to habeas corpus relief unless a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Earhart v. Konteh*, 2007 U.S. Dist. LEXIS 63816 at * 33 (S. D. Ohio 2007); *Calderon v. Coleman*, 525 U.S. 141, 145 (1998); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). The evidence of guilt was overwhelming. Fitzpatrick pled guilty to all counts, and additionally the State presented witnesses to various

---

[13] Early on there is a reference that Petitioner was having difficulty breathing as a result of the belt being too tight. This occurred prior to the pre-trial hearing and the trial court's order granting the motion to appear without restraints. (Trial Tr. Vol. 5 At 202, 222-224); (Petition, Doc. No. 22 at 42); (Return of Writ, Doc. No. 26 at 38.)

aspects of the crime. There is no evidence that the jury was aware of shackling, as the record reflects that the jury was not present in the courtroom at the time of Fitzpatrick's outburst and reference to the stun belt. (Trial Tr. Vol. 10 at 872.) Furthermore, Fitzpatrick eventually waived his right to a jury, opting instead to plead in front of a three-judge panel. As the jury was not involved in the decision making process, it is clear that the stun belt did not have a "substantial and injurious effect or influence in determining the jury's verdict."

As for whether or not the shackles may have swayed the decision of the judges to consider future dangerousness as a non-statutory aggravating circumstance, this Court assumes that the judges were able to separate the facts of the crime from the defendant appearing before them in shackles. A similar issue arose in the case of *Fautenberry v. Mitchell*, where the defendant appeared in front of a judge in shackles. 515 F.3d 614, 642 (6th Cir. 2008) The Sixth Circuit held that under Ohio law, it is presumed that during a bench trial in a criminal case that "the court consider[s] only the relevant, material, and competent evidence in arriving at its judgment, unless it affirmatively appears to the contrary." *Id. citing State v. Post*, 513 N.E.2d 754, 759 (1987). Likewise, his assertion that by appearing in shackles he was deprived of the mitigating factor of an ability to adjust positively to prison is without merit. Records from the jail show that Fitzpatrick had in fact been placed into administrative segregation. Furthermore, while this Court agrees with the Petitioner's claim that there was no evidence that he made threats to witnesses, court personal or others while *in* jail, he neglects to mention that the transcript of the proceedings show that he did in fact have outbursts and make threats while *in* court. (Traverse, Doc. No. 30 at 62); (Trial Tr. Vol. 10 at 873-878, 891-893). For the foregoing reasons, this Court holds that the use of the stun belt and shackles did not have a substantial or

injurious effect nor did it influence the panel of judges in reaching their decision.

This claim is without merit. The decision of the state court was neither contrary to nor an

unreasonable application of United States Supreme Court law.


### Fourth Ground for Relief

The errors and omissions of Trial Counsel at Guilt Phase violated Mr.
Mr. [sic] Fitzpatrick's constitutional right to the effective assistance
of Trial Counsel. U.S. Const. Amend. VI and XIV.

1. Impermissible And Unconstitutional Waivers of Mr. Fitzpatrick's Constitutional Rights.

2. Trial Counsel Egregiously Failed To Recognize Mr. Fitzpatrick's Long-and-Well Documented History Of Hallucinations, Delusions, Paranoia And Related Psychiatric Problems

3. Trial Counsel Blanketly Chose To Ignore Hamilton County Justice Center Records On Mr. Fitzpatrick That Paralleled That Of A Mental Institution's

4. Trial Counsel Perpetrated Many In A Pattern Of Instances In It Chose [sic] To Prioritize Securing As Many Waivers From Mr. Fitzpatrick Rather Than Take Into Account Mr. Fitzpatrick's Severe Confusion And Compromised Psychiatric State
   A. Speedy Trial Waiver Over Mr. Fitzpatrick's Concession That He Did not Understand The Matter Before Him
   B. Challenging Prosecutor's Suggestion And Recommendation That Trial Counsel File A Competency Motion
   C. Accepting Mr. Fitzpatrick's Jury Waiver Without Regard For Mr. Fitzpatrick's Severe Mental Confusion And Distress.
   D. Securing Mr. Fitzpatrick's Guilty Plea In Outcome Determinative Fashion
   F. Stun Belt
   G. Speedy Trial Waiver

The governing standard for effective assistance of counsel is found in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). To show ineffective assistance of trial counsel, Petitioner

must be able to show that counsel's performance was deficient. *Id*. In evaluating whether or not the representation of counsel fell into the category of ineffective it must be evaluated for "reasonableness under prevailing professional norms." *Id*. Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Id.* at 680. Prejudice results when a defendant is deprived of a fair trial. *Id*. To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). *See generally* Annotation, 26 ALR Fed 218.

An evidentiary hearing on this ground for relief was held before this Court on October 29, 2007 and October 30, 2007. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75); (Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76.) In an attempt to develop his ineffective assistance of trial counsel claim, Petitioner presented testimony from Dr. Neal Dunsieth, Dr. Emmett Cooper, mitigation specialist Jim Crates, and from his former trial attorney, Tim Cutcher. Respondent presented testimony from Fitzpatrick's former trial attorney Steve Wenke. Additional testimony was sought from Dr. Robert Tureen but due to deteriorating health conditions, the Court excused Dr. Tureen from testifying in the matter and in lieu of his live testimony, admitted the first nine paragraphs of a previously submitted affidavit. (Order Setting Conditions for the Testimony of Doctor Robert Tureen, Doc. No. 77; Minute Entry for Proceedings Held before Magistrate Michael R. Merz/Motion Hearing/Order Regarding the Testimony of Doctor Robert Tureen and Briefing Schedule, Doc. No. 78.) The parties briefed the evidentiary hearing issues. (Brief

Regarding Motion for Extension of Time, Doc. No. 80); (Brief by Respondent, Doc. No. 82.)

   1. Impermissible And Unconstitutional Waivers of Mr.
     Fitzpatrick's Constitutional Rights

   In his first sub-claim Fitzpatrick alleges that his counsel were ineffective in failing to

ensure his waiver of a jury trial, speedy trial, and guilty plea were knowing, intelligent, and

voluntary. (Petition, Doc. No. 22 at 45); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 3.)

Respondent counters by arguing that this portion of the claim is procedurally defaulted. (Return

of Writ, Doc. No. 26 at 42.)  Petitioner raised this claim in post-conviction proceedings and the

court found that because this claim was based in large part on the record, was not supported with

sufficient evidence outside the record, and could have been brought on direct appeal, it was

barred by *res judicata*. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26,

Apx. Vol. V at 343-345.)  On appeal from that decision the Ohio Court of Appeals, First

Appellate District addressed the claim on the merits, stating:

> 2. Defense counsel's failure to insist on a hearing
>
> The outside evidence submitted by Fitzpatrick did preclude
> application of the doctrine of res judicata to bar the challenges
> presented in his fifth, seventh, and eighth postconviction claims to his
> trial counsel's effectiveness in failing to insist on a competency
> hearing to determine the knowing, intelligent, and voluntary nature
> of his speedy-trial and jury waivers and his guilty pleas.  But the
> claims were subject to dismissal on other grounds.
>
> In his direct appeal to the Ohio Supreme Court, Fitzpatrick did not
> challenge the knowing, intelligent, and voluntary nature of his waiver
> of his right to a speedy trial.  He did, on appeal, unsuccessfully
> challenge the knowing, intelligent, and voluntary nature of his guilty
> pleas, but on grounds other than competency.
>
> The supreme court also rejected Fitzpatrick's challenge to the
> voluntary nature of his jury waiver, holding that he had failed to
> overcome the presumption, raised by his written waiver, that he had

voluntarily relinquished his right to a jury trial. In so holding, the court found nothing in the record to contradict Fitzpatrick's statement during the jury-waiver proceedings that his medication had not "interfered with his ability to understand the [jury] waiver form or the proceedings." The court also noted that Fitzpatrick's "decision to waive a jury trial [had] followed from his decision to plead guilty," and that the record made "clear * * * that his decision to plead guilty [had been] voluntary [,] [when] Fitzpatrick [had] initiated that decision, [had] insisted upon it against advice of counsel, and [had] held to it through a lengthy plea colloquy."

The record of the proceedings at trial confirmed defense counsel's need for substantial preparation time and disclosed rational reasons for Fitzpatrick's waiver of a trial before a jury. Nothing in the outside evidence offered in support of the fifth, seventh, and eighth claims demonstrated a reasonable probability that, but for counsel's failure to insist on, or to secure, a competency hearing, Fitzpatrick would not have waived his speedy-trial or jury rights or pleaded guilty or would have been found incompetent to do so. Thus, Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief. Accordingly, we conclude that the common pleas court properly denied Fitzpatrick's fifth, seventh, and eighth claims.

*State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at **31-34 (Ohio App. 1st Dist. 2004). As the

state court found the claim to be barred on *res judicata*, this claim is now procedurally defaulted.

Petitioner is not able to establish cause and prejudice, as the underlying claim of ineffective

assistance of trial counsel is also procedurally defaulted, and ineffective assistance of appellate

counsel is not before this Court. *See supra* First Ground for Relief 27-30.

In order to establish that counsel was ineffective in the waiver of Fitzpatrick's

constitutional rights, Petitioner would have to show that he was incompetent to waive his rights

or that the waiver was not made knowingly, intelligently, or voluntarily as counsel did not

adequately explain his rights and the ramifications of waiving those rights. Fitzpatrick has not

made such a showing. For the reasons stated in the first ground for relief, neither counsel nor the

court felt that competency was at issue and that a hearing was required. *See supra* First Ground for Relief at 30-42. Additionally, the record clearly shows that counsel represented to the judge and/or judicial panel in open court that they had explained his rights to him and that Fitzpatrick indicated that he understood what he was constitutionally entitled to, the result of such waivers, but regardless would like to waive his rights and plead guilty. (Trial Tr. Vol. 3 at 28-31);(Trial Tr. Vol. 10 at 869-870, 882, 888, 904, 913); (Trial Tr. Vol. 11 at 924); (Trial Tr. Vol. 12 at 980-981.) Without more than a mere assertion, Petitioner cannot impeach counsels' representations and fails to meet the burden of demonstrating that counsels' conduct was unreasonable and detrimental.

Additionally, it is noted that Petitioner did in fact exercise his right to a jury, waiving it only after voir dire and a jury had been selected. Thus, it is logical to assume that after spending days questioning potential jury members, and selecting an actual jury, Petitioner was in fact aware of his right to have this case heard before twelve members of the community. Counsel was not ineffective in allowing Fitzpatrick to waive his constitutional rights.

2. Trial Counsel Egregiously Failed To Recognize Mr. Fitzpatrick's Long-and-Well Documented History Of Hallucinations, Delusions, Paranoia And Related Psychiatric Problems

3. Trial Counsel Blanketly Chose To Ignore Hamilton County Justice Center Records On Mr. Fitzpatrick That Paralleled That Of A Mental Institution's

4. Trial Counsel Perpetrated Many In A Pattern Of Instances In It Chose [sic] To Prioritize Securing As Many Waivers From Mr. Fitzpatrick Rather Than Take Into Account Mr. Fitzpatrick's Severe Confusion And Compromised Psychiatric State
   A. Speedy Trial Waiver Over Mr. Fitzpatrick's Concession That He Did not Understand The

Matter Before Him

B.      Challenging Prosecutor's Suggestion And
Recommendation That Trial Counsel File A
Competency Motion

C.      Accepting Mr. Fitzpatrick's Jury Waiver
Without Regard For Mr. Fitzpatrick's Severe
Mental Confusion And Distress.

In this next portion of his claim, Petitioner asserts that counsel was ineffective in that they ignored Fitzpatrick's mental problems and the ramifications arising from this issue. (Petition, Doc. No. 22 at 45.)  Specifically, he alleges that counsel improperly served as "psychiatric competency expert[s]," and secured unconstitutional waivers of Fitzpatrick's rights. *Id*.  As support for this claim he cites to his past drug use and its lasting impact, his hallucination of the devil, records from the Hamilton County Justice Center documenting his psychiatric problems and medication, irrational behavior at trial, the multiple prescription medications he was taking at time of trial. (Petition, Doc. No. 22 at 47-51); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 10.)  The Warden argues that Petitioner failed to previously raise the sub-claims alleging counsels' failure to recognize Petitioner's mental health history, ignored prison's records concerning Petitioner's mental health, and their failure to make a competency motion. (Return of Writ, Doc. No. 26 at 42-43.)  Respondent further argues that the claim is now exhausted.  If it had been raised during post-conviction relief proceedings, it would have been barred by *res judicata* as the claim is based entirely on the record. *Id*. at 15-16.  As such, Respondent contends that Petitioner no longer has an available state avenue in which to bring this portion of the claim and it is procedurally defaulted.

A state prisoner seeking federal habeas corpus relief must first exhaust the remedies

available to him in the state courts. 28 U.S.C. §2254(b) and (c); *Picard v. Connor*, 404 U.S. 270

(1971). In Ohio, this includes direct and delayed appeal to the Ohio Court of Appeals and the

Ohio Supreme Court. *Mackey v. Koloski,* 413 F.2d 1019 (6th Cir. 1969); *Allen v. Perini,* 424 F.2d

134, 140 (6th Cir. 1970). It also includes the remedy of a petition for post-conviction relief under

Ohio Revised Code §2953.21. *Manning v. Alexander*, 912 F.2d 878 (6th Cir. 1990). "Often,

federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to

exhaust his remedies and the time for refiling an appeal in the state court has passed. The

unexhausted claim is then classified as "procedurally defaulted" and deemed forfeited absent a

showing of cause and prejudice." *Abdur'Rahman v. Bell (In re Abdur'Rahman)*, 392 F.3d 174,

186-187 (6th Cir. 2004); *See In re Cook*, 215 F.3d 606, 607-08 (6th Cir. 2000). Because the time

for refiling has passed, these sub-claims are now procedurally defaulted.

Based on the trial court record, it appears to this Court that counsel was not ignorant of

any potential mental issues, and did in fact investigate, to some degree, the possibility that

Petitioner may have been incompetent.

> Mr. Wenke: The Court and I just had a discussion this morning regarding his competency. I have indicated to the Court I don't have any indicia that he's incompetent at this time. That's based on conversations I have had with Dr. Emmett Cooper, as of approximately 9:30 last night. Also conversations I have had with Dr. Hawkins, and also reviewing medical records from Dr. Dunsieth and Dr. Newton, who are all psychiatrists.
>
> In addition, I have had discussions with Dr. Bob Tureen, who is a psychologist. And, again, I see nothing at this point which is an indicia of the competency. So I cannot stand before the Court and suggest that he's incompetent.

(Trial Tr. Vol. 10 at 903-904.)

The above statement indicates that trial counsel had in fact reviewed the medical records

from Hamilton County, referenced as the medical records from Dr. Dunsieth and Dr. Newton. Furthermore, an exchange during trial between the state and Dr. Cooper reflects that he was questioned on competency and said that it was not an issue.

> Q.     Doctor, just so we're clear on this, and it is not an issue, I understand this is not an issue, but there is no question as regards to his competency, is there?
>
> A.     Correct
>
> Q.     I mean, he's competent during this entire period in every instance that you've had contact with him?
>
> A.     You mean competent to stand trial? Is that what you're asking?
>
> Q.     Yes.
>
> A.     Yes.
>
> Q.     And, again, never been an issue?
>
> A.     No.

(Trial Tr. Vol. 13 at 1240.)

During the evidentiary hearing in this Court on the matter of ineffectiveness of counsel, both Dr. Dunsieth and Dr. Cooper testified that they had contact with Fitzpatrick prior to his trial, they evaluated his mental status but neither was asked to evaluate his competency to stand trial. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 10, 64, 107, 112.) Additionally, Attorney Wenke recalled that he had obtained the medical records from the Dr. Dunsieth, reviewed them, and had concerns with the issue that Fitzpatrick may have been malingering. (Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 23.) He felt that strategically this would have been difficult to deal with at trial. *Id.* Exchanges between habeas counsel and Fitzpatrick's trial attorneys during the

evidentiary hearing further demonstrate that the competency issue was considered and for various reasons, including strategic, was not pursued.

> Q:     Okay.  Tell us what is happening here.
>
> A:     Well, the prosecutor was always concerned that at the last minute we were going to raise the issue of competency, which can be raised at any time, and we weren't.
>
> * * * *
>
> A:     I didn't finish my statement.  I never thought he was incompetent, if that's - - and so whether it's a rational statement or not, I don't think it was very rational on his part. I just finished seating a jury and we're ready to go to trial and he wants to plead guilty.  That came as a complete surprise to me.
>
> Q:     Quote, I never thought he was incompetent, close quote.  Did you just say that?
>
> A:     That's what I said, yes.
>
> Q:     Why?  Tell us.
>
> A:     He never gave me reason to believe that he was incompetent.

(Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 149-151.)

> Based on the conversations I had with him, I believe that he understood, and this is my opinion of what was going on, but I believe that he understood the nature of the charges, that he was capable of assisting in his defense based on having done numerous cases prior to that.  I believe he would be - - if he were examined by the court clinic, that it would be determined he was competent. The odds would be very high of that.
>
> So I really believed that he understood everything and that he was competent.  Otherwise, I would have raised the issue to the Court and had a competency evaluation done.

(Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 22-23.)

> . . . . I know we had Dr. Hawkins evaluate him as far as a competency issue. I remember talking to Dr. Cooper. . . . . .
>
> I'd have to see and you'd have to talk to him about what all he did, but the goal of that really - - and that was something that we planned. I didn't - - what we would do was have a private psychiatrist look at him without having him go to the court clinic because my concern would be there would be issues raised that would be difficult to deal with later on.
>
> I believe he did, because now to say what constitutes a formal competency evaluation, you know, a person can have - - they could have a really detailed examination or you could have, you know, a couple of hours or something. I know that Dr. Hawkins, I believe we probably paid him about $1,000. So I assume that would be four or five hours of work. So to answer your question, I think I remember asking him whether he thought he was competent.

(Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 39-40).

When questioned as to any potential harm that might arise from a competency evaluation, Wenke explained that counsel decided strategically to not pursue the matter. (Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 23.) He stated that there were issues that concerned counsel, such as the possibility of malingering, and they did not want to have a report issued and given to the State. *Id*. To avoid that they hired their own doctor and paid out of pocket rather than go through the court. *Id*. at 23-24. Based on that finding, Fitzpatrick's medical records, co-counsel's opinion, and Wenke's own opinion based on conversations he had had with Fitzpatrick, it was not worth the risk to request a court competency evaluation as some issues may have arisen which would have been difficult for the defense to deal with. *Id*. at 24-25, 39-41. He later clarified that:

> It's the statements. He made a number of statements to me during the course of it which led me to believe that there would be a lot of problems in a competency evaluation. For instance, there were some times that he told me some things that weren't true and it wasn't

71

necessarily something I thought was a function of mental illness.

And for instance, even the issue where he said he didn't remember killing Denee [sic, Shenay] and his girlfriend, there was a lot of evidence that he did. In fact, he made a lot of statements to people about it and he made some statements to me which would be different.

Now I couldn't tell you whether he's saying I don't remember right now or I remember it later, but it was the statement and some of the statements he made to me. I still remember there was a situation with regard to the competency issue where he had told me that he talked to another attorney and that the attorney told him for $100,000 he could get him into a mental hospital and I was worried about if that came out, what would happen is it would make him look like he was trying to use his mental state to get into a hospital.

So the statements were the problem. It wasn't, you know, the records and everything else that's somebody's interpretation of it, but once he starts making statements where it's things that a psychiatrist would say. And I'll give you an example. If, for instance, he says I don't remember anything about killing these two people but I really remember this other guy, I've had psychologists and psychiatrists in the past say that's not how memory works. You don't block out for one thing or the other specifically. You remember the whole thing. So I was worried about that.

I was mostly worried more than anything about the statements he was going to make because those statements, if they were out there, I could never bring them back. I could never - - and the other thing, the aspects of it is if I weigh what he was going to say to the court clinic against the odds of being found incompetent, the odds of being found incompetent just generally, as you know, in the legal system are very small.

But with regard to - -so I say to myself the odds of him being found incompetent are three percent or five percent or whatever. Is it worth risking having somebody sit there and talk to Stan for that period of time? In the dealings I had with him, there were some major concerns I had with his description of these auditory hallucinations, how they were formulated and that type of stuff. And I'm not an expert and I could be wrong, but from my standpoint, what I wanted to do was protect him and not have him make a bunch of statements to the court clinic that were going to come back and destroy any

meaningful mitigation we might have.

And it's not the jail records; it was the statements. I mean, more than anything else I was worried about that.

\* \* \* \*

It could have been [effect of drugs]. You know, what I do, and it's kind of an, I guess it's a function of experience and doing it for long enough, that yeah, it could be a function of the drugs and I couldn't tell you for sure whether it was or not.

The only thing I'm worried about really is the perception of other people or the perception of an expert when they make that evaluation and what they are going to tell the Court because if they start saying, well, you know, he's faking it, he's doing this and that stuff, then that's going to hurt me later.

The goal of that, like for instance having Dr. Hawkins do something or Jim Turene [sic]do it, was to contain it and not have the statements brought before the Court if they were really bad. In fact, that was one of the reasons I didn't want him to do an unsworn statement because I wanted to control that as much as I could, based on what he told me he was going to say.

\* \* \* \*

What I would tell you was in my conversations with him I made the judgment call myself, the determination that I believed he understood everything and the nature of the charges and I believed that I didn't want to have him do a competency evaluation through the court clinic because I think that would have really hurt our case and strategically I didn't want to do it that way.

If you're asking me am I an expert with it, I don't know. I could be wrong, but at the time I really believed that that was in his best interest that way. So I was really trying to do the best I could for him.

(Evid. Hrg. Trial Tr. 10/30/07, Doc. No. 76 at 41-45.)

"Strategic choices are virtually unchallengeable."*Buell v. Mitchell*, 274 F.3d 337, 359 (6th

Cir. 2001) *quoting Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). However, strategic

decisions must still be within the range of logical choices an ordinary competent attorney handling a death penalty case would assess as reasonable to achieve a 'specific goal.' *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001). In this case counsel voiced that they made this decision based on the belief that Petitioner was in fact competent and that this belief had been reaffirmed by private psychologists/psychiatrists that had been hired to evaluate Fitzpatrick. They further stated that a tactical decision was made to go through private doctors as opposed to a court ordered competency exam in an effort to prevent the opposing side from gaining access to Petitioner's records. All these reasons are within the realm of reasonable representation.

During the evidentiary hearing, Petitioner further supported his ineffective assistance of trial counsel claim by arguing that counsel was either not aware of or withheld IQ test results. He asserts that the red flag of his score would have been important information in advancing his incompetency claim. (Petitioner's Post-Hearing Brief, Doc. No. 80 at 9); (Petitioner's Post-Hearing Reply Brief, Doc. No. 83 at 12.) Fitzpatrick was administered an abbreviated form of the Wexler Intelligence Scale test by Dr. Tureen. (Aff.of Dr. Tureen, Doc. No. 52, Ex.4 Para. 8) Petitioner scored a 69, which would have placed him in a level of borderline to mild retardation. Attorney Cutcher testified that until recently he was not aware that Petitioner had been administered a test, or the results of such test. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 119-120.) He claimed that had he known such information it would have raised a red flag as to Fitzpatrick's competence. He also stated in the same response however, that while it would have raised a flag as to competence, in their [defense counsel] minds, they already had that issue resolved. *Id.* at 120. He then stated on re-direct that even if he had known of the IQ test and Fitzpatrick's results, it would not have changed his opinion as to whether or not he believed

Petitioner to be competent. *Id*. at 154.

Dr. Cooper was also unaware, until prior to the evidentiary hearing, that such testing had been done. (Evid. Hrg Trial Tr. 10/29/07, Doc. No. 75 at 55.)  He, too, felt this information would have been useful in his assessment of Petitioner.  He also stated, however, that an IQ test was one way of measuring someone's ability to understand information, but other components, such as the ability to function, to think, to process information, logic, and how one tolerates a situation, would all be considered as well. *Id*. at 55.  An additional benefit to having had this information is that it would have allowed Dr. Cooper to compare the current IQ test score with any previous testing which may have been done in an attempt to determine if Fitzpatrick's IQ was consistent or if not, what trajectory may have been occurring. *Id*. at 98.  Additionally he noted that the abbreviated test was a screen and that in cases of low scores more sophisticated testing would have been the next step. *Id*.

The Court notes however, that there is other evidence in the record to suggest that Fitzpatrick's low IQ score may not have been an accurate indicator of his functioning, or rather was just one of many components to be considered.  Fitzpatrick may have operated at least in the normal range as he was a high school graduate and had worked at the Formica Corporation for many years.  His employment records show that aside from occasional tardiness, he was a good employee and received certifications in various aspects. (Evid. Hrg. Trial Tr. 10/29/07 at 86.)  Furthermore, it is noted that if Fitzpatrick had presented functioning problems, Dr. Cooper, or one of the many other doctors, could have requested an IQ test be performed.  Dr. Cooper himself acknowledged that various aspects of Fitzpatrick's life lend itself to a finding that he may have been functioning at a normal range, but then states that the low IQ score could have

been a result of depression or transient dementia. (Evid. Hrg. Trial Tr. 10/26/07, Doc. No. 75 at 87.)

Finally, even assuming counsel had been ineffective, Petitioner cannot establish prejudice. It is undisputed that prior to trial Fitzpatrick met with various psychologists and psychiatrists, including Dr. Dunsieth, Dr. Hawkins, Dr. Turreen, and Dr. Cooper. With the exception of the IQ test, Petitioner does not offer any new evidence as to his mental state at time of trial which would counter the finding he was competent.

> D.    Securing Mr. Fitzpatrick's Guilty Plea In Outcome
>        Determinative Fashion

This was addressed in the first ground for relief. *See supra* First Ground for Relief at 41 . As there was no constitutional violation, trial counsel cannot be found to have been ineffective in their failure to object.

> F.    Stun Belt

On post-conviction, Fitzpatrick presented this sub-claim, alleging ineffective assistance of counsel resulting from their failure to act or to remove the shackles and stun belt during the court proceedings. (Return of Writ, Doc. No. 26 at 43.) The court found that this claim was barred by *res judicata* as it was based on the record and should have been raised at trial or on direct appeal. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V, p 343.) Furthermore, it held that he was not able to demonstrate prejudice. *Id*. The court of appeals affirmed. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058, ** 13-25 (Ohio App. 1st Dist. 2004). This claim is now procedurally defaulted.

In the alternative, the Court turns to the merits. The Court addressed the issue of the stun belt in the third ground for relief. *See supra* Third Ground for Relief at 53. The trial judge held a

hearing on the matter and determined that Petitioner should not appear shackled.  In looking through the record, however, it is apparent that Fitzpatrick was wearing a stun belt and shackles for at least certain portions of his proceedings.  However, for the reasons set forth in the third ground for relief, there was no constitutional violation.  *See supra* Third Ground for Relief at 53.  As there was no constitutional violation, trial counsel cannot be found to have been ineffective in their failure to object.

G.      Speedy Trial Waiver

In his last sub-claim, Petitioner again alleges counsels' ineffectiveness in their failure to ensure that he was capable of waiving his right to speedy trial.  For the reasons set forth above the portions alleging ineffective assistance of counsel in allowing Fitzpatrick to waive his right to a speedy trial are also procedurally defaulted.

In turning to the merits, Petitioner references the discussion between himself and the court, during which he said he was not feeling well, citing "noticeable emotional distress" and a lack of understanding the implications of the waiver, but the court continued with the waiver regardless. (Traverse, Doc. No. 30 at 86); (Trial Tr. Vol. 3 at 28-29.)

Again, like the first sub-claim in this ground for relief, in order to establish that counsel were ineffective in the waivers of Fitzpatrick's constitutional rights, he has to show that counsel did not adequately explain his rights and/or the ramifications of waiving those rights.  Fitzpatrick has not made such a showing.  The record shows that counsel represented to the judge in open court that they explained to Fitzpatrick his right to a speedy trial, and that Fitzpatrick indicated that he understood.  He agreed to waive that right so that counsel had time to adequately prepare his case and file a multitude of pre-trial motions. (Trial Tr. Vol. 2 at 23-24);(Trial Tr. Vol. 3 at

27-28, 47, 83.) At one point counsel even represented to the court that Fitzpatrick himself had specifically asked counsel to request an additional continuance. (Trial Tr. Vol. 4 at 47, 53.) Without more than a mere assertion Petitioner cannot impeach counsels' representations and fails to meet the burden of demonstrating that counsels' conduct was unreasonable and detrimental. This claim is without merit.

### Fifth Ground for Relief

The errors and omissions of Trial Counsel during the Penalty Phase of Trial Violated Mr. Fitzpatrick's right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

1.   Stun Belt
2.   Partially Waiver Of Mitigation Without A Hearing
3.   Failure To Obtain Mitigation Specialist And Addictions Expert
4.   Failure to Carry Out Proper Mitigation Investigation

For the ease of addressing this claim, the portion of the Ohio Supreme Court's direct appeal decision summarizing the mitigation evidence is reproduced below.

> The centerpiece of Fitzpatrick's case in mitigation was the testimony of Dr. Emmett Cooper, a psychiatrist who examined Fitzpatrick twice: first in October 2001 and again in January 2002, about two weeks before the penalty hearing. Dr. Cooper diagnosed Fitzpatrick as having a "substance-induced psychotic disorder and major depression disorder with psychotic features." Dr. Cooper also concluded that Fitzpatrick had suffered from "acute cocaine intoxication" and "cocaine delirium during the alleged offenses."
>
> Cooper explained that chronic cocaine use can cause changes in the brain that may lead to hallucinations and delusions "even when one is not using." According to Cooper, such changes have taken place in Fitzpatrick's brain. A few months before the murders, Fitzpatrick began experiencing paranoia, delusions, and hallucinations, which are signs of a "thought disorder." This condition was Fitzpatrick's "baseline." Despite his substance-induced psychotic disorder, Fitzpatrick "was still able to function. More or less able to go to work, and to interact reasonably well." Cooper explained that some

schizophrenics "have good reality testing." Even though they experience hallucinations, they know their hallucinations are not real.

However, intoxication caused Fitzpatrick to lose his reality-testing ability. Intoxicated, Fitzpatrick could not tell his hallucinations from reality, and his hallucinations thus "drove his behavior."

According to Cooper, Fitzpatrick was intoxicated at the time of the murders with cocaine, Valium, marijuana, beer, and benzodiazepines. Fitzpatrick was hallucinating at times, "going in and out of consensual reality," even though he was still "able to transact some social interactions" (e.g., buying more drugs). The level of drugs in his system at any given time "dictated whether * * * he was more psychotic or more in a reality basis." In Cooper's opinion, at the time of the murders, intoxication rendered Fitzpatrick "acutely psychotic to about the top of his baseline" and caused him to commit the murders.

Detective Dilbert was a defense witness in the penalty phase. He testified about statements that Fitzpatrick's cousin Marvin Thomas had made to investigators concerning Thomas's June 10, 2001 conversation with Fitzpatrick.

According to Thomas, Fitzpatrick said he had been "on a crack binge from Tuesday [June 5] to Thursday [June 7]." Fitzpatrick told his cousin that on June 7, he saw the Devil, who said he was "as real as God" and invited Fitzpatrick to touch him. Thomas said that Fitzpatrick had described the feeling as follows: "The feeling was like when you put a sweeper up to your hand and it sucks your hand. He [Fitzpatrick] said he felt the hard suck, just like suck all his life out of his body."

Dilbert also testified that Fitzpatrick had told him that "he had been smoking crack for several days, and that he had been up for several days." In Dilbert's opinion, Fitzpatrick's appearance was consistent with that statement.

Fitzpatrick's co-worker Eric Mitchell testified about a conversation he had had with Fitzpatrick in the basement of 867 Chicago Avenue on the morning of June 9. Fitzpatrick had recently been suspended from his job at the Formica plant. Mitchell visited Fitzpatrick that morning to notify him to attend a meeting about his job status.

Mitchell testified that Fitzpatrick told him that "he had been fighting

against the devil, and felt like he had been fighting a thousand people." During the conversation, Fitzpatrick repeatedly interrupted Mitchell with claims that he heard people upstairs. He would then run upstairs, peep outside through the window blinds, then run back downstairs.

Mitchell testified that Fitzpatrick had mentioned his hallucinations before June 9, on a few occasions when he was drinking or "high on pills." On those occasions, Fitzpatrick told Mitchell that "he felt somebody was following him" and that he was having blackouts. During the June 9 conversation, Mitchell noticed drug paraphernalia in the basement.

In rebuttal, the state called Anita Nixon, a cousin of Doreatha Hayes. Nixon testified that she had telephoned Doreatha's house at approximately 9:00 a.m. on June 8, 2001-- the day after Fitzpatrick had killed Shenay and Doreatha, and the day before he killed Rose. Fitzpatrick answered the phone, and he and Nixon talked for about ten minutes. Nixon described Fitzpatrick as speaking in a "normal * * * relaxed * * * pleasant" manner. In Nixon's opinion, Fitzpatrick did not sound intoxicated.


Fitzpatrick instructed his counsel not to call certain witnesses, including family members, in mitigation. However, he did make an unsworn statement under R.C. 2929.03(D)(1). He stated: "I don't remember anything that happened with Shay [Shenay] or Doreatha. When I woke up I was at the bottom of the steps leaning towards Doreatha's room. I was covered with blood." After finding their bodies, he took "a whole bunch of Valiums." He woke up the next morning and "got high some more," and then when he felt better, he "went over and got Mr. Rose."

Fitzpatrick said that after he and Rose entered the house, he told Rose that he had done "something real bad to Doreatha," and Rose told him to call 911. Fitzpatrick claimed that as he called 911, Rose hit him in the back of the head and a struggle began. As they struggled, they both fell down the basement stairs and then Rose pointed a gun at Fitzpatrick. Fitzpatrick then hit Rose in the arm with the hatchet and then "kept hitting him, hitting him." (Fitzpatrick told a similar tale to Marvin Thomas the day after he killed Rose.)

Fitzpatrick stated that he had then run outside. When he saw police, he went back inside, ran downstairs, and got Rose's gun. When he

came back upstairs, a police officer (Sumler) was in the house. Fitzpatrick pointed the gun at him and said, "I don't want to kill you; I just want to leave." The officer ran, and Fitzpatrick fired "at the glass" in the door; he later claimed, "[The officer] was already out the door when I shot."

Fitzpatrick said that he had fled in the police cruiser but had to abandon it when he "ran the car up into some bushes." When he ran past a store, a crowd of people grabbed him, and as he struggled to get free, the gun fell out of his pocket; upon seeing it, the crowd "scattered."

Fitzpatrick admitted that he had entered Montika Pitt's house through an open door, but denied that he had choked her. Fitzpatrick said that Pitts began screaming and pushing him against a door, while he merely tried to get away. He fled down the street, where he saw a lady (Marjorie Duff) getting out of her car. He admitted that he had pushed her out of his way and stolen her car, but denied that he had demanded her keys, which he claimed had been in the ignition.

Fitzpatrick apologized for killing Doreatha and Shenay, and said that he "wouldn't knowingly do this to anybody."

Fitzpatrick contends that the evidence establishes a mitigating factor under R.C. 2929.04(B)(3): "because of a mental disease or defect," Fitzpatrick "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" at the time he murdered his victims.

*State v. Campbell*, 102 Ohio St. 3d 321, 335-337 (2004).

The first sub-claim of this ground for relief alleges counsels' ineffectiveness in their failure to object or to request a hearing on Fitzpatrick appearing in shackles and/or a stun belt. (Petition, Doc. No. 22 at 56); (Traverse, Doc. No. 30 at 99-102.) Respondent counters by arguing that this sub-claim is procedurally defaulted. (Return of Writ, Doc. No. 26 at 49.) Petitioner raised this claim on post-conviction relief. The court held that the claim was based on the record and could have been raised at trial or on direct appeal and was therefore barred by *res judicata*. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V, p 343.)

On appeal, the court held that "Fitzpatrick failed to provide in support of the challenges to his restraint during the penalty phase of trial evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief," and that denial of the claim was proper. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 **24-25 (Ohio App. 1st Dist. 2004). Therefore, the claim before us is now procedurally defaulted. In addition, for reasons set forth in the third ground for relief, this sub-claim is without merit. *See supra* Third Ground for Relief at 53.

In his next sub-claim Petitioner argues that counsel were ineffective in their failure to request a hearing prior to allowing Fitzpatrick to partially waive mitigation. (Petition, Doc. No. 22 at 59-60); (Traverse, Doc. No. 30 at 103); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 12.) Respondent counters by stating that this portion of the claim is procedurally defaulted stating that Petitioner failed to bring this claim on either direct appeal or in post-conviction relief proceedings. (Return of Writ, Doc. No. 26 at 50.) This claim however was brought as an underlying claim to ineffective assistance of appellate counsel in Petitioner's Application to Reopen his appeal under Ohio S. Ct. Prac. R. XI § 5(A) Motion to Reopen which was denied on February 16, 2005. *State v. Fitzpatrick*, 105 Ohio St. 3d 1436 (2005). Because claims of ineffective assistance of appellate counsel are based on a different legal theory from the underlying claims, the application to reopen does not preserve the underlying claims from default. *Garner v. Mitchell,* 502 F.3d 394 (6th Cir. 2007), *citing White v. Mitchell,* 431 F.3d 517, 526 (6th Cir. 2005); *Bailey v. Nagle,* 172 F.3d 1299, 1309 n. 8 (11th Cir. 1999); and *Levasseur v. Pepe*, 70 F.3d 187, 191-92 (1st Cir. 1995). Therefore, the underlying claim of ineffective assistance of trial counsel is procedurally defaulted as Petitioner failed to present that claim at the proper time of direct appeal or post-conviction relief. Furthermore, cause and prejudice cannot be established as

Petitioner failed to raise ineffective assistance of appellate counsel as an independent claim in this Court, so it is not preserved for review, and therefore cannot serve as cause. *See supra* First Ground for Relief at 27-30. This claim is procedurally defaulted.

In the alternative, this Court examines the merits. Petitioner asserts that counsels' failure to request a competency hearing, or insist that the court make a colloquy on the record, when Fitzpatrick asked to partially waive his mitigation violated his rights as they could not be assured that he waived this right knowingly and voluntarily. (Petition, Doc. No. 22 at 59-60); (Traverse, Doc. No. 30 at 103.)

At the beginning of the mitigation phase, trial counsel informed the court that Fitzpatrick did not wish to have any of his family members testify on his behalf. (Petition, Doc. No. 22 at 59-60); (Traverse, Doc. No. 30 at 103); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 12.) Specifically, counsel stated that they had a number of witnesses, including family members, that were willing to testify for Fitzpatrick, but it was Fitzpatrick's decision that they not do so. (Trial Tr. Vol. 13 at 1130.) These witnesses included Fitzpatrick's mother and Tracy Bailey, a friend, both of whom would have testified on the subject of Fitzpatrick's upbringing and life. (Trial Tr. Vol. 14 at 1254.)

Petitioner now argues that counsel were ineffective in following his decision, and that in partially waiving his mitigation, defense counsel should have requested a hearing to ensure that this waiver was knowing and voluntary, should have had him sign a waiver of this right, or should have insisted that the court make a colloquy on the record. (Petition, Doc. No. 22 at 60); (Traverse, Doc. No. 30 at 103.) Petitioner acknowledges that a waiver of mitigation does not necessarily call into question competency, but coupled with his psychological problems and

medication he was taking at the time of his trial, he feels that competency became an issue counsel should have considered. (Traverse, Doc. No. 30 at 103.) "A defendant is mentally incompetent to stand trial if he lacks a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him."" *Dusky v. United States*, 362 U.S. 402 (1960). As discussed in the first ground for relief, counsel for both parties and the trial court felt that Fitzpatrick met the competency requirements. *See supra* First Ground for Relief at 30-42.

The Sixth Circuit stated in the *Coleman* case that "[t]his court has squarely held that a capital defendant's counsel is not constitutionally ineffective when a competent defendant prevents the investigation and presentation of mitigation evidence." *Coleman v. Mitchell*, 244 F.3d 533, 544-46 (6th Cir. 2001). It follows that the Constitution does not prohibit a competent capital defendant from partially waiving the presentation of mitigation evidence.

Petitioner also fails to meet the prejudice prong of the *Strickland* standard. Petitioner fails to show that he was prejudiced as a result of waiving potential mitigation evidence. The only information before the Court is that testimony could have been presented from these two individuals, that they had spoken with Dr. Cooper, the defense expert at mitigation, and that their testimony would have generally related to Fitzpatrick's upbringing and life. (Traverse, Doc. No. 30 at 103.) To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id.* at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In certain circumstances, such as actual or constructive denial of assistance of counsel, prejudice is presumed, as the defendant has a Sixth Amendment right to counsel to

ensure he is given the assistance necessary to rely on the outcome of the trial. *Id*. at 692; *United States v. Cronic*, 466 U.S. 648, 658 (1984); *Rickman v. Bell*, 131 F.3d 1150 (6ᵗʰ Cir. 1997)(inferring prejudice when there is a complete failure to investigate existing mitigating evidence as such representation is below an objective standard of reasonable representation.)  In this case it seems that defense counsel did speak, to some extent with these two witnesses, but did not present them as a result of Fitzpatrick's decision. (Trial Tr. Vol. 13 at 1130); (Trial Tr. Vol. 14 at 1254); (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 159-160.)  There is no information as to what these two witnesses would have testified to other than a general statement it would refer to Petitioner's "upbringing and life."  "There is an insufficient showing of prejudice where 'one is left with pure speculation in whether the outcome of the trial or the penalty phase could have been any different.'" *Slaughter v. Parker*, 450 F.3d 224, 234 (6ᵗʰ Cir. 2006) *citing Baze v. Parker*, 371 F.3d 310, 322 (6ᵗʰ Cir. 2004).  This general statement does not demonstrate that there is a reasonable probability that their testimony would have contained mitigating evidence sufficient to undermine the reliability in the outcome of the trial.

Next Petitioner alleges counsels' ineffectiveness in their failure to hire a mitigation specialist and an addictions expert. (Petition, Doc. No. 22 at 60.)  Respondent counters that the claim is procedurally defaulted. (Return of Writ, Doc. No. 26 at 50-51.)  Fitzpatrick raised the mitigation specialist issue on post-conviction relief as his eleventh claim, and it was held to have been barred by *res judicata* as it should have been raised on direct appeal.("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V, p 346-347.)  Additionally the trial court held that "the claim was based on an alternative theory of mitigation and was not sufficient to demonstrate ineffective assistance of counsel." *Id*.  The court of appeals stated that

"Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief"and that this claim was currently defaulted as it was not supported by sufficient evidence outside the record. *State v. Fitzpatrick*, 2004 Ohio App. Lexis 5058 at ** 43 (Ohio App. 1st Dist. 2004). On the issue of an addictions specialist the trial court found the claim to be without merit as trial counsel engaged in a reasonable strategy and the addiction evidence offered in post-conviction was cumulative to the evidence presented by Dr. Cooper during trial and that he fails to demonstrate a denial of a constitutional right or prejudice. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx. Vol. V at 347-348.) The court of appeals held that the lower court properly denied the claim. Both courts addressed this sub-claim on the merits. *Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at ** 47 (Ohio App. 1st Dist. 2004). This sub-claim is properly preserved for this Court to address the merits.

The Court now turns to the merits of this sub-claim, and addresses the merits in the alternative of the sub-claim pertaining to the mitigation specialist. In post-conviction the state court held:

> 1. Mitigation Specialist
> We address together Fitzpatrick's ninth, tenth and eleventh claims. In his eleventh claim, he assailed his counsel's effectiveness in failing to avail themselves of the funds granted by the trial court to secure the services of a mitigation specialist. Specifically, he argued that a mitigation specialist would have instructed counsel in the use of his employment and jail records and would have directed counsel to secure the services of a mental-health professional to assist in preparing and presenting in mitigation his psychological, medical, and social histories. His ninth and tenth claims similarly charged that counsel had inadequately assembled and presented evidence to prove in mitigation that he had been gainfully employed and could adjust to incarceration.
>
> The record disclosed that less than a month before Fitzpatrick's trial was scheduled to begin, the defense had filed a motion requesting

funds to employ as a mitigation specialist one James F. Crates. The next day, the defense moved for a continuance for a variety of reasons, including the fact that the date set for trial presented "scheduling problems" for Crates and other mitigation investigators whom counsel had sought to employ. The trial court granted the continuance and authorized funding for and the appointment of Crates to serve as the defense's mitigation specialist.

In an affidavit offered in support of Fitzpatrick's ninth, tenth, and eleventh claims, Crates averred that, after the court had settled upon the new trial date, he had warned defense counsel of a "possible conflict" with the new date. This conflict ultimately limited Crates's assistance on the case to a single day. In the course of that day, he did not speak to Fitzpatrick, but spoke with three potential mitigation witnesses, reviewed the case files, and advised counsel "about issues that [had] quickly [become] apparent to [him]." Specifically, Crates pointed to witness statements concerning Fitzpatrick "hearing voices and acting bizarre." Crates found these statements to suggest that Fitzpatrick had "mental health issues that [the defense's psychiatric expert,] Dr. [Emmett] Cooper[,] was not exploring," and that Fitzpatrick "might be psychotic from another standpoint." Crates thus suggested to counsel that a "psychologist * * * with a neuropsychological specialty get involved," "to conduct a full clinical and neuropsychological battery of tests" and to provide "a dual diagnosis, not solely looking at the crack cocaine effects on [Fitzpatrick]."

Fitzpatrick also submitted in support of his claims outside evidence in the form of his justice-center records, the affidavit of his capital-litigation expert, his employment records, and correspondence from defense counsel to his former employer requesting the records. Crates averred in his affidavit that counsel had provided him with neither the justice-center records nor the employment records. If they had, he asserted, he would have recommended that counsel provide the records to the defense's mental-health expert, and that they introduce the records at trial in support of the relevant mitigating factors.

Crates conceded that he did not know what, if any, action defense counsel had taken on his suggestions. But he asserted that he had perceived defense counsel to be "dismissive" of his efforts to engage them in "a cooperative psycho-social history inquiry."

A. Intoxication

87

* * * *

Fitzpatrick failed to submit in support of his eleventh claim evidence that he had, as the mitigation specialist had suspected, acted under something other than a voluntary "substance-induced psychotic disorder." Thus, he failed to demonstrate a reasonable probability that, but for his counsel's failure to employ a mitigation specialist, the R.C. 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors. Because Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief, we conclude that the common pleas court properly denied this aspect of his eleventh claim.

B. Gainful employment and ability to adapt to incarceration

Fitzpatrick's ninth and tenth claims and the remaining aspects of his eleventh claim challenged his counsel's effectiveness in failing to secure the services of a mitigation expert to assist in assembling, and then presenting, mitigating evidence of his gainful employment and his ability to adjust to incarceration. In the direct appeal, the Ohio Supreme Court specifically found that Fitzpatrick's employment record was a factor to be weighed against the aggravating circumstances in determining whether he should be sentenced to death. But again, the evidence offered in support of these claims did not demonstrate a reasonable probability that, but for counsel's failure to employ a mitigation specialist to assist in assembling such evidence, or but for counsel's failure to offer such evidence, these mitigating factors would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors. And, again, Fitzpatrick's failure to demonstrate substantive grounds for relief leads us to conclude that the common pleas court properly denied his ninth and tenth claims and the relevant aspects of his eleventh claim.

2. Addiction expert

In his twelfth claim, Fitzpatrick contended that he had been denied the effective assistance of counsel by his counsel's failure to employ an "addiction" expert. Such an expert, he asserted, would have helped the three-judge panel to understand that Fitzpatrick's drug addiction had destroyed his ability to voluntarily choose to use or not to use drugs.

In support of this claim, Fitzpatrick submitted outside evidence in the form of the affidavit of his capital-litigation expert, a photocopy of a portion of a mental-disorders manual that provided the American

Psychiatric Association's definition of substance dependency, and a photocopy of a research report on drug abuse and addiction. He also submitted an undated transcript of testimony in an unspecified proceeding by a doctor certified in "addictions medicine" that appears to have been offered by another capital defendant in support of an postconviction challenge to his trial counsel's effectiveness in failing to consult an addiction expert.

The Ohio Supreme Court assigned the R.C. 2929.04(B)(3) diminished-capacity factor "little weight" upon its determination that Fitzpatrick had "voluntar[ily]" undertaken the "chronic cocaine use" that had "both caused and exacerbated" the "preexisting mental disorder" under which he had operated when he had committed the murders. Fitzpatrick failed to submit in support of his twelfth claim evidence that his ingestion of drugs had been other than voluntary. Thus, he failed to demonstrate a reasonable probability that, but for his counsel's failure to employ an addiction expert, the R.C. 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors. Fitzpatrick again failed to sustain his initial burden of demonstrating substantive grounds for relief. Therefore, the common pleas court properly denied his twelfth claim.

*State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at **35-47(Ohio App. 1st Dist. 2004).

Petitioner argues the importance that "a cohesive, sound theory of mitigation is essential to a capital trial. (Traverse, Doc. No. 30 at 104.) A sound mitigation theory would have presented the complete picture of Mr. Fitzpatrick over his lifetime. *Id*. This would have enabled the three-judge panel to understood [sic] Mr. Fitzpatrick's behavior in light of his lifelong development." *Id*. He further cites to the ABA Guidelines which state that a defense team should consist of no fewer than two qualified attorneys, an investigators, and a mitigation specialist. American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003). (Petitioner's Post-Hearing Brief, Doc. No. 80 at 2.) Portions of this claim were also addressed during the evidentiary hearing held before this Court on October 29- 30, 2007. (Transcript, Doc. No. 75; Transcript, Doc. No. 76.) It was established through both the

record and the evidentiary hearing, that defense counsel sought and obtained court funds to hire mitigation expert, James Crates. (Petition, Doc. No. 22 at 61);(Traverse, Doc. No. 30 at 104); ("Defendant's Motion for Appropriation of Funds for a Defense Mitigation Expert," Return of Writ, Doc. No. 26 Apx. Vol. 2 at 69); (Entry Authorizing Appointment of Expert and Payment of Fees for Same," Return of Writ, Doc. No. 26 Apx. Vol. 2 at 120); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 18); (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 123, 140, 156). Crates, due to prior commitments with another trial, thought he would unavailable at the time of Fitzpatrick's trial, at which point defense counsel requested a continuance. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 140.); ("Motion for Continuance of Trial Date," Return of Writ, Doc. No. 26 Apx. Vol. 2 at 113.) This continuance however, did not clear Crates' scheduling conflict and he still had concerns of his availability to work on Fitzpatrick's case. (Evid. Hrg. Trial Tr. 10/29/07, Doc. No. 75 at 158.) Crates attempted to meet with the Petitioner on one occasion but was told by Attorney Wenke that it was not possible at that time. *Id*. at 158-159. Instead, the preparations consisted of document review, some of which suggested that Fitzpatrick may have been experiencing hallucinations. *Id*. Crates interviewed "several people"which may have included Fitzpatrick's mother and a colleague. *Id*. at 159-160. In addition, he requested school and employment records, but did not recall at the time of the evidentiary hearing, if he had the opportunity to review them prior to Fitzpatrick's trial. *Id*. at 160-161, 163. Crates testified that he then relayed his concerns of Fitzpatrick's mental health to defense counsel and suggested a mental health specialist be contacted, recommending Robert Tureen. *Id*. at 162, 164. Despite Crates lack of time to investigate mitigation for this cause, trial counsel did not seek to obtain another mitigation specialist. (Traverse, Doc. No. 30 at 104.) Fitzpatrick argues that he was

prejudiced as a result of this failure as there was no adequate or reasonable investigation into his psychological, social, or medical histories. *Id*.; (Petition, Doc. No. 22 at 61); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 22.)

Fitzpatrick makes the general argument that the mitigation evidence should have included "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant." (Petitioner's Post-Brief Hearing, Doc. No. 80 at 21) *citing* ABA Guidelines § 10.7. There is a reference made to the availability of both Fitzpatrick's mother and Tracey Bailey, a friend of the family. Both had previously spoken with defense expert, Dr. Cooper, and there was a general statement made that they would have informed the panel of Fitzpatrick's upbringing. (Trial Tr. Vol. 13 at 1200.) There is no specificity as to particular aspects or incidents within that upbringing about which they could have testified. Aside from this statement Petitioner has not provided the Court with any additional social information which could have been presented for mitigation purposes. Counsels' decision can only be effective to the extent they undertook investigation and knew their options. *Harries v. Bell*, 417 F.3d 631, (6th Cir. 2005). A reluctance or resistance on the part of a client to disclose information does not excuse failure to investigate. *Id*. *citing Coleman v. Mitchell*, 268 F.3d 417, 449-50 (6th Cir. 2001). However, on a claim of ineffective assistance of trial counsel for failure to present mitigating evidence, AEDPA requires the petitioner to have presented the factual bases of his claims during postconviction proceedings in state court. *Frazier v. Huffman,* 348 F.3d 174 (6th Cir. 2003), *citing Alley v. Bell,* 307 F.3d 380, 386 (6th Cir. 2002). "There is an insufficient showing of prejudice where 'one is left with pure speculation in whether the outcome of the trial or the penalty phase could have been any different.'" *Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006) *citing*

*Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).

More specifically, however, Fitzpatrick argues that his employment records and jail records should have been investigated and presented. He supports this argument by stating that a trained mitigation specialist would have been able to review his medical records from the Justice Center and would have "recognized the implications of the medications being administered in varying types and combinations." (Petition, Doc. No. 22 at 61.) Not only would this have raised a red flag but the mitigation specialist could have recommended that trial counsel raise the issue of the medications effect with a mental health professional. *Id.* at 62.

This sub-claim is without merit. Regardless of the participation of a mitigation specialist, counsel and its various doctors had the records prior to, and at the time of trial. Dr. Cooper, the psychiatric expert for the defense, testified to the fact that he had reviewed Fitzpatrick's medical records from the Justice Center and was aware of the multiple medications Fitzpatrick had been prescribed, which included nortroptyline, trazodone, respidol, seroquil, haldol, and Benadryl. (Trial Tr. Vol. 13 at 1192-1194.)

Additionally, he asserts that a mitigation specialist would have reviewed Fitzpatrick's employment history and jail records and alerted counsel to their mitigation value in that he held his job for a number of years and his jail records showed positive adjustment to incarceration. (Petition, Doc. No. 22 at 62); (Traverse, Doc. No. 30 at 105); (Petitioner's Post-Hearing Brief, Doc. No. 80 at 22.) The employment record sub-claim is without merit as the information was before the trial court, albeit, in the form of testimony from Eric Mitchell. Mitchell, a co-worker testified to the fact that he had worked with Fitzpatrick at the Formica Corporation for a period of almost five years. Furthermore, it is noted that the Ohio Supreme Court considered Fitzpatrick's

employment record in its reweighing analysis on direct appeal. *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 339 (2004). Errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing or by harmless error review in the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle*, 289 F.3d 882, 888-90 (6th Cir. 2002); *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005).

Petitioner's positive adjustment to incarceration was not presented. However, this Court notes that there are references in the record to suggest that Fitzpatrick had been placed in administrative segregation for reasons not made clear to the trial court other than, "there was some sort of incident with another inmate." (Trial Tr. Vol. 3 at 42.) The jail records, submitted in post-conviction, show grievances filed by Petitioner which referenced being accused of stealing another inmate's medication, having been the victim of theft, his cell was being searched, and forceful treatment by officers. (Return of Writ, Doc. No. 26 Apx. Vol. 4 at 161-162, 167-168, 278-279.) The Court recognizes that Petitioner's use of the "proper internal procedures" to get these issues resolved does show that he was adapting to the prison system, however, there are also notes of Petitioner's behavior and not taking responsibility. *Id.* at 169. Given the conflicting statements in the jail records, the omission of the jail records in mitigation could well have been a matter of strategy.

Next, Fitzpatrick claims he was denied effective assistance of counsel during mitigation as a result of counsels' failure to obtain an expert on addictions, specifically cocaine, to explain the effects of the drug. (Petition, Doc. No. 22 at 66);(Traverse, Doc. No. 30 at 106.) Specifically an expert would have explained to the judicial panel that addiction is not a choice and Petitioner

could not have discontinued his use at will as cocaine is powerfully addictive. In addition an expert would have provided the judicial panel with "(1) the testimonial component necessary for the panel to give weight and effect to Mr. Fitzpatrick's mitigating evidence offered on his crack cocaine psychosis; (2) information as to the effects of Mr. Fitzpatrick's crack cocaine and other substance abuse on his mental state and behavior at the times he engaged in the charged capital crimes; (3) an explanation to the panel regarding the illness of chemical dependency generally; and (4) how this illness manifested in Mr. Fitzpatrick specifically." (Petition, Doc. No. 22 at 66-67.) Had an expert presented this information, he argues, it would have given additional weight to Dr. Cooper's testimony, and there was a reasonable probability that the judicial panel would have weighed this drug use more heavily in mitigation, rather than assigning it so little weight as the consumption of drugs was a voluntary act on Petitioner's part.

During mitigation there was testimony presented regarding Fitzpatrick's drug use and both the long and short term effects it may have had on him. Co-worker and friend Eric Mitchell testified as to Petitioner's drug use, its effects on Petitioner's increasingly erratic behavior, and the effect of this addiction within his personal relationship with the Doreatha Hayes. (Trial Tr. Vol. 13 at 1172-1173, 1176). Additionally Detective Dilbert testified and relayed to the court Fitzpatrick's assertion that prior to the murders he had been on a cocaine binge which lasted for days. *Id.* at 1144, 1146, 1153. Dr. Cooper also testified on Fitzpatrick's behalf during mitigation discussing extensively both his drug use and the possible chemical reaction the substances were having on his brain causing paranoia, delusions, and hallucinations. *Id.* at 1199-1212, 1221, 1230. Specifically Dr. Cooper diagnosed Fitzpatrick with having substance induced psychotic disorder and major depression disorder with psychotic features, brought on by his use of cocaine and other

substances. *Id*. at 1198-1199, 1201, 1204-1205, 1208-1209, 1216, 1230-1231, 1234-1235. He explained to the panel of judges that cocaine is a strong stimulus which can induce changes in the brain and bring about hallucinations and delusions, often even after the addict has stopped using. *Id*. at 1208. He stated that Fitzpatrick had at least a fifteen or sixteen year history of polysubstance dependence, including cocaine, and that he had been suffering from a thought disorder including paranoia and hallucinations which had onset six to nine months prior to the murders. *Id*. at 1202-1203, 1220-1222. He opined that Fitzpatrick was in and out of consensual reality in that at some points in time he was still able to function regularly, going to work and conducting social interactions, and at other points he was responding to the hallucinations and delusions. *Id*. at 1203-1207, 1231. Dr. Cooper also explained to the panel that the ingestion of cocaine affects the brain in its release of dopamine, serotonin and norepinephrine. *Id*. at 1211-1212. The shift in this balance can produce Parkinson's Disease, schizophrenia, psychosis, and hallucinations. *Id*. He further testified that people who abuse cocaine, especially crack cocaine, have a significant increased instance of violent behavior. *Id*. at 1216. Dr. Cooper was of the opinion that at the time of the murders Fitzpatrick was suffering from acute cocaine intoxication and that during the several days of the binge, he was in and out of reality. *Id*. at 1230-1232.

Fitzpatrick does not prevail on this claim as he fails to meet the prejudice prong of *Strickland*. While he argues that counsel were ineffective in their failure to obtain an addictions expert, he fails to demonstrate that there was a reasonable probability that, absent this error, the outcome of the trial would have been different. He does not offer any additional information as to what an expert would have offered and the explanation for the need for an expert appears to be cumulative to what was actually presented in mitigation. The panel of judges was made aware of

Fitzpatrick's substance abuse history and the potential effects of cocaine on the brain and one's sense of reality. This sub-claim is without merit.

In his last sub-claim Petitioner alleges ineffective assistance of counsel in that they failed to carry out a proper mitigation investigation. (Petition, Doc. No. 22 at 67.) He argues that counsel did virtually nothing to prepare for mitigation, which included failing to investigate his past employment records as well as his jail records. *Id.* Respondent counters by arguing that this claim is procedurally defaulted as it was never presented to the state courts and no longer has the opportunity to do so. (Return of Writ, Doc. No. 26 at 51.) Petitioner asserts that this portion of the claim was presented in his motion to reopen under Ohio S. Ct. Prac. R. XI § 5(A). (Traverse, Doc. No. 30 at 112.) The Court does not see where counsels' failure to investigate was alleged as an underlying claim in Petitioner's 26(B) motion. (Return of Writ, Doc. No. 26, Apx. Vol. 3 at 326.) This claim is procedurally defaulted as Petitioner can no longer raise the issue in state court.

In the alternative, in turning to the merits, Fitzpatrick alleges that counsel should have investigated and presented evidence of his employment and positive adjustment to incarceration. (Petition, Doc. No. 22 at 67.) He argues that his employment records would have shown the court that he was a productive member of society. *Id.* He had been employed by the Formica Corporation for almost five years, and aside from absenteeism and tardiness was a satisfactory employee. *Id.* He further argues that counsel should have contacted supervisors and co-workers to present testimony during mitigation. *Id.* The Court notes that testimony was presented from one co-worker, Eric Mitchell. (Trial Tr. Vol. 13 at 1167.) Mitchell told the trial court that he and Fitzpatrick had been co-workers at the Formica Corporation for approximately five years. *Id.* at

1168, 1177-1178.  He also testified to the fact that this was the first time to his knowledge that

Petitioner had been suspended from his job. *Id*. at 1178.  Petitioner fails to identify any other

particular people or what type of testimony they would have provided.  "There is an insufficient

showing of prejudice where 'one is left with pure speculation in whether the outcome of the trial

or the penalty phase could have been any different.'" *Slaughter v. Parker*, 450 F.3d 224, 234 (6th

Cir. 2006) *citing Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).

He also alleges that counsel should have investigated, presented, or had Dr. Cooper testify

to Fitzpatrick's ability to adjust to incarceration. (Petition, Doc. No. 22 at 68.)  For the reasons set

forth above in regards to jail records, this sub-claim is without merit.


### Sixth Ground for Relief

The Trial Court's failure to conduct a competency hearing concerning
Mr. Fitzpatrick's waiver of his Sixth Amendment right to Trial by
Jury, his Guilty Plea, and his waiver of his Sixth Amendment right to
a Speedy Trial deprived Mr. Fitzpatrick of his constitutional rights.
Const. Amends. V, VI, VIII, and XIV.

1.    Speedy Trial Waiver
2.    Jury Waiver and Speedy Trial Waiver

For reasons set forth in the first and second grounds for relief, Respondent argues that this

ground for relief is procedurally defaulted. (Return of Writ, Doc. No. 26 at 60.)  This claim was

raised on post-conviction relief.  The court held that because the exchange between Fitzpatrick

and the court regarding his understanding of this waiver was on the record, and as such should

have been raised either at trial or on direct appeal.  Therefore, the claim is barred by the doctrine

of *res judicata*. ("Findings of Fact and Conclusions of Law" Return of Writ, Doc. No. 26, Apx.

Vol. V, p 339.); *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 at **26-31(Ohio App. 1st Dist.

2004); *see also* First Ground for Relief 27-30.

As stated in the first ground for relief, the standard in determining whether or not a defendant is competent is whether he or she "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - - and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. 162, 172 (1975). A determination of competence is a factual finding, to which deference must be paid. *Thompson v. Keohane*, 516 U.S. 99, 110-111(1995); *State v. Stanley*, 121 Ohio App. 3d 673 (1997). Furthermore, a competency determination is necessary only when a court has reason to doubt the defendant's competence. *Godinez v. Moran*, 509 U.S. 389 (1993); *Drope*, 420 U.S. at 180-181 (1975); *Pate v. Robinson*, 383 U.S. 375, 385 (1966).

Ohio sets forth a statutory scheme to protect the right to a fair trial in O. R. C. § 2945.37. *See supra* First Ground for Relief at 31-32. Under this statute, section (B) sets forth that "in a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial." In this particular case, counsel and the court were in the position to observe Petitioner and decide if there was a bona fide doubt as to his competency. Counsel for the defense represented to the court that it was their opinion, after having known Petitioner for an eight-month time period, that he was competent and able to fully understand the proceedings and waive his constitutional rights. (Trial Tr. Vol 10 at 881-882, 885-886, 903-904); (Trial Tr. Vol 12 at 980-981.) The trial court then specifically asked the prosecution if they felt competency was at issue and wanted an evaluation. (Trial Tr. Vol. 10 at 906.) The prosecutors responded that they did not have a finding of evidence

of incompetency and would not be requesting an evaluation. *Id.* After representations of competency by counsel and the court's own observations, it seems that the trial judge did not have reason to doubt that Fitzpatrick had the requisite "sufficient ability to consult with his counsel with a reasonable degree of rational understanding" and "both a rational and factual understanding of the proceedings against him" and did not find a hearing necessary. This Court defers to that finding. For the foregoing analysis in addition to the First and Second Ground for Relief, this claim is without merit.

### Seventh Ground for Relief

The trial court's acceptance of Mr. Fitzpatrick's partial waiver of mitigation without ensuring that it was made knowingly, intelligently, and voluntarily and that Mr. Fitzpatrick was competent to waive that right violated his constitutional rights. Const. Amends. V, VI, VIII, XIV

In his seventh ground for relief, Fitzpatrick asserts that the trial court erred when it accepted his partial waiver of mitigation without *sua sponte* conducting a competency exam to ensure that he was competent to waive his right to mitigation and that the waiver was made knowingly, intelligently, and voluntarily. (Petition, Doc. No. 22 at 75); (Traverse, Doc. No. 30 at 148.) At the beginning of mitigation defense counsel informed the court that they had a number of witnesses, including family members, however, Fitzpatrick had made it clear that he did not want the family members to testify on his behalf. (Trial Tr. Vol. 13 at 1130); (Trial Tr. Vol. 14 at 1254.) There is a specific reference made to the availability of both Fitzpatrick's mother and Tracey Bailey, a friend of the family. Both had previously spoken with defense expert Dr. Cooper, and there was a general statement made that they would have informed the panel of

Fitzpatrick's upbringing. (Trial Tr. Vol. 13 at 1200.)  There is no specificity as to particular aspects or incidents within that upbringing.  Petitioner argues that it was erroneous of the court to not pursue the matter, in that there was not a signed waiver nor any questions asked of him regarding his desire to waive partial mitigation. (Petition, Doc. No. 22 at 75.)  He further argues that the record is void of showing why he waived mitigation or that he understood and was capable of waiving this right. *Id*.

Respondent counters by arguing that the claim was not properly presented to the state courts, having been raised only in the Application for Reopening of direct appeal to the Ohio Supreme Court, which was denied, and thus, effectively preempting any habeas consideration of the claim absent a showing of cause and prejudice. (Return of Writ, Doc No. 26 at 62.)  In the alternative, Respondent argues that this claim is without merit. *Id*. at 63.  Petitioner does not claim here, before this Court, that appellate counsel were ineffective.  As such, this claim has not been preserved for our review and cannot establish cause.  This claim is procedurally defaulted.

Under *Coleman v. Mitchell*, the Sixth Circuit stated that the same standard of competence to stand trial should also apply to whether or not a Petitioner was competent enough to instruct counsel in strategy of his sentencing phase. *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001); *U.S. v. Ford*, 184 F.3d 566, 580 (6th Cir. 1999); *Zuern v. Tate*, 101 F. Supp. 2d 948, 992 (S.D. Ohio 2000).  Therefore, a defendant is competent to waive mitigation if he or she has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Dusky v. United States*, 362 U.S. 402 (1960); (Traverse, Doc. No. 30 at 148.)  A trial court's decision to *sua sponte* conduct a competency

hearing depends on "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Pate v. Smith*, 637 F.2d 1068, 1072 (6ᵗʰ Cir. 1981); *see also State v. Ashworth,* 85 Ohio St. 3d 56, 62 (1999) (holding that under Ohio law, if a defendant waives all mitigation there *should* be a hearing to determine if the waiver is competent, knowing, intelligent, and voluntary)(emphasis added) *but see State v. Monroe,* 105 Ohio St. 3d 384, 396-398 (2005) (clarifying that this need for a hearing only extends to cases in which the defendant makes a waiver of *all* mitigation) (emphasis added), *see further State v. Barton*, 108 Ohio St. 3d 402, 409-410 (2006).

As discussed in the first ground for relief, counsel and the judge spoke extensively prior to trial as to whether or not competency would be at issue. Both counsel for the defendant and the State represented to the court on multiple occasions that they did not feel Fitzpatrick's competency was in question. (Trial Tr. Vol 10 at 881-882, 884-886, 903-904, 906); (Trial Tr. Vol 12 at 980-981.) The trial court was in the position to observe Petitioner throughout the guilt phase. *State v. Stanley*, 121 Ohio App. 3d 673 (1997)(stating that under Ohio law, court may include its own observations in evaluating competency.) The panel of judges also interacted with Petitioner through a colloquy when Petitioner opted to waive a trial by jury and plead guilty, during which they explained to Fitzpatrick his right to present evidence in mitigation. (Trial Tr. Vol. 12 at 966, 968-970, 973.) Throughout this interaction with the court it appeared that Petitioner was able to understand and follow the line of questioning, and in turn respond in a manner which seemed reasonable. *United States v. Walker*, 160 F.3d 1078, 1096 (6ᵗʰ Cir. 1998)(holding that simple and straight forward answers such as yes or no responses may be

sufficient in determining if a defendant made a competent, knowing, intelligent, and voluntary plea.) A determination of competence is a factual finding, to which deference must be paid. *Thompson v. Keohane*, 516 U.S. 99, 110-111(1995). The trial court was not erroneous in its belief that Fitzpatrick was competent in that "he had the sufficient ability to consult with his lawyers and had a reasonable degree of rational and factual understanding of the proceedings against him." *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001); *U.S. v. Ford*, 184 F.3d 566, 580 (6th Cir. 1999); *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *see supra* First Ground for Relief at 30-42.

### Eighth Ground for Relief

> The trial court's erroneous weighing of aggravating circumstances against the mitigating factors and consideration of the nature and circumstances of the offense as an aggravating circumstance deprived Mr. Fitzpatrick of his right to due process and a fair sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

In his eighth ground for relief, Petitioner argues that the weighing process of the trial court was erroneous under Ohio Revised Code § 2929.03(F). (Traverse, Doc. No. 30 at 159.) Specifically, that the written opinion failed to set out reasons why the aggravating circumstances outweigh the mitigating factors. *Id*. Additionally, he argues that the trial court improperly considered the nature and circumstances of the crime as an aggravating factor. *Id*. at 160. As a result of these errors, he argues he was denied his constitutional right to a fair, reliable, and individualized sentencing determination as guaranteed by the Eighth and Fourteenth Amendments and due process of law. *Id*. at 161. Respondent does not assert procedural default. (Return of Writ, Doc. No. 26 at 67.) This Court now turns to the merits.

102

Upon addressing this claim on direct appeal, the state court held:

> B. Sentencing Opinion
> In his sixth proposition of law, Fitzpatrick contends that the trial court's sentencing opinion fails to explain why the panel found that the aggravating circumstances outweigh the mitigating factors. We disagree.
>
> The opinion contains extensive discussion of the aggravating circumstances and the mitigating factors, as well as the following passage:
>
>> "When weighing the aggravating circumstances as previously stated versus the mitigating factors which the Court noted and considered, the Court finds the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt separately as to Counts One, Two, and Three.
>>
>> "A death penalty assessment is the ultimate resolution for the most serious of crimes. It is, as it should be, reserved only for the most heinous aggravated murder cases and for the most vicious acts against common decency and mankind. In this case, Stanley L. Fitzpatrick qualifies in both respects."
>
> Fitzpatrick also contends that the trial court considered the nature and circumstances of the offense as a nonstatutory aggravating circumstance. The panel's discussion of the aggravating circumstances appears under the heading, "Facts Constituting Aggravating Circumstances." This may suggest that the panel believed that the circumstances of the murders were aggravating circumstances. If the panel so believed, it was in error. However, any such error in the trial court's sentencing opinion can be corrected by our independent review in Part VI, below. See State v. Bey (1999), 85 Ohio St. 3d 487, 506, 1999 Ohio 283, 709 N.E.2d 484. Fitzpatrick's sixth proposition is therefore overruled.

*State v. Fitzpatrick*, 102 Ohio St. 3d 321, 331-332 (2004).

This Court agrees. The written opinion was thorough in its discussion of aggravating

circumstances and mitigating factors.[14]  In its sentencing opinion the trial court summarized the

facts constituting the aggravating circumstances, which included: purposely and with prior

calculation and design causing the death of Shenay Hayes, who was under thirteen years of age at

the time of the commission of the offense and that Fitzpatrick was the principal offender in the

commission of the offense; purposely and with prior calculation and design causing the death of

Doreatha Hayes as part of a course of conduct involving the purposeful killing of two or more

persons; and purposely and with prior calculation and design caused the death of Elton Arybie

Rose as part of a course of conduct involving the purposeful killing of two or more persons.

(Return of Writ, Doc. No. 26 , Apx. Vol. 2 at 321-322, 325.)

In addition, the decision thoroughly addressed the mitigation evidence. *Id.* at 323-325,

326-327.  It summarized the testimony from Detective Dilbert, Dr. Cooper, and Eric Mitchell as

to Petitioner's mental state at the time of the murders.  It described hallucinations and delusions

of interactions with the devil, substance abuse problems including acute cocaine intoxication at

the time of the events, and a diagnosis of his mental state as being substance induced psychotic

disorder with major depression.  Additionally, the court considered Fitzpatrick's unsworn

statement.

The trial court specifically considered three mitigation factors in its weighing process:

lack of significant history of prior convictions; whether at the time of committing the offense, the

offender, because of a mental disease or defect lacked substantial capacity to appreciate the

criminality of the offender's conduct or to conform the offender's conduct to the requirements of

---

[14] For an excerpt of the relevant portions of the "Opinion in Compliance with Ohio Revised Code 2929.04(F)" see Appendix.

the law; and any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Under the first mitigation factor the court found that Fitzpatrick had no criminal history with the exception of a minor misdemeanor traffic citation. *Id*. at 326. Under the second, the judges considered the fact that Fitzpatrick may have or did consume a large amount of crack cocaine prior to the murders which may have affected his mental status. *Id*. Additionally they considered the testimony of Dr. Cooper, in which he stated that it was his professional opinion that Fitzpatrick was suffering from a serious mental defect of substance induced psychotic disorder and major depression disorder with psychotic features. *Id*. He further testified it was his opinion that Petitioner was acutely intoxicated with cocaine and other substances and as a result was going in and out of consensual reality. *Id*. Finally the court considered Dr. Cooper's assertion that Petitioner was suffering from hallucinations and delusions but was still able to function and carry on with activities such as going to work. *Id*. The court gave some weight to Dr. Cooper's assessment as to Fitzpatrick's mental state, but did not however, give it a lot of weight as Fitzpatrick voluntarily ingested the cocaine which produced this acute intoxication that led to his behavior. *Id*. at 327. Finally, in the third "catch-all" mitigating factor the court took into consideration Fitzpatrick's plea of guilty and his remorse and apology to the victims' families. *Id*.

After a seven page discussion of the facts supporting the aggravating circumstances, a summary of the mitigation evidence, and an explanation of what aggravation circumstances and mitigating factors the court considered in its weighing process, the court issued the following decision:

<u>Decision</u>

When weighing the aggravating circumstances as previously stated versus the mitigating factors which the Court noted and considered, the Court finds the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt separately as to Counts One, Two and Three.

A death penalty assessment is the ultimate resolution for the most serious of crimes. It is, as it should be, reserved only for the most heinous aggravated murder cases and for the most vicious acts against common decency and mankind. In this case, Stanley L. Fitzpatrick qualifies in both respects.

This panel of Judges has presided over these proceedings, carefully reviewed the facts presented and followed the law in arriving at its decision. This panel has made every effort to effectuate justice.

In this particular case, the evidence warrants it, the law requires it and justice demands this defendant, Stanley L. Fitzpatrick be sentenced to death with respect to the capital offenses set forth in Counts One, Two and Three of the Indictment.

(Return of Writ, Doc. No. 26 , Apx. Vol. 2 at 328.)

Petitioner argues that the court "failed to delineate the reasons why the aggravating circumstances outweighed the mitigating factors" and that the only factor cited by the trial court is the "heinous nature of the crimes." (Traverse, Doc. No. 30 at 160.) He argues that the use of the phrase "the death penalty is reserved only for the most heinous aggravated murder cases and for the most vicious acts against common decency and mankind" shows that the court considered an invalid non-statutory aggravating circumstance. *Id.* He argues that the heinous nature of a crime is not one of the statutorily permissible aggravating circumstances that make an individual eligible for the death penalty. *Id.*; O.R.C. § 2929.04(A). The panel of judges was clear in its written decision as to which aggravating circumstances they considered in the weighing process. Those aggravating circumstances were: purposely causing the death of someone under the age of

13;[15] and the purposeful killing of, or attempt to kill two or more persons.[16] (Return of Writ, Doc. No. 26, Apx. Vol. 2 at 325.) These aggravating circumstances are clearly enumerated under the death penalty eligible aggravating circumstances under Ohio Revised Code § 2929.04(A).

Furthermore, it should be noted, that even if this had constituted error, errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002). *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005).

### Ninth Ground for Relief

Ohio Rev. Code § 2929.04(A)(9) as an aggravating circumstance to Ohio Rev. Code § 2903.01(C) is unconstitutional as it repeats an element of the underlying aggravated murder. U.S. Const. Amend. VIII, XIV.

In his ninth ground for relief, Petitioner argues that his rights were violated as it is unconstitutional for an aggravating circumstance to duplicate an element of the capital offense. (Petition, Doc. No 22 at 82); (Traverse, Doc. No. 30 at 166.) He raised this claim on direct appeal and it was addressed on the merits. (Return of Writ, Doc. No. 26 at 70.) As such, this Court may turn to the merits to consider if the State court's decision was either contrary to or an

---

[15] "The offender, in the commission of the offense, purposely caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design." O.R.C. § 2929.04 (A)(9).

[16] "Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." O.R.C. § 2929.04 (A)(5).

unreasonable application of established federal law.

He argues that this is erroneous and unconstitutional as both statutes employ the same operative elements violating the Eighth and Fourteenth Amendments. (Traverse, Doc. No. 30 at 167.) Specifically, that "the scheme is unconstitutional because the O.R.C. § 2929.04(A)(9) aggravating circumstance merely repeats, as an aggravating circumstance, factors that distinguish aggravated child murder from aggravated murder." *Id.* Additionally, he argues that "[e]ach O.R.C. § 2929.04(A) circumstance, when used in connection with O.R.C. § 2903.01(A), adds an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death." *Id.*

In addressing this claim on direct appeal the Ohio Supreme Court held that:

> In his seventh proposition of law, Fitzpatrick contends that the child-murder aggravating circumstance set forth in R.C. 2929.04(A)(9) fails to narrow the class of offenders eligible for the death penalty (and hence violates the Eighth Amendment to the United States Constitution), because it merely restates the elements of the offense of aggravated murder as defined in R.C. 2903.01(C).
>
> R.C. 2903.01(C) provides: "No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense." R.C. 2929.04(A)(9) creates an aggravating circumstance to an aggravated-murder charge if "[t]he offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, *and* either the offender *was the prinicipal offender* in the commission of the offense or, if not the principal offender, *committed the offense with prior calculation and design."*
>
> Contrary to Fitzpatrick's assertion, R.C. 2929.04(A)(9) does not simply restate the elements of R.C. 2903.01(C). Anyone who purposely kills a child younger than 13 violates R.C. 2903.01(C). But R.C. 2929.04(A)(9) applies to a narrower group: the offender can be convicted of an R.C. 2929.04(A)(9) specification only if he (1) *personally* kills the child (which makes him the "principal offender") or (2) kills the child with prior calculation and design. We used

identical reasoning to uphold the constitutionality of the R.C. 2929.04 (A)(7) felony-murder aggravating circumstance. *State v. Barnes* (1986), 25 Ohio St.3d 203, 206-207, 25 OBR 266, 495 N.E.2d 922

Moreover, even if the elements of the R.C. 2929.04(A)(9) aggravating circumstance were identical to the elements of aggravated murder set forth in R.C. 2903.01(C), R.C. 2929.04 (A)(9) would not violate the Constitution. "[A]n aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself." *Williams v. Taylor* (2000), 529 U.S. 362, 392, 120 S.Ct. 1495, 146 L.Ed.2d 389, fn. 16, citing *Lowenfield v. Phelps* (1988). 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. See, also, *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237; *Cooey v. Coyle* (C.A.6, 2002), 289 F.3d 882, 900-901. Fitzpatrick's seventh proposition is overruled.

*State v. Fitzpatrick*, 102 Ohio St. 3d 321, 332-333 (2004).

The Court agrees with the state courts finding that the statutes are not identical. Furthermore, the state court properly identified and applied the established federal law that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. *Williams v. Taylor*, 529 U.S. 362 (2000), *citing Lowenfield v. Phelps*, 484 U.S. 231 (1988). The Sixth Circuit has held this claim to be without merit in *Scott v. Mitchell*, 209 F.3d at 854, 884 (2000). *See also*, *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Buell v. Mitchell*, 274 F.3d 337, 369-370 (6th Cir. 2001). The decision of the state court was neither contrary to nor an unreasonable application of established Supreme Court law. This claim is without merit.

### Tenth Ground for Relief

Execution by lethal injection violates Petitioner's constitutional right to protection from cruel and unusual punishment as guaranteed by the

Eighth Amendment and to due process of law.

In his tenth ground for relief, Petitioner argues that execution by lethal injection violates his constitutional right to protection from cruel and unusual punishment. He raised this claim during his post-conviction relief proceeding. *State v. Fitzpatrick*, 2004 Ohio App. LEXIS 5058 **47-48 (Ohio App. 1ˢᵗ Dist. 2004). The state court held that:

> *D. The Constitutionality of Lethal Injection*
> In his thirteenth claim for relief, Fitzpatrick challenged the constitutionality of the state's use of lethal injection as a means of execution. In affirming Fitzgerald's [sic] convictions in his direct appeal, the Ohio Supreme Court overruled his "general <u>Eighth Amendment</u> attack on Ohio's statutes governing capital punishment." And the supreme court specifically held in <u>*State v. Carter*</u> that execution by lethal injection does not run afoul of the <u>Eighth Amendment's</u> proscription against cruel and unusual punishment. We, therefore, hold that the common pleas court properly denied Fitzpatrick's thirteenth claim.

*Id*.

Fitzpatrick does not provide this Court with any citation to case law in which lethal injection was found to be cruel or unusual punishment. No court has found this method of execution to be constitutionally impermissible. The Sixth Circuit has even commented that at this time, lethal injection "is the law of the republic." *Alley v. Little*, 2006 WL 1313365 *2 (6ᵗʰ Cir. 2006); *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 796 (2007). This Court also notes, that recently the U.S. Supreme Court upheld the constitutionality of a lethal injection protocol similar to that used in Ohio.[17] *Baze v. Rees*, 128 S. Ct. 1520 (2008). This claim is without merit.

## Conclusion

---

[17] Kentucky uses a three drug combination of sodium thiopental, pancuronium bromide, and potassium chloride. Each drug is administered separately through an IV. Ohio uses a similar combination.

In accordance with the foregoing analysis, it is respectfully recommended that the Petition for Writ of Habeas Corpus be dismissed with prejudice.

October 14, 2008.


s/ **Michael R. Merz**
Chief United States Magistrate Judge


## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), ©, or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

# APPENDIX

The Court: And Mr. Fitzpatrick, I do want to address you, sir. They have indicated to me something that you talked to them about. I'm not going to get into it a whole lot. You know what I'm talking about, sir.

And I indicated to them at this point, that that is a situation that I would ask that you think about, okay, and discuss that more throughly at an appropriate time, with your attorneys.

I suggested to them that at lunchtime, if you want to talk to them about it, or at the end of the day, overnight, or whatever, you want to talk to them about that. That is certainly something that is not to be made at the spur of the moment, and I, on your behalf, sir, I want that to be done.

Do you understand what I'm saying?

The Defendant: Not really. I told him. I told them.

The Court: I apologize. I don't mean to cut you off, sir, that's not my style. But anything you say here, sir, is being taken down, and I want you to go through your attorney before you say anything to me, please.

Okay. If you want to talk to them, talk to them. And then if they say it's okay, you can say something to me.

(Defendant speaking with attorneys.)

The Court: Do you want to approach the Court? Would that be easier?

The Defendant: Can I come up there?

The Court: This thing, at this point, Mr. Wenke, Mr. Cutcher, do you wish the defendant to say anything?

Mr. Cutcher: We have advised him not to, your Honor.

The Court: Okay. All right.
Well, let me say this, Mr. Fitzpatrick.

The Defendant: No, no, no. This is my life, you know, my life. I would like to say something.

The Court: Okay.

The Defendant: What I told you, I want it done.  I don't want to wait till no lunch or the next day or nothing.

The Court: Okay.  All right.  I understand that, sir.  Unfortunately for you, at this position, sir, that's not going to be able to be taken care of, okay.  It's something that I personally, have a problem with.  And the way the law is set up, sir, it just can't be done at this point.

The Defendant: It can be done, man.  This - - you know, it can be done.  You're lying to me.

The Court: I'm sorry?

The Defendant: You're lying to me.

The Court: Sir, don't say that to me.  I don't lie to anybody.

The Defendant: Well, whatever, man.  I told them what I wanted to happen, and that save you some tax money or whatever, you know.

The Court: All right.

The Defendant: Seriously.  Tell the jury or whatever, they don't have to go through this, be cut right down.  Trying to give me the death penalty, give me the death penalty.  You ain't got to sit here and put my family through this shit, you know.

The Court: Just watch your language, okay?

The Defendant: This is - - just make it over with, man.

The Court: I understand what you're saying.

The Defendant: He already lied on me, you know.  I don't remember killing Shenay, Doreatha.  I remember what happened to Mr. Rose.

The Court: There is  - - okay. I don't want anybody else involved.  I will not tolerate anybody else involved.  Don't start.  This is not a good situation.

I understand what you're saying, okay.  I do disagree with you at this point.  I'm telling you right now, that we're going to proceed,

at least at this juncture. If there is something else that comes up from your attorneys, I will certainly discuss that with them. Okay. In the meantime, sir - -

The Defendant: Take me out of the courtroom, man.

The Court: No.

The Defendant: I'm tired of them lying on me, man. Just take me out of the courtroom, you know.

The Court: In the meantime, I'm going to ask you, sir, to please do what you're supposed to do here in the courtroom.

The Defendant: I just told you what I wanted to do. I plead guilty. I killed them, but I don't remember what happened to Doreatha and Shenay. I remember to Mr. Rose. He tried to beat me.

Cut this shit out, man. I can stop this right now.

Mr. Wenke: Take a break and talk to him for a while. I've never had this occur before. I want to do whatever's appropriate here, sir.

The Court: I understand. Okay. I mean, I'm - -

The Defendant: I love Shenay.

The Court: Hold on a moment, sir. Don't mess with the deputies. Okay? I mean that. Do not mess with the deputies.

* * * *

(Next morning.)

Mr. Wenke: Judge, my client's related to me, at this time, he wants to withdraw his not guilty plea and enter a guilty plea, as I told the Court before.

At this point I do not see any issues with regard to his competency that I can present to the Court. So, I believe that it would be our position, at this time, that we would want to go forward with that.

The Court: Go forward with what? The plea?

Mr. Wenke: With the guilty plea. We would like some time for him to be fully informed of his decision, and also we would like an opportunity, if the Court were to see fit, pursuant to State vs. Ashworth, to have an examination done with regard to his competency.

The Court: just on that note, okay, I am not sure I understand. You just indicated to me that you do not see an issue of competency, but based upon - -

Mr. Wenke: That's correct, your Honor.

Well, what happened, pursuant to Ashworth, there was an independent evaluation done pursuant to the court's order. I believe Ashworth would stand for that proposition.

But what I am saying right now is, he's indicated he wants to enter a guilty plea and I believe that I would be bound to pursue that, based on my conversations with him.

This, of course, is the first time he had mentioned that to us. But, what I would suggest to the Court is that we take some time now to facilitate that.

I would like to have an opportunity to talk to some other lawyers for some guidance on that issue, and also make sure that, like I said, that he's competent. That we cover everything with regard to that.

But Mr. Fitzpatrick has indicated he doesn't want to be here right now. He's told me that a couple different times, and that at this point, because of his request, I see no point in going forward with the evidence and having people go through the experience of testifying.

The Court: So your issues are three-fold. Number 1, that because you feel Mr. Fitzpatrick is competent, that his request to plead guilty should be honored; and as you know, by statute the only way that can be facilitated is if he does that in front of a three-judge panel.

* * * *

The Court: I know there's some law out there, at some point, for a defendant who has asked for a jury trial, to withdraw their request to have a jury trial. I think at some point the State does have an option as to whether or not they can agree or disagree with that. I don't have

the case law citation on that, either.

So really, then, and I appreciate your talking with me, Mr. Wenke. Really then the only issue that I need to be concerned with is to give you time, along with Mr. Cutcher, to talk to the defendant, and to research the law to see that, Number 1, if he wants to proceed with his plea of guilty, which would then take place in front of a three-judge panel.

And I'm sure he understands that the sentencing aspect would take part in front of that same three-judge panel, it would not be a jury. And whether or not, at this point, the trial, the jury having been sworn, or whatever the criteria is, whether or not he is allowed by law to actually withdraw his request to have this tried in front of a jury and enter a plea in front of a judge; is that correct?

* * * *

The Court: I appreciate that, but at this point, Mr. Fitzpatrick, you - - by law you are entitled to be here. By law you have a right to be here, and it is in your best interest to be here. If you decide, sir, that you do not wish to participate in the proceedings, then that's something you need to let your attorneys know, and ultimately let me know. But, I'm telling you right now, my inclination, sir, is to have you brought down and request, certainly, that you behave and conduct yourself in a proper manner, and we will go from there.

Defendant Fitzpatrick: Your Honor, how can I do that? I have got 50,000 volts attached to me. I have got this guy playing with the remote control. . . . I'm shackled up, man. I already look bad to the jury.

* * * *

The Court: Well, I understand. I am just not sure if, really, he is able to do that at this point, and I'm not sure - - I'll leave it at that.

As far as him being here, Mr. Fitzpatrick, sir, if you are brought down here to participate in whatever proceeding we have, are you indicating to me, sir, that you could not conduct yourself in a proper manner?

Defendant Fitzpatrick: I can't, man. I can't.

The Court: You can't?

Defendant Fitzpatrick: No.

The Court: Which means that you would be disruptive?

Defendant Fitzpatrick: Yeah.

The Court: And that you might, in fact, cause yourself to jeopardize the safety of the participants in the trial as well as the deputies?

Defendant Fitzpatrick: Yeah.

The Court: You understand the ramifications. You will not be able to face any of your accusers. You will not hear what testimony takes place in this case. You wouldn't be able to assist your attorneys, as far as asking questions of witnesses. Anything in that nature.
Do you understand all that?

Defendant Fitzpatrick: (Nodding head in the affirmative.)

The Court: Are you saying yes?

Defendant Fitzpatrick: Yes.

The Court: You understand, sir, that in my opinion, and I'm sure your attorneys, that it is not in your best interest to not be here.
You understand that?

Defendant Fitzpatrick: Yes.

The Court: Despite those warnings, if you will, by this Court, you are saying to me that you do not wish to be here and you do not wish to participate?

Defendant Fitzpatrick: Right.

The Court: Anything on that, Mr. Krumpelbeck? Mr. Dressing?

Mr. Krumpelbeck: No, your Honor. Thank you.

The Court: Anything on that, Mr. Wenke? Mr. Cutcher?

Mr. Wenke: No, Judge.

Mr. Cutcher: No.

Mr. Krumpelbeck: Judge, may I just offer one suggestion?

The Court: Yes, sir.

Mr. Krumpelbeck: If, in fact, we are going to have - - if the Court is inclined to give, you know, a reasonable amount of time, at least to try to sort these things out, at this point in time, maybe we can put that decision, as regards to whether he is going to be here or not - - obviously if he is going to take a plea he has got to be here.

Maybe we can put that decision - - you may or may not have to make one, as regards to his being present in the courtroom, and we can put that off until we decide exactly how we are going to proceed at this juncture.

The Court: All right.

Well, based upon your indications here, on the record, Mr. Fitzpatrick, and based upon the admonitions that I gave you, I am sure your attorneys have talked to you about it, I don't know what else the law requires me to do.

I certainly am concerned about the safety of participants in the trial, as well as the deputies. Therefore, based upon your representations I will honor your request today, that you not be allowed, or that you not come back to the courtroom to participate in the proceedings, unless, obviously, we work out the situation and you are allowed then to enter a plea in front of a three-judge panel. Obviously you have to be here for that. You have to participate in that. And if you don't, then we don't proceed with that.

So as of this afternoon, deputies, when we reconvene, if, in fact, it is decided that it is to be in front of a jury, as opposed to proceeding with the plea in front of a three-judge panel, he does not need to be brought down.

I would request, and I am sure you would honor this, that he be available upstairs, if he would change his mind, or whatever, to bring him down right away so we don't hold up the jury anymore than we have already done.

* * * *

Mr. Wenke: Judge, he's indicated to me he wants to enter a guilty

plea. So the next step would be to put a jury waiver on and then proceed from there.

The Court and I just had a discussion this morning regarding his competency. I have indicated to the Court I don't have any indicia that he's incompetent at this time. That's based on conversations I have had with Dr. Emmett Cooper, as of approximately 9:30 last night. Also conversations I have had with Dr. Hawkins, and also reviewing medical records from Dr. Dunsieth and Dr. Newton, who are all psychiatrists.

In addition, I have had discussions with Dr. Bob Tureen, who is a psychologist. And, again, I see nothing at this point which is an indicia of the competency. So I cannot stand before the Court and suggest that he's incompetent.

So at this time, we intend to withdraw his plea of not guilty and enter a plea of guilty. But in order to facilitate that, we will first have to enter a jury waiver.

The Court: Okay. All right. Thank you, Mr. Wenke. Anything, Mr. -

Mr. Wenke: I just had one other thing, Judge. I would like a period of time in order to facilitate that, and also to spend more time talking to my client to make sure he is fully informed of the consequences of his plea. That's all I have. Thank you.

* * * *

The Court: Okay. All right. Thank you.

Just for the record, there is nothing that you are indicating to the Court that is suggesting to you that the Court should, in any way, order any type of evaluation as to competency; is that correct, Mr. Krumpelbeck?

Mr. Krumpelbeck: That is absolutely correct, your Honor. Yes. In fact, I would indicate we have had conversations with the sheriff's department, et cetera. Again, there's no indication the defendant's incompetent.

Mr. Wenke: Judge, I did have one caveat to that, is if we get to a point where there's an issue with regard to the waiver of presentation of mitigation evidence, there are the cases of State v. Ashworth and State

119

v. Berry, which lay out a procedure for the Court to follow.

So the Court may have to make an evaluation at that time. But, at this point, I do not see the necessity with regard to the jury waiver at the time of plea.

The Court: Okay. All right. Thank you, Mr. Wenke.

Based upon what has now been entered of record, it's the Court's order that the defendant be brought down as soon as is possible, after you have had a chance to talk to him, Mr. Wenke, Mr. Cutcher.

At that point I will address the defendant in regards to his request to waive his right to a jury trial, trial by jury. And being assured that that request is made knowingly, intelligently, and voluntarily, the Court will then accept that request, sign an order allowing him to proceed to a three-judge panel, as the statute calls for. And being assured that the defendant is ready, willing, and able to proceed to trial, or plea in front of a three-judge panel.

\* \* \* \*

The Court: Please be seated. Thank you.

For the record, State of Ohio versus Stanley Fitzpatrick. Case Number b0104117.

For the record, obviously, Mr. Cutcher, Mr. Wenke, you represent Mr. Fitzpatrick; is that correct?

Mr. Wenke: Yes, your Honor.

Mr. Cutcher: Yes, your Honor.

The Court: Sir, you're Stanley Fitzpatrick; is that correct, sir?

The Defendant: Yes.

The Court: Okay. Sir, I'm holding in my hand an entry which is captioned, "Entry on Waiver of Trial by Jury." Do you recognize that form, sir?

The Defendant: Yes.

The Court: You've seen that before; is that correct?

The Defendant: Yes.

The Court: Have you read it over, sir.

The Defendant: Yes.

The Court: Do you have any questions about anything that's on this?

The Defendant: No.

The Court: I'm sure your attorney went over it with you; is that correct?

The Defendant: Yes.

The Court: Do you have any questions of them about anything that's on this form, sir?

The Defendant: No.

The Court: Okay. Do you have any questions of me about anything that's on that form?

The Defendant: No.

The Court: Okay. Do you have any questions of me about anything that's on that form?

The Defendant: No.

The Court: Okay. And, sir, there is a line that says "Stanley Fitzpatrick," and above that line there is a signature. Is that, in fact, your signature?

The Defendant: Yes.

The Court: Okay. Did you put that signature on there voluntarily?

The Defendant: Yes.

The Court: Nobody made you sign it; is that correct?

The Defendant: No.

The Court: Okay. That's what you want to do; is that correct?

The Defendant: Yes.

The Court: All right. So what you're telling me, Mr. Fitzpatrick, is that you knowingly, intelligently, and voluntarily waive your right to a trial by jury, and you want this case tried to a three-judge-panel; is that correct?

The Defendant: Yes.

The Court: You talked to your attorneys about that situation?

The Defendant: Yes.

The Court: And after doing that, you're telling me here in open court, without any duress, that that's what you want to do; is that correct?

The Defendant: Yes.

The Court: Do you have any questions at this point, of myself or your attorneys, in regard to this situation?

The Defendant: No.

The Court: Okay. Is it your understanding then, Counsel, that that's what he wishes to do at this time? Mr. Wenke?

Mr. Wenke: Yes, your Honor.

The Court: Okay. Mr. Cutcher?

Mr. Cutcher: Yes, your Honor.

The Court: All right. Thank you. Is there anything you want to put on the record at this point, Mr. Wenke?

Mr. Wenke: Judge, that he's taken medication right now, respidol, which helps him actually to think more clearly and to sleep better.

So, I know the Court sometimes asks whether or not that would affect his decision. In my communications with Stan, I don't

think that it has, but I just wanted to bring that to this Court's attention as well.

The Court: I appreciate that. In the form of plea, I always do that. Perhaps with this situation, you're right, maybe I should do that. You understand what your attorney just said?

The Defendant: Yes.

The Court: Okay. Is there anything about the medication that you're taking while you're in the Justice Center, that has caused you to not be able to understand what's going on here today?

The Defendant: No.

The Court: Okay. And I'm not trying to put you on the spot, Mr. Fitzpatrick, but what you're telling me, everything that we've gone over, whatever you've read on this form, you understand all that; is that correct?

The Defendant: Yes.

The Court: And the medication does not interfere with that in any way?

The Defendant: No.

The Court: Thank you. I appreciate that . . . .

(Trial Tr. Vol. 10 at 873-914.)


Footnote to the Eighth Ground for Relief- Relevant Excerpts from the Sentencing Decision

FACTS CONSTITUTING AGGRAVATING CIRCUMSTANCES

Count One

On or about June 7, 2001, at the location of 867 Chicago Avenue in Lincoln Heights, Hamilton County, Ohio, the defendant, Stanley Fitzpatrick, purposely and with prior calculation and design caused the death of Shenay Hayes, 12 years old at the time of her demise.

Though the motive and reason for the death of Shenay Hayes are subject to speculation, the defendant's actions and means used to effectuate the death Shenay Hayes could not be more telling.

Shenay Hayes was stabbed by the defendant four times with a knife, had inflicted upon her head a blow of such force as to cause a skull fracture and was choked by means of a ligature. Shenay Hayes' body was found in a bedroom closet.

Count Two

On or about June 7, 2001, at 867 Chicago Avenue, Lincoln Heights, Hamilton County, Ohio, the defendant Stanley L. Fitzpatrick, purposely and with prior calculation and design caused the death of Doreatha Hayes as part of a course of conduct by Stanley Fitzpatrick involving the purposeful killing of two or more persons.

As with her 12 year old daughter, Shenay Hayes, the motive and reason for the defendant's killing of Doreatha Hayes is unknown. However, the defendant's actions and means to cause the ultimate demise of Doreatha Hayes are clear.

Doreatha Hayes suffered multiple wounds. The injuries of note are the approximate thirteen (13) "chop wounds" to Doreatha Hayes' arms, hands, face and head. The injuries are consistent with infliction by the defendant using a hatchet.

Doreatha Hayes died due to a fractured skull and face from the infliction of the "chop wounds."

Count Three

On or about June 9, 2001, the defendant, Stanley L. Fitzpatrick, purposely and with prior calculation and design caused the death of Elton Arybie Rose as part of a court of conduct by Stanley Fitzpatrick involving the purposeful killing of two or more persons.

Mr. Rose who was an across the street neighbor of Shenay and Doreatha Hayes was lured to the 867 Chicago Avenue address by the defendant. Once again, the defendant's motives and reasons for killing Mr. Rose are subject to speculation but his actions and means to cause Mr. Rose's death are brutally clear.

Mr. Rose was beaten to death with a blunt instrument. The injuries included approximately ten (10) blows to various areas of the head and one (1) to the arm (the blow to the arm fractured the bone).

Mr. Rose died as a result of lacerations and blunt impact injuries to the head and brain.

## SENTENCING HEARING EVIDENCE

The State moved for the admission of all the evidence it had produced at the guilt or innocence phase to be admitted into evidence for the sentencing trial.

The Court admitted all of the evidence.

The defense presented Detective Patrick Dilbert, Hamilton County Sheriff's Department Investigator. Detective Dilbert related more of the statement the defendant made to a Mr. Marvin Thomas, a cousin of the defendant. This included the defendant stating he was on a "crack binge from Tuesday to Thursday," the devil appeared to him (Stanley Fitzpatrick) and the devil told the defendant, "I'm just as real as God;" the devil asked the defendant to touch him and the defendant did and the defendant stated "the feeling was like when you put a sweeper up to your hand and it sucks your hand. He said he felt the hard suck, just like suck all his life out of his body."

Detective Dilbert also testified regarding the defendant's demeanor at the time of arrest and about a 911 tape (defendant's exhibit #2).

The defense called Eric Mitchell, a co-worker of the defendant for five years. Mr. Mitchell testified he went to Doreatha Hayes' house on the early morning of June 9, 2001 and talked with the defendant. Mr. Mitchell stated the defendant was talking about "fighting against the devil," hearing people moving about the house and acting in an abnormal manner.

The defense called Dr. Emmett Cooper, a doctor engaged in the private practice of psychiatry. Dr. Cooper testified he examined Stanley Fitzpatrick twice at the Hamilton County Justice Center (one time in October 2001 and another time two weeks before the trial). He indicated the defendant was prescribed a number of medications during his time at the Justice Center including "Nortriptyline, Trazodone, Respidol, Seroquil, Haldol, Benadryl" and others.

Dr. Cooper testified his diagnosis of the defendant was: "I was able to come up with certain diagnostic impressions, differential diagnosis, that included substance-induced psychotic disorder." He

further indicated, "a finding of substance-induced psychotic disorder and major depression disorder with psychotic features."

He further explained his diagnosis by stating: "I think, also, transiently, acute cocaine intoxication of cocaine delirium during the alleged offenses."

Dr. Cooper opined that he thought the defendant suffered from a serious mental defect, i.e. substance induced mood disorder.

He also testified when asked if the defendant lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law that [the defendant] ". . . for some months he appears to have experienced hallucinations and delusions, but was still able to function. More or less able to go to work, and to interact reasonably well." Additionally he said, "It appears that during the alleged offenses he was acutely intoxicated with cocaine and other substances, and would go in and out of consensual reality."

Finally, the defendant presented an unsworn statement indicating some degree of sorrow to members of the victims' families and gave a version of what transpired regarding the deaths of the three victims and the corresponding incidents.

In rebuttal, the State offered the testimony of Anita Nixon, a friend of Doreatha Hays [sic] who talked to the defendant on June 8, 2001 for approximately ten (10) minutes. She testified regarding her impressions of the defendant's demeanor as being "normal," relaxed, pleasant and not indicating signs of intoxication.


## AGGRAVATING CIRCUMSTANCES AND MITIGATING FACTORS

The aggravating circumstances established beyond a reasonable doubt in this case are as follows:

Regarding Count One: The defendant, Stanley L. Fitzpatrick purposefully caused the death of Shenay Hayes, who was under thirteen years of age at the time of the commission of the offense and the said Stanley L. Fitzpatrick was the principal offender in the commission of the offense.

<u>Regarding Counts Two and Three</u>: The offense(s) at the bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by Stanley L. Fitzpatrick.

The mitigating factors alleged and considered enumerated in Ohio Revised Code 2929.04(B) here are as follows:

> "Whether at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;"

> "The offender's lack of a significant history of prior criminal convictions and delinquency adjudications."

> "Any other factors that call for a penalty less than death or lessen the appropriateness of the death penalty."

## MITIGATING FACTORS DISCUSSION

The Court must make a finding as to the existence of any mitigating factors pursuant to Ohio Revised Code §2929.04(B). The evidence was in regards to at most three (3) mitigating factors.

<u>First Mitigating Factor</u>: Lack of significant history of prior convictions.

At the age of 33 years, the defendant has no criminal history except for a minor misdemeanor traffic citation. As such, the defendant is entitled to mitigation on these facts.

<u>Second Mitigating Factor</u>: Whether at the time of committing the offense, the offender, because of a mental disease or defect lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law.

The evidence before the Court indicates the defendant may have or did ingest amounts of crack cocaine at or about the time of the killing of all three victims.

The defendant, according to the testimony of Dr. Emmett Cooper, may have been suffering from a serious mental defect which

Dr. Cooper diagnosed as substance-induced psychotic disorder and a major depression disorder with psychotic features.

Dr. Cooper also opined the defendant was acutely intoxicated with cocaine and other substances and would go in and out of consensual reality.

Further, Dr. Cooper testified that despite reported hallucinations and delusions the defendant was still able to function, i.e. work and interact with others. Dr. Cooper also indicated at the time he examined the defendant, the defendant suffered from a substance-induced psychotic disorder and major depression.

The Court gives some weight to Dr. Cooper's opinion with respect to the defendant's mental condition. Though the opinions of Dr. Cooper are certainly respected, the Court has concerns with the foundational evidence used to formulate the opined diagnosis. As Dr. Cooper testified it was Mr. Fitzpatrick's self-induced acute cocaine intoxication that led to his behavior in these offenses. This Court is hard-pressed to find and award mitigation to a defendant who increases his problems by the voluntary ingestion of illegal substances. The Court therefore assigns little weight to it.

<u>Third Mitigating Factor</u>: Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

The Court has considered all other mitigation factors it could determine from the evidence presented. In this regard, in his unsworn statement, the defendant exhibited remorse and apologized to the victims' families. The Court considered this as a mitigating factor.

The Court also considered his plea of guilty to the offenses as a mitigating factor.

<u>DECISION</u>

When weighing the aggravating circumstances as previously stated versus the mitigating factors which the Court noted and considered, the Court finds the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt separately as to Courts One, Two and Three.

A death penalty assessment is the ultimate resolution for the most serious of crimes. It is, as it should be, reserved only for the

most heinous aggravated murder cases and for the most vicious acts against common decency and mankind. In this case, Stanley L. Fitzpatrick qualifies in both respects.

This panel of Judges has presided over these proceedings, carefully reviewed the facts presented and followed the law in arriving at its decision. This panel has made every effort to effectuate justice.

In this particular case, the evidence warrants it, the law requires it and justice demands this defendant, Stanley L. Fitzpatrick be sentenced to death with respect to the capital offenses set forth in Counts One, Two and Three of the Indictment.

Opinion in Compliance with Ohio Revised Code 2929.04(F)
(Return of Writ, Doc. No. 26, Apx. Vol. 2 at 316)