# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|                        |   |                                         |
|------------------------|---|-----------------------------------------|
| Stanley Fitzpatrick,   | : |                                         |
|                        | : | Case No. 1:06-cv-356                    |
| Petitioner,            | : |                                         |
|                        | : | District Judge Susan J. Dlott           |
| v.                     | : |                                         |
|                        | : | ORDER DENYING AMENDED                   |
| Margaret Bradshaw, Warden | : | PETITION FOR WRIT OF HABEAS          |
|                        | : | CORPUS                                  |
| Respondent.            | : |                                         |

In this case, Magistrate Judge Michael R. Merz has recommended that Petitioner Stanley Fitzpatrick's Amended Petition for Writ of Habeas Corpus ("Amended Petition") (doc. 22) be denied. Pending before the Court are Magistrate Judge Merz's Report and Recommendations ("R&R") (doc. 85), Petitioner's Objections to the R&R (doc. 87), Respondent's Memorandum in Opposition to the Objections (doc. 88), Magistrate Judge Merz's Supplemental Report and Recommendations ("Supplemental R&R") (doc. 90), Petitioner's Objections to the Supplemental R&R (doc. 91), and Respondent's Memorandum in Opposition to the Objections to the Supplemental R&R (doc. 92).

For the reasons that follow, the Court will **OVERRULE** Petitioner's Objections and **ADOPT** Magistrate Judge Merz's R&R and Supplemental R&R. The Court will **DENY** the Amended Petition.

# I.     FACTUAL AND PROCEDURAL HISTORY

The Court adopts the factual procedural history, almost verbatim, as set forth in the R&R.

## A.     Factual History of the Crimes and Convictions

Petitioner was indicted on June 19, 2001, by the Hamilton County Grand Jury on one count of aggravated murder of an individual under thirteen years of age under Ohio Revised Code ("O.R.C.") § 2903.01(C) and two counts of aggravated murder with prior calculation and design under O.R.C. § 2903.01(A).  Count one included the under thirteen years of age specification, O.R.C. § 2929.04(A)(9), while the second and third counts included the specification of purposeful killing or attempt to kill two or more persons under O.R.C. § 2929.04(A)(5).  Petitioner was also indicted on one count of attempted murder under O.R.C. § 2923.02(A) and aggravated robbery under O.R.C. § 2911.01.  Each of these counts included a firearm specification.  Petitioner was further indicted on one count of aggravated burglary under O.R.C. § 2911.11(A)(1) and one count of aggravated robbery under O.R.C. § 2911.01(A)(1). (Apx. Vol. 1 at 18).[1]

Fitzpatrick's case went before a Hamilton County jury on February 4, 2002.  (Apx. Vol. 2 at 261.)  After jury selection, opening statements were held on February 6, 2002.  (Apx. Vol. 2 at 274, 276, 283-93; Tr. Vol. 10 at 823.)  After opening statements, Petitioner asked for a jury waiver and changed his plea to guilty on all charges.  (Apx. Vol. 2 at 274, 276, 283-93.)  His case proceeded before a three-judge panel.  On February 11, 2002, the panel accepted Fitzpatrick's plea of guilty on all counts and specifications.  ( Apx. Vol. 2 at 283-93, 301.)  Upon completion of the mitigation phase, the judges returned a sentence of death on each of the

---

[1] "Apx." refers to the Appendix to the Return of Writ filed at CM/ECF docket number 27.

aggravated murder counts, concurrent nine years in prison for the other four felonies, and two

consecutive three year terms for the firearm specifications.  (Apx. Vol. 2 at 308-28.)

The Ohio Supreme Court summarized the facts as follows:

Appellant, Stanley Fitzpatrick, murdered his girlfriend, Doreatha Hayes, her 12-year-old daughter Shenay, and a neighbor, Elton Rose.  While leaving the crime scene, he attempted to kill a police officer.  Fitzpatrick pleaded guilty to three counts of aggravated murder with death specifications.  He appeals his convictions and death sentence.

Prior to the murders, Fitzpatrick lived with Doreatha and Shenay Hayes at 867 Chicago Avenue in the village of Lincoln Heights.  On Thursday, June 7, 2001, Fitzpatrick killed Shenay and Doreatha.  On June 10, 2001, he confessed these crimes to his cousin Marvin Thomas.

Fitzpatrick told Thomas that 12-year-old Shenay had come home and caught him smoking crack.  Fitzpatrick claimed that Shenay had attacked him with a knife and was accidentally stabbed in the ensuing altercation.  The coroner later testified that Shenay had been stabbed three times in the back of the neck and once near her ear.

As Shenay gasped for breath, Fitzpatrick ran into the next room.  A few minutes later, he came back and struck Shenay repeatedly in the head with an ax handle, fracturing her skull, "so that he wouldn't hear the sounds that she was making." At some point, Fitzpatrick wrapped a ligature around Shenay's neck. Nevertheless, according to Fitzpatrick, she was still "making sounds" when Fitzpatrick wrapped her in a blanket and a carpet and put her in a bedroom closet. Shenay died of the combined effect of the stab wounds, blows to the head, and strangulation.

Later that evening, Fitzpatrick beat Doreatha Hayes to death.  He told Marvin Thomas that, after Doreatha came home, "we got into it as usual."  Fitzpatrick said that during the argument, he hit her in the head with an ax handle or an ax. She fell to the floor, and he hit her repeatedly in the face.  When Doreatha stopped making noises, Fitzpatrick moved her body to another bedroom and placed a mattress on top of it.

An autopsy showed that Doreatha had at least 13 "chop wounds": five on her head, five on her left forearm, one on her right wrist, and one on each hand. Doreatha's wounds were consistent with her having been struck with State's Exhibit 12, a hatchet that police later found in the basement of 867 Chicago Avenue.  Blood on the hatchet, and on a hammer also found at 867 Chicago Avenue, had a DNA profile matching Doreatha's.

At approximately 10:30 p.m. on June 9, Fitzpatrick walked across Chicago Avenue and rang the doorbell of Elton and Betty Rose.  Looking through the window, Mrs. Rose recognized Fitzpatrick standing on her front porch, and, calling through the door, she asked him what he wanted. Fitzpatrick said, "[I]t's Doreatha's boyfriend. * * * Doreatha would like to see your husband.  She said to tell him to come over to the house."  Mrs. Rose summoned her husband, Elton Rose ("Rose").  Rose went across the street with Fitzpatrick and entered 867 Chicago Avenue, where Fitzpatrick killed him.

Rose died from lacerations of the brain caused by blunt-impact injuries to his head.  He sustained numerous lacerations and skull fractures caused by at least ten separate blows to the back and right side of his head.  These injuries were consistent with Rose having been struck with the blunt side of State's Exhibit 12, the hatchet.  Blood on the hatchet had a DNA profile consistent with Rose's.

Five or ten minutes after he had left with Rose, Fitzpatrick rang the Roses' doorbell again.  He told Mrs. Rose, "[Y]our husband wants you to come across the street."  When Mrs. Rose asked why, Fitzpatrick had no answer, and Mrs. Rose did not believe him, so she said, "[G]o tell my husband to come to the door."

Fitzpatrick turned away from Mrs. Rose.  He appeared to be "looking around * * * to see if there was anyone watching him."  Suddenly, he "took off," back across the street.

Just then, at 10:50 p.m., Sergeant Deangelo Sumler of the Lincoln Heights Police Department drove up in his cruiser.  Sumler had been dispatched to 867 Chicago Avenue in response to a "silent 911" call.  Sumler saw Mrs. Rose and noted that she looked "distraught," so he pulled over to talk to her.

Mrs. Rose pointed out Fitzpatrick standing on the sidewalk in front of 867 Chicago Avenue.  Fitzpatrick approached Sumler and said, "[C]ome on in, he needs some help."  Sumler asked Mrs. Rose what was going on.  She replied, "[M]y husband is over there."  Fitzpatrick repeated that "he needed some help" and ran inside 867 Chicago Avenue.  Sumler followed Fitzpatrick into the house.

When he went in, Sumler saw Fitzpatrick pointing a .38-caliber revolver at him.  Although Sumler had not drawn his gun, Fitzpatrick told him to drop it.  Sumler raised his hands.  He then backed up to the door, pushed it open, and ran outside.  Fitzpatrick fired twice at Sumler.

Sumler sought cover behind a large metal trash container.  Fitzpatrick came out, aimed at Sumler, and fired a third shot.  Sumler fired back.  Fitzpatrick then got into Sumler's cruiser and drove off.

4

Fitzpatrick abandoned the stolen cruiser after driving into some bushes. He then entered the home of Montika Pitts. When Pitts encountered him inside her home, she asked what he wanted. Fitzpatrick's response was to scream at Pitts and then grab her throat. They scuffled, and Fitzpatrick shoved Pitts outside. When Pitts re-entered her home, to protect her child, who was asleep in the house, Fitzpatrick fled. Later, Fitzpatrick robbed Marjorie Duff of her car at knifepoint. He then fled in Duff's car, which was later found abandoned in Cincinnati.

As mentioned previously, on June 10, 2001, Fitzpatrick confessed to committing the murders to his cousin Marvin Thomas. Thomas then called the Hamilton County Sheriff's Department. He told a detective that Fitzpatrick was in a motel in Sharonville, Ohio.

Police officers went to Fitzpatrick's motel room and spoke with him through the door. Fitzpatrick eventually surrendered. Duff's car keys were found in Fitzpatrick's room.

Later that day, Detective Patrick Dilbert interviewed Fitzpatrick at the Hamilton County Sheriff's Department. Fitzpatrick waived his <u>Miranda</u> rights and agreed to speak with Dilbert. Fitzpatrick told Dilbert that "he'd been up for several days smoking crack," that he lived at 867 Chicago Avenue, and that he had been either fired, suspended, or placed on probation by his employer on June 5.

A grand jury indicted Fitzpatrick on one count of aggravated murder under R.C. 2903.01(C) (child murder) and two counts of aggravated murder under R.C. 2903.01(A) (prior calculation and design). Each aggravated murder count carried a single death specification. The specification to Count One (the Shenay Hayes murder) alleged that Fitzpatrick had purposefully caused the death of a person who was under the age of 13 and that Fitzpatrick had been the principal offender. See R.C. 2929.04(A)(9). The specification to Count Two (Doreatha Hayes) alleged that the murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more people. See R.C. 2929.04(A)(5). The specification to Count Three (Elton Rose) also alleged a course of conduct. The indictment also included one count of attempted murder (Deangelo Sumler), two counts of aggravated robbery (Sumler's cruiser and Marjorie Duff's car), and one count of aggravated burglary (Montika Pitts's residence).

Fitzpatrick initially pleaded not guilty. He requested a jury trial, and a jury was seated. However, during the defense's opening statement, Fitzpatrick decided to change his plea to guilty. Counsel recommended against a guilty plea, but Fitzpatrick told counsel that if they did not stop the proceedings, he would.

Fitzpatrick's remarks to the trial judge made clear his insistence on pleading

guilty:

"What I told you, I want it done. I don't want to wait till no lunch or the next day or nothing."

* * *

"I told them what I wanted to happen, and that save you some tax money or whatever, you know. * * * Seriously. Tell the jury or whatever, they don't have to go through this, be cut right down. * * * You ain't got to sit here and put my family through this * * *, you know."

* * *

"This is - just make it over with, man."

* * *

"I just told you what I wanted to do. I plead guilty. I killed them, but I don't remember what happened to Doreatha and Shenay."

Defense counsel informed the court that the defense had discussed Fitzpatrick's competence with two psychiatrists and a psychologist, and had reviewed medical records from two other psychiatrists. The defense was unable to find any basis to assert that Fitzpatrick was incompetent.

After Fitzpatrick signed a jury waiver, the jury was discharged and a three-judge panel was selected. The panel went over each count in the indictment with Fitzpatrick, explaining the maximum sentence for each charge. The court explained to him that by pleading guilty, he would waive his rights to a jury trial, to confront witnesses before a jury, to present witnesses in the guilt phase, and to hold the state to its burden of proving guilt beyond a reasonable doubt to a jury, and his privilege against self-incrimination. The court noted that Fitzpatrick would be entitled to confront witnesses that testified for the prosecution, present witnesses in a penalty phase (if there was one), and that the prosecution would have to prove to the three-judge panel that he was guilty beyond a reasonable doubt of the aggravated murders and specifications. Fitzpatrick said he understood the court's explanations, had consulted with his counsel, was satisfied with his counsel's work, and wished to plead guilty. The court then allowed him to withdraw his earlier plea and enter a plea of guilty to all counts and specifications in the indictment.

The state then presented evidence, as required by R.C. 2945.06 ("If the accused pleads guilty of aggravated murder, a court composed of three judges shall

examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly"). See State v. Green (1998), 81 Ohio St.3d 100, 1998 Ohio 454, 689 N.E.2d 556. Witnesses included Detective Dilbert, Sergeant Sumler, Betty Rose, Montika Pitts, Marjorie Duff, and Dr. Robert Pfalzgraf, Chief Deputy Coroner of Hamilton County. Also testifying were Anthony Barner, who was Shenay Hayes's father, and Deputy Sheriff David Linder, an evidence technician.

The panel found Fitzpatrick guilty of all charges and specifications. The panel then held a mitigation hearing. The state reintroduced its evidence from the plea hearing. Fitzpatrick presented three witnesses and made an unsworn statement, and the state called one rebuttal witness. After the mitigation hearing, the panel sentenced Fitzpatrick to death.

Ohio v. Fitzpatrick, 102 Ohio St. 3d 321, 321-25, ¶¶ 1-32, 810 N.E.2d 927 (2004).

## B.     State Court Post-Conviction Procedural History

On April 1, 2002, Petitioner filed his Notice of Appeal in the Ohio Supreme Court. (Apx. Vol. 3 at 4.) He asserted twelve Propositions of Law in his appeal. (Apx. Vol. 3 at 44 *et seq*.) On July 7, 2004, the Ohio Supreme Court issued a Judgment Entry affirming Petitioner's conviction and sentence. (Apx. Vol. 3 at 279; *Fitzpatrick*, 102 Ohio St. 3d 321, 810 N.E.2d 927 (2004).) The Ohio Supreme Court conducted a *de novo* review of the death sentence pursuant to O.R.C. § 2929.05 and held that the aggravating circumstances outweighed the mitigating factors as a matter of law and that death sentences were not disproportionate. *Fitzpatrick*, 120 Ohio St. 3d at 334, 339-40, ¶¶ 82, 116-21. Fitzpatrick sought review by *certiorari* in the United States Supreme Court, which declined to consider the case. *Fitzpatrick v. Ohio*, 545 U.S. 1130 (2005).

Fitzpatrick then filed an Application for Reopening with the Ohio Supreme Court to reopen his appeal pursuant to Ohio Supreme Court Practice Rule XI § 5(A) and *Ohio v. Murnahan*, 63 Ohio St. 3d 60, 584 N.E.2d 1204 (1992), based on ineffective assistance of appellate counsel. (Apx. Vol. 3 at 327.) The Application for Reopening was denied on February

16, 2005. *Ohio v. Fitzpatrick*, 105 Ohio St. 3d 1436, 822 N.E. 2d 808 (2005).

On November 22, 2002, Fitzpatrick filed his Petition for Post-Conviction Relief under O.R.C. § 2953.21 in the Hamilton County Court of Common Pleas, pleading fifteen Grounds for Relief. (Apx. Vol. 4 at 45 *et seq.*; Apx. Vol. 5 at 1.) The Court of Common Pleas for Hamilton County found that Fitzpatrick was not entitled to relief on any of his claims and denied the petition for post-conviction relief. (Apx. Vol. 5 at 338 *et seq.*) Fitzpatrick filed a notice of appeal with the First District Court of Appeals from the denial of post-conviction relief on October 30, 2003. (Apx. Vol. 6 at 3.) On appeal he raised four Assignments of Error. (Apx. Vol. 6 at 59.) On October 22, 2004, the Court of Appeals affirmed the decision of the Court of Common Pleas. *Ohio v. Fitzpatrick*, No. C-0303804, 2004 WL 2367987, at *14 (Ohio App. Oct. 22, 2004). Petitioner then appealed to the Ohio Supreme Court which declined to review the judgment of the lower courts. *Ohio v. Fitzpatrick*, 105 Ohio St. 3d 1499, 825 N.E.2d 623 (2005).

### C.    Federal Court Procedural History

Fitzpatrick filed his Notice of Intention to seek habeas relief in this Court on July 26, 2005, and followed with the Petition for Writ of Habeas Corpus on June 9, 2006. (Docs. 2, 17.) He filed an Amended Petition on June 23, 2006. Fitzpatrick pleads ten Grounds for Relief in the Amended Petition:

**First Ground for Relief**

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Guilty Plea despite overwhelming documentation and information making it impossible for the Trial Court to constitutionally find that Mr. Fitzpatrick was competent and capable to enter a knowing, voluntary or intelligent Guilty Plea. Const. Amends. V, VI, VIII and XIV.

**Second Ground for Relief**

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Jury Waiver despite overwhelming documentation and information making it impossible for the Trial Court to have constitutionally found that Mr. Fitzpatrick was competent and capable of entering into a knowing, voluntary or intelligent Jury Waiver. Const. Amends. V, VI, VIII and XIV.

**Third Ground for Relief**

The excessive security measures used throughout Mr. Fitzpatrick's Trial violated his right to a fair and impartial trial, due process, the presumption of innocence, and the right to Trial Counsel. U.S. Const. Amends. V, VI, VIII, IX, and XIV.

**Fourth Ground for Relief**

The errors and omissions of Trial Counsel at Guilt Phase violated Mr. Mr. [sic] Fitzpatrick's constitutional right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

**Fifth Ground for Relief**

The errors and omissions of Trial Counsel during the Penalty Phase of Trial Violated Mr. Fitzpatrick's right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

**Sixth Ground for Relief**

The Trial Court's failure to conduct a competency hearing concerning Mr. Fitzpatrick's waiver of his Sixth Amendment right to Trial by Jury, his Guilty Plea, and his waiver of his Sixth Amendment right to a Speedy Trial deprived Mr. Fitzpatrick of his constitutional rights. Const. Amends. V, VI, VIII, and XIV.

**Seventh Ground for Relief**

The trial court's acceptance of Mr. Fitzpatrick's partial waiver of mitigation without ensuring that it was made knowingly, intelligently, and voluntarily and that Mr. Fitzpatrick was competent to waive that right violated his constitutional rights. Const. Amends. V, VI, VIII, XIV[.]

**Eighth Ground for Relief**

The trial court's erroneous weighing of aggravating circumstances against the mitigating factors and consideration of the nature and circumstances of the offense as an aggravating

circumstance deprived Mr. Fitzpatrick of his right to due process and a fair sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Ninth Ground for Relief**

Ohio Rev. Code § 2929.04(A)(9) as an aggravating circumstance to Ohio Rev. Code § 2903.01(C) is unconstitutional as it repeats an element of the underlying aggravated murder. U.S. Const. Amend. VIII, XIV.

**Tenth Ground for Relief**

Execution by lethal injection violates Petitioner's constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law.

Respondent filed a Return of Writ (doc. 26) on September 1, 2006 and Petitioner filed a Traverse (doc. 30) on November 6, 2006.

Discovery was granted after an evidentiary hearing on the Fourth and Fifth Grounds for Relief which was held before this Court on October 29-30, 2007. (Docs. 41, 49, 51, 75, 76.) The parties then briefed the merits. (Docs. 82, 83.)

Subsequently Magistrate Judge Merz issued an R&R recommending that each Ground for Relief be denied and that the Amended Petition be dismissed. After Petitioner Fitzpatrick filed objections thereto, Magistrate Judge Merz issued the Supplemental R&R adhering to his original recommendations except as to the Tenth Ground for Relief which Fitzpatrick voluntarily withdrew. Fitzpatrick now has filed Objections to the Supplemental R&R.

## II. LEGAL STANDARDS FOR HABEAS CORPUS PETITIONS

Petitioner Fitzpatrick's Amended Petition was filed after April 24, 1996 so it is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir. 2007). A habeas petitioner must exhaust all remedies available to him in state court before filing a habeas petition. 28 U.S.C. § 2254(b)(1)(A). The

AEDPA requires federal courts to respect any determination on the merits made by a state court unless it: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2); *see also Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). In *Williams*, the Supreme Court further explained the meaning of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-13. An unreasonable application is more than simply incorrect; it must be objectively unreasonable. Id. at 409, 411; *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005). "Clearly established Federal law" under § 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). "Clearly established" refers to only holdings, not to dicta. *Id.* "Under [the] AEDPA, if there is *no* clearly established Federal law, as determined by the Supreme Court, that supports a habeas petitioner's legal argument, the argument must fail." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (internal citation omitted and emphasis in the original).

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue by a state court shall be presumed correct and the applicant shall have the burden of rebutting the presumption

by clear and convincing evidence. This presumption does not apply to mixed questions of law and fact. *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003). Instead, the "unreasonable application" prong of § 2254(d)(1) applies to mixed questions of law and fact. *Id.*

A federal court will not review a question of federal law decided by an Ohio court if the decision rests "on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This is true whether the state law ground is substantive or procedural. *Id.* If a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate *cause* for the default and actual *prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750 (emphasis added).

That is, a petitioner may not raise in federal habeas proceedings a federal constitutional right he could not raise in state court because of procedural default. *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review if the state court relied on that procedural bar. *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000).

The failure to raise a constitutional issue on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994). The failure to present an issue to the state supreme

court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999). The Sixth Circuit explained the issues of procedural default and exhaustion as follows:

> As is well-established (although sometimes muddled by courts), two types of procedural barriers might preclude federal review of claims in a habeas petition. The first type, procedural default, is a judicially created rule, grounded in fealty to comity values and requiring federal courts to respect state court judgments that are based on an "independent and adequate" state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 732, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (establishing a four-part test for determining whether a procedural rule is an independent and adequate state ground). In procedural default cases, the state court or courts reject a direct or post-conviction appeal because the defendant failed to comply with some state law or rule concerning timeliness, pleading requirements, sufficient evidence, or the like.

> The second type of bar, exhaustion, is similarly grounded in respect for state court procedures, but it is federally mandated by AEDPA, *see* 28 U.S.C. § 2254(b)(1)(A),(c), and requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims. *O'Sullivan*, 526 U.S. at 844. Often, federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to exhaust his remedies and the time for refiling an appeal in the state court has passed. The unexhausted claim is then classified as "procedurally defaulted" and deemed forfeited absent a showing of cause and prejudice. *See In re Cook*, 215 F.3d 606, 607-08 (6th Cir. 2000). . . .

> But exhaustion and procedural default are distinguishable in an important sense. A defendant could fail to exhaust a claim without procedurally defaulting if he could return to the state courts to exhaust. Alternatively, as in this case, the defendant could fail to exhaust without defaulting if a clarification in procedural law indicates that he has already taken the necessary action to exhaust. That is, forfeiture by failure to exhaust entails a legal fiction, of sorts. The state court has not rejected an appeal based on a state rule violation; there is no declaration by the state court of an independent and adequate state ground to which the federal court must defer. Instead, the federal court makes a presumption that the state court would reject the appeal on independent and adequate state grounds if the petitioner tried to file it. But, by declaring the claim forfeited, the federal court saves the petitioner and the state court from respectively preparing and rejecting a futile filing. The federal court then views the claim through the lens of procedural default to determine whether there is cause and prejudice to excuse the default. In short, the crux of forfeiture by failure to exhaust is that the federal

court's default decision rests upon a presumption about what the state court *would* do, rather than respect for what a state court actually *did*.

*Abdur'Rahman v. Bell (In re Abdur'Rahman)*, 392 F.3d 174, 186-187 (6th Cir. 2004) (emphasis in the original), *vacated on other grounds*, *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005).

The Sixth Circuit Court of Appeals requires a four-part analysis when the state alleges a habeas claim is precluded by procedural default.

> *First*, the court must find there is a state procedural rule that applies to the petitioner's claim, and the petitioner failed to comply with the rule. *Second*, the court must determine whether the state courts actually enforced the state procedural sanction. *Third*, the court must decide whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of the petitioner's federal constitutional claim. This third question typically focuses on the adequacy of the state ground. The adequacy of the state ground is determined by examining the state's legitimate interests in the procedural rule in light of the federal interest in considering federal claims. [*Fourth*], once a court determines the petitioner did not comply with a state procedural rule, and the rule is an adequate and independent state ground, then the petitioner must demonstrate cause for not following the procedural rule and prejudice resulting from the alleged constitutional error.

*Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998) (emphasis added) (citing, among others, *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001).

## III.   ANALYSIS

### A.   First Ground for Relief

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Guilty Plea despite overwhelming documentation and information making it impossible for the Trial Court to constitutionally find that Mr. Fitzpatrick was competent and capable to enter a knowing, voluntary or intelligent Guilty Plea. Const. Amends. V, VI, VIII and XIV.

(Doc. 22 at 24.)

#### 1.   Procedural Default

Magistrate Judge Merz correctly found this claim was procedurally defaulted as to the competency issue. On direct appeal in state court, Petitioner asserted as his second Proposition of Law that his guilty plea was not intelligent, knowing, or voluntary because the plea colloquy was inadequate. *Fitzpatrick*, 102 Ohio St. 3d at 328 ¶ 51. The Ohio Supreme Court overruled the Second Proposition of Law on the merits. *Id.* at 330 ¶ 63. It does not appear that Fitzpatrick raised the competency issue as a part of this Proposition of Law in the direct appeal. The trial court concluded in the proceedings for post-conviction relief that the competency claim was barred by *res judicata*. (Apx. Vol. 5 at 341.) The Ohio court of appeals affirmed the *res judicata* holding. *Fitzpatrick*, 2004 WL 2367987, at *6-8. The appellate court stated:

> Fitzpatrick submitted in support of his postconviction claims outside evidence in the form of visitor logs from the Hamilton County Justice Center, his medical records while incarcerated there, and the affidavit of his capital-litigation expert. Fitzpatrick offered the visitor and medical records to show that, following the proceeding in which he had waived his speedy-trial right, he had asked to see a psychiatrist; that he had subsequently been prescribed medicine, the types and dosages of which had been continuously adjusted throughout the proceedings leading to his jury waiver and pleas; and that the psychiatrists upon which counsel had relied in concluding that he was competent to waive a jury trial and to plead guilty had not based their opinions of his mental state on current clinical assessments. This evidence, he asserted, coupled with the evidence of record, demonstrated that the trial court and defense counsel had been aware of issues concerning his competency to waive his speedy-trial and jury rights and to enter guilty pleas. Thus, he contended, counsel had incurred a duty to request, and the court had incurred a duty to conduct, a hearing into the matter.
>
> * * * *
>
> Again, this outside evidence did not preclude application of the doctrine of res judicata to bar the challenges presented in Fitzpatrick's second, third, and fourth claims. The visitor and medical records were available to the defense at the time of Fitzpatrick's trial, and the attorney's affidavit was essentially a "notarized argument" that could have been made at trial or on appeal. Thus, Fitzpatrick could have presented at trial or on appeal a challenge to the trial court's failure to conduct a competency hearing to determine the knowing, intelligent, and voluntary nature of his speedy-trial and jury waivers and his guilty pleas. We,

15

therefore, hold that his second, third, and, fourth claims were subject to dismissal under the doctrine of res judicata.

*Id.* at *7-8. The Ohio Supreme Court declined to hear an appeal of the appellate court judgment. *Fitzpatrick*, 105 Ohio St. 3d at 1499.

Fitzpatrick objects to the *res judicata* finding. Fitzpatrick first asserts that his challenge to the guilty plea on the grounds that the plea was not intelligent, knowing, or voluntary encompassed the subclaim that he was incompetent. The Court disagrees. The Supreme Court stated that these issues address different concerns. *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993); *see also United States v. Calvin*, 20 F. App'x 452, 453-54 (6th Cir. 2001) (same). Fitzpatrick cites no authority to the contrary.

Fitzpatrick also objects to the *res judicata* finding on the grounds that it is not regularly and consistently applied in Ohio on the issue of guilty pleas. Contrary to Fitzpatrick's objection, the Ohio *res judicata* rule that claims advanced in post-conviction proceedings must be supported by cogent documentation from outside the record has been upheld by the Sixth Circuit as an adequate and independent state law ground for upholding a conviction. *See*, *e.g.*, *Frazier v. Huffman*, 343 F.3d 780, 805 (Batchelder, J., concurring) *supplemented* 348 F.3d 174 (6th Cir. 2003); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

Finally, Fitzpatrick asserted in the Traverse that any procedural default is overcome by cause and prejudice. He asserts that his trial counsel[2] and appellate counsel were ineffective for failing to raise and support this claim, and that their ineffectiveness constituted sufficient cause to excuse the default. (*Id.*) Ineffective assistance of appellate counsel can be an excusing cause

---

[2] The Court will use the term "trial counsel" to refer to either or both of Stephen J. Wenke and Timothy R. Cutcher.

to avoid a state procedural default rule, but only if the ineffective assistance of appellate counsel claim is properly presented to the state courts in the first instance. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Magistrate Judge Merz held that ineffective assistance of appellate counsel could not be excusing cause because Fitzpatrick did not raise it as a separate ground for relief on habeas review. Fitzpatrick does not challenge this finding in his Objections to the R&R or to the Supplemental R&R. For all these reasons, the Court holds that Fitzpatrick procedurally forfeited the First Ground for Relief insofar as Fitzpatrick argues that it was impossible for the trial court to determine that Fitzpatrick was competent to plead guilty.

### 2. Merits

In addition to finding that the competency subclaim was barred by *res judicata*, Magistrate Judge Merz also recommended denying this claim on the merits. Magistrate Judge Merz held that Fitzpatrick was competent to waive his right to trial and that his guilty plea was made intelligently, knowingly, and voluntarily. The Ohio Supreme Court held on direct appeal that Fitzpatrick's guilty plea was made intelligently, knowingly, and voluntarily. *Fitzgerald*, 102 Ohio St. 3d at 328-30 ¶¶ 51-63. Likewise, the trial court had determined that Fitzgerald was competent to plead guilty. This Court must presume these factual findings were correct absent clear and convincing evidence to the contrary. *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (competency to stand trial is a factual issue for purposes of 28 U.S.C. § 2254); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004) (relying on 28 U.S.C. § 2254(e)(1)); *Mackey v. Dutton*, 217 F.3d 399, 413 (6th Cir. 2000) (following *Keohane*).

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with

counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The same competency standard applies to a person who intends to plead guilty. *Godinez*, 509 U.S. at 399. The failure of a trial court to conduct a competency hearing or inquiry when appropriate denies a criminal defendant of his constitutional right to a fair trial. *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966); *see also Conner v. Wingo*, 429 F.2d 630, 632 (6th Cir. 1970). "The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent." *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006). Factors to be considered when determining whether a hearing is necessary include evidence of a defendant's irrational behavior, the defendant's demeanor at trial or pretrial, prior medical opinion on competency, and the opinion of counsel. *Drope*, 420 U.S. at 178 n.13, 180. "[E]ven if the evidence could support a finding that a sufficient doubt existed regarding [Fitzgerald's] competency to warrant further inquiry," this Court must affirm the trial court if the trial court's determination was "fairly supported by the record." *Mackey*, 217 F.3d at 414.

Magistrate Judge Merz in the R&R reviewed the evidence before the trial court and the evidence presented at the evidentiary hearing held before him. His recitation of the evidence and analysis are incorporated herein as if fully rewritten. Magistrate Judge Merz concluded that Fitzpatrick had not proven by clear and convincing evidence that the trial court's finding that he was competent was incorrect. Magistrate Judge Merz specifically noted in the Supplemental R&R that no medical professional has testified that Fitzpatrick was incompetent. (Doc. 90 at 3.) Fitzpatrick does not have the burden to present clear and convincing evidence that he was incompetent to prove this claim. Rather, he must establish only that the trial court violated

18

Fitzpatrick's due process rights by not granting him a competency hearing based on substantial evidence of Fitzpatrick's incompetence. *Filiaggi*, 445 F.3d at 858.

Fitzpatrick contends that the trial court had substantial evidence of his incompetence to plead guilty. The issue of competency was raised before the initial trial judge, Judge Patrick Dinkelacker, by the prosecution on July 16, 2001, the date of the speedy trial waiver and several months before trial:

> Mr. Krumpelbeck: * * * I suspect[] that we may see a competency motion filed by the defense. . . .
>
> The reason being, is because in a statement that the defendant had given to his cousin[, Marvin Thompson, shortly after the murders], he talked about the incident. . . . [Fitzpatrick] indicated to Mr. Thomas that he had did some crack with the devil. He had been smoking crack, and the devil sat across the table from him and said, I'm just as real as God.

(Tr. Vol. 3 at 34-35.) Sergeant Thomas Boeing of Hamilton County Sheriff's Department was questioned at that pretrial hearing. Sergeant Boeing initially had concerns regarding Fitzpatrick because Fitzpatrick had told Thompson that he had taken crack cocaine and that the devil made him commit the murders. (*Id.* Vol. 3 at 36-37.) However, Sergeant Boeing had no concerns about Fitzpatrick's competency after his own and other officers' interactions with Fitzpatrick. (*Id.* Vol. 3 at 38-39.) "[H]e seemed able to make intelligent decisions[] and . . . he was aware of what was going on." (*Id.* Vol. 3 at 38.) Sergeant Boeing remarked that Fitzpatrick demonstrated his understanding of the events surrounding his arrest by the way that he first waived his rights and then later invoked his rights. (*Id.* Vol. 3 at 38.)

Fitzpatrick also points to incidents during the pretrial and early trial proceedings during which he acted in a manner he now describes as erratic. Much of the alleged erratic behavior took place when, after the trial opening statements were presented to the jury, Fitzpatrick

notified his trial counsel, who in turn informed the trial judge, that he wanted to plead guilty. (*Id.* Vol. 10 at 869.) The trial judge advised Fitzpatrick to discuss the issue of whether to plead guilty with his attorneys more thoroughly at the lunch break or at the end of the day. (*Id.* Vol. 10 at 873-74.) Fitzpatrick accused the trial judge of lying to him when the trial judge stated that he could not change his plea to guilty at that moment in the trial. (*Id.* Vol. 10 at 875.) He stated that he did not want to put his family or the jury through the trial. (*Id.* Vol. 10 at 875-76.)

Fitzpatrick, apparently referring to his trial counsel's opening statement, stated that his attorney "already lied on me" because he remembered killing Mr. Rose, but he did not "remember killing Shenay, [and] Doreatha." (*Id.* Vol. 10 at 876.) Fitzpatrick then asked to be taken out of the courtroom if he could not plead guilty at that time. (*Id.*) He stated:

> I just told you what I wanted to do. I plead guilty. I killed them, but I don't remember what happened to Doreatha and Shenay. I remember to Mr. Rose. He tried to beat me. Cut this shit out, man. I can stop this right now.

(*Id.* Vol. 10 at 877.)

Following a short break, Fitzpatrick's trial counsel reiterated Fitzpatrick's intention to change his plea to guilty. (*Id.* Vol. 10 at 882.) Trial counsel then stated that "[a]t this point I do not see any issues with regard to his competency that I can present to the Court." (*Id.* Vol. 10 at 881-82.) Thereafter, trial counsel and Judge Dinkelacker discussed Fitzpatrick's request not to be present for the trial proceedings if they continued. (*Id.* Vol. 10 at 888.) When the trial judge requested that Fitzpatrick conduct himself in a proper manner during the proceedings, Fitzpatrick complained about physical restraints that had been placed on him: "I have got 50,000 volts attached to me. . . . I'm shackled up, man." (*Id.* Vol. 10 at 889-90.) The following exchange then took place:

The Court: * * * Mr. Fitzpatrick, sir, if you are brought down here to participate in whatever proceeding we have, are you indicating to me, sir, that you could not conduct yourself in a proper manner?

Defendant Fitzpatrick: I can't, man. I can't.

* * *

The Court: Which means that you would be disruptive?

Defendant Fitzpatrick: Yeah.

The Court: And that you might, in fact, cause yourself to jeopardize the safety of the participants in the trial as well as the deputies?

Defendant Fitzpatrick: Yeah.

(*Id.* Vol. 10 at 891-92.) Fitzpatrick was required to return to the courtroom for a later session that same day in order to waive his right to a jury trial. (*Id.* Vol. 10 at 910-15.) Fitzpatrick participated in a colloquy with the trial court regarding the waiver of his jury rights and did so without any further disruptive behavior. (*Id.*)

Fitzpatrick's behavior during the initial phase of his trial as described above can be described as agitated and disruptive. However, it is not evident that Fitzpatrick lacked the "capacity to understand the nature and object of the proceedings against him." *Drope*, 420 U.S. at 171. "[D]isruptive behavior alone, especially when prompted by anger at certain aspects of the proceedings against him as opposed to mental disease or defect, is insufficient to establish a defendant's incompetency or even necessarily raise questions as to his competency." *Cowans v. Bagley*, 624 F. Supp. 2d 709, 754 (S.D. Ohio 2008). Fitzpatrick's statements suggest that he understood that he was on trial for the murders of Doreatha and Shenay Hayes, as well as Elton Rose. Likewise, his statements that he would be disruptive in the courtroom suggest an understanding of the questions posed to him by Judge Dinkelacker about the behavior expected

of him. Finally, Fitzpatrick's statements that he did not want to put his family or jury though a trial intimate that he understood not only the nature of the proceeding, but also that the proceedings had an emotional cost.

Fitzpatrick also points to the medical evidence indicating that he had a history of mental illness and took a variety of medications which could cause severe drowsiness. This evidence was not presented accurately or completely to the trial court. For example, Fitzpatrick's trial counsel told the court before Fitzpatrick's jury waiver was entered that Fitzpatrick had taken a single medication, Respidol, "which helps him actually to think more clearly and to sleep better." (Tr. Vol. 10 at 913.) Dr. Emmett Cooper, a psychiatrist retained by Fitzpatrick's trial counsel to testify about Fitzpatrick's mental status for the mitigation stage of trial, testified after Fitzpatrick's guilty plea was entered that Fitzpatrick suffered from major depression disorder with psychotic features and substance-induced psychotic disorder. (*Id.* Vol. 13 at 1189, 1197-98.) Dr. Cooper stated that had no concerns about Fitzpatrick's competency to stand trial during the period in which he had interactions with Fitzpatrick, but he conceded that he had not been retained to evaluate Fitzpatrick's competency. (*Id.* Vol. 13 at 1240-41, 1243.)

Subsequently, Dr. Cooper testified at the evidentiary hearing held before Magistrate Judge Merz in this habeas case. Dr. Cooper had examined Fitzpatrick in October 2001 and then again in January 2002, the month before the trial. (Doc. 75 at 65-66.) Dr. Cooper observed in October 2001 that Fitzpatrick was suffering from "major depression with psychotic features." (*Id.* at 66.) Dr. Cooper contradicted Fitzpatrick's trial counsel's testimony from the trial regarding the medication Fitzpatrick had taken at the time of trial. Fitzpatrick's medical records revealed that Fitzpatrick was taking Trazodone (a sleeping pill), Benadryl (a antihistamine,

sleeping pill, and anti-anxiety agent), Ativan (an anti-anxiety muscle relaxant), and Seroquel (an anti-psychotic) at the time of his trial. (*Id.* at 76-81.) Dr. Cooper described these medications as prescribed to treat mood and thought disorders. (*Id.* at 81.) Dr. Cooper testified that these medications would have "impair[ed] the ability to comprehend and to concentrate because they are sedating." (*Id.* at 80.) Dr. Cooper also learned in preparation for the hearing that Fitzpatrick had taken an abbreviated IQ test in January 2002 which revealed that he was functioning at an IQ level of 69, a borderline mental retardation level. (*Id.* at 58, 87.) Dr. Cooper concluded at the evidentiary hearing that he would have suggested a competency hearing for Fitzpatrick at the time of his trial if he had had full information about Fitzpatrick's medications, his requests for treatment at the county jail, and results of IQ test. (*Id.* at 86.)

A diagnoses of mental illness is not by itself sufficient to justify a competency hearing. *See United States v. Miller*, 531 F.3d 340, 349-50 (6th Cir. 2008) (on mental illness). Importantly, despite the concerns raised by Dr. Cooper at the evidentiary hearing, no medical expert conclusively testified that Fitzpatrick was incompetent at the time of trial. Dr. Cooper testified about the likely sedating effects of the medications which Fitzpatrick was taking. His testimony, given years after the events in question, has to be examined against the record evidence of Fitzpatrick's demeanor and behavior at the time of his trial and guilty plea.

Fitzpatrick's trial counsel made numerous representations that Fitzpatrick was competent. (Tr. Vol. 10 at 881-85, 903-04.)[3] Fitzpatrick's trial counsel stated that he based his opinion on

---

[3] After Fitzpatrick's trial counsel informed the trial court that Fitzpatrick sought to change his plea to guilty, Fitzpatrick's trial counsel stated "[a]t this point I do not see any issues with regard to his competency that I can present to the Court." (*Id.* at 881-82.) The attorney pointed out case law recognizing that the trial court could order a competency examination, but stated his opinion that such a hearing was not needed. (*Id.* at 882-85.)

his conversations with or reviewing the medical records from four physicians. (*Id.* Vol. 10 at

903-04.)[4] Representations by Fitzpatrick's trial counsel that Fitzpatrick was competent are

"significant" to the analysis. *United States v. Gignac*, 301 F. App'x 471, 475 (6th Cir. 2008);

*see also Medina v. Cal.*, 505 U.S. 437, 450 (1992) (stating in dicta that "defense counsel will

often have the best-informed view of the defendant's ability to participate in his defense");

*Drope*, 420 U.S. at 176-77 & 177 n. 13 (stating that judges must depend to some extent on

counsel to bring competency issues into focus); *United States v. Tucker*, 204 F. App'x 518, 520-

21 (6th Cir. 2006) (holding no error in failure to hold competency hearing after noting that "three

separate attorneys represented Tucker and none of them expressed personal concern about

Tucker's competence").

Trial counsel Cutcher later testified at the evidentiary hearing that he was not aware at

the time of trial about Fitzpatrick's IQ examination result, (doc. 75 at 119-20), but "a low IQ

alone is not definitive of competency." *United States v. Carpenter*, 25 F. App'x 337, 345 (6th

Cir. 2001). Additionally, the IQ score is not consistent with trial counsel's own perceptions of

Fitzpatrick's cognitive abilities. Mr. Cutcher stated at the plea hearing that "I've known Mr.

---

[4] The trial attorney stated:

> Mr. Wenke: * * * I don't have any indicia that he's incompetent at this
> time. That's based on conversations I have had with Dr. Emmett Cooper, as of
> approximately 9:30 last night. Also conversations I have had with Dr. Hawkins,
> and also reviewing medical records from Dr. Dunsieth and Dr. Newton, who are
> all psychiatrists.

> In addition, I have had discussions with Dr. Bob Tureen, who is a psychologist.
> And, again, I see nothing at this point which is an indicia of the competency. So I
> cannot stand before the court and suggest that he's incompetent.

(*Id.* Vol. 10 at 903-04.)

Fitzpatrick for over the past eight months, and I believe that he is able to fully understand the proceedings here today." (Tr. Vol. 12 at 981.) Mr. Cutcher affirmed at the evidentiary hearing held by Magistrate Judge Merz that he would not have sought a competency hearing if he had known about the low score on the abbreviated IQ test. (Doc. 75 at 153-54.) The prosecutors confirmed, after consulting with the sheriff's department, that they were in agreement that no competency hearing was necessary. (Tr. Vol. 10 at 906.)

The three-judge panel, which included Judge Dinkelacker, that accepted Fitzpatrick's guilty plea also had sufficient opportunity to observe Fitzpatrick and form an opinion as to his competency. The panel engaged Fitzpatrick in a lengthy examination to ensure that he understood the charges against him, the potential sentences, and the rights he was forfeiting. (Tr. Vol. 12 at 948-80.) Fitzpatrick stated during the colloquy that he had graduated from high school. (*Id.* Vol. 12 at 962.) As part of the examination, the trial court asked questions designed to ensure that Fitzpatrick's plea was voluntary and competent. (*Id.* Vol. 12 at 975-79.) The fact that Fitzpatrick was able to respond to most of the questions posed to him with one-word answers did not render the colloquy meaningless. *See United States v. Walker*, 160 F.3d 1078, 1096 (6th Cir. 1998) ("There is no requirement that in order to rely on a defendant's answers in a guilty-plea colloquy to conclude that the defendant pleaded guilty knowingly and voluntarily, those answers must be lengthy and all-encompassing; a straightforward and simple "Yes, your Honor" is sufficient to bind a defendant to its consequences."); *see also United States v. Jones*, 403 F.3d 817, 823 (6th Cir. 2005) (same).

The trial court specifically asked Fitzpatrick about medications he was taking:

> Judge Dinkelacker: * * * [H]ave you taken any type of medication while you've been over in the Justice Center?

Defendant Fitzpatrick: I take medication from the time I get up until the time I go to sleep.

Judge Dinkelacker: I appreciate that, sir. I want to make sure that we have an understanding about where you are.

Any of the medication that you take, sir, that caused you to not be able to understand what's going on here today?

Defendant Fitzpatrick: It stops me from hearing voices and seeing things.

* * *

Judge Dinkelacker: * * * So the medication, what you're telling us, is good for you. It helps you.

Is that correct?

Defendant Fitzpatrick: Yes.

(Tr. Vol. 12 at 975-76.) The Court had no separate Constitutional duty to inquire about whether Fitzpatrick was taking prescription medication and the use of medications, alone, does not indicate incompetency. *See Otte v. Houk*, No. 1:06CV1698, 2008 WL 408525, at *23 n.9 (N.D. Ohio Feb. 12, 2008); *see also Filaggi*, 445 F.3d at 855, 858-59 (finding jury waiver to be competent and voluntary despite the fact that the defendant was on Valium); *Hoffman v. Jones*, 159 F. Supp. 2d 648, 650-53 (E. D. Mich. 2001) (examining various factors to determine whether or not prescription medication is affecting a defendant's competency), *aff'd*, 53 F. App'x 342 (6th Cir. 2002).[5]

---

[5] The defendant in *Hoffman* was taking Depakote, Paxil, Xanax, Atarax, and Darvocet for a number of months before his plea. 159 F. Supp. 2d at 651. The defendant's treating physician testified that "although the medication had the ability to depress the central nervous system, petitioner had developed a tolerance to the medication and, therefore, the drugs did not have the same effect on him as they would have had on a first-time user." *Id.* at 651-52. The trial court denied a defense motion to withdraw the defendant's guilty plea on the basis that his medications impaired his ability to knowingly and voluntarily enter the plea. *Id.* at 653.

The trial court then heard a summary presentation of the prosecution's case against Fitzpatrick through witness testimony. The trial court heard more testimony about Fitzpatrick's history of drug use and delusional behavior as part of this summary presentation of evidence. Eric Mitchell, a former friend and co-worker of Fitzpatrick, testified that he went to Doreatha's home on the morning of June 9, 2001 to talk to Fitzpatrick about work. (Tr. Vol. 13 at 1169-70.) Mitchell saw drug paraphernalia in the home and Fitzpatrick told him that he had been "fighting the devil" and "fighting a thousand people." (*Id.* Vol. 13 at 1170.) Fitzpatrick claimed to hear noises that Mitchell could not hear and he frequently ran up and down the stairs and peaked out the windows. (Tr. Vol. 13 at 1172.) Mitchell also testified that he had witnessed Fitzpatrick have delusional episodes on previous occasions when he had been under the influence of drugs and alcohol. (*Id.* Vol. 13 at 1173). Nonetheless, Fitzpatrick's history of drug abuse standing alone is not sufficient to justify a competency hearing. *United States v. Kirk*, 240 F. App'x 66, 69 (6th Cir. 2007) (on drug abuse); *cf. Miller*, 531 F.3d at 349 (on mental illness). Fitzpatrick points to no evidence indicating he was under the influence of illegal drugs or that he was experiencing hallucinations or delusional episodes at the time of his trial or when he changed his plea to guilty.

Fitzpatrick instructed his trial counsel not to question the witnesses put on by the State during the summary evidence proceeding. (Tr. Vol. 12 at 1110.) The trial court could have found that Fitzpatrick's instruction was another indication that he understood the proceedings in which he was engaged. After the presentation of the evidence against Fitzpatrick, the trial court again had Fitzpatrick confirm his guilty pleas. (*Id.* Vol. 12 at 1113-17.)

This Court must affirm the trial court if the trial court's determination to accept the guilty

plea without a competency hearing was "fairly supported by the record." *Mackey*, 217 F.3d at 414. This Court agrees with Magistrate Judge Merz that the trial court's determination was sufficiently supported by the record, including the opinions of counsel on both sides of the aisle that Fitzpatrick was competent, the representation from Fitzpatrick's trial counsel regarding the opinion of medical experts, and Fitzpatrick's answers to questions posed by the trial court demonstrating an awareness of the proceedings in which he was engaged. The information subsequently developed regarding Fitzpatrick's IQ score and medical history does not change that conclusion. While the evidence suggests that there were factors that potentially could impact a defendant's reasoning and comprehension ability, no evidence before the Court indicates that Fitzpatrick's reasoning and comprehension ability actually were impaired or that he was unable at the time he entered the guilty plea to understand the nature and implication of his decision to plead guilty.

"In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez*, 509 U.S. at 400. Again, the trial court's determination that Fitzpatrick's plea was intelligent, knowing, and voluntary is fairly supported by the record. The trial court's colloquy with Fitzpatrick was sufficient to demonstrate that Fitzpatrick understood the charges against him, the potential sentences, and the rights he was forfeiting. (Tr. Vol. 12 at 948-80.)

For the foregoing reasons, the First Ground for Relief is **DENIED**.

**B.      Second Ground for Relief**

The Trial Court violated Mr. Fitzpatrick's constitutional rights when it sought, obtained and accepted Mr. Fitzpatrick's Jury Waiver despite overwhelming documentation and

information making it impossible for the Trial Court to have constitutionally found that Mr. Fitzpatrick was competent and capable of entering into a knowing, voluntary or intelligent Jury Waiver. Const. Amends. V, VI, VIII and XIV.

(Doc. 22 at 33.)

The Court adopts and restates herein, almost verbatim, Magistrate Judge Merz' well-reasoned analysis of the Second Ground for Relief from the R&R.

Petitioner Fitzpatrick alleges trial court error in its failure to hold a competency hearing before accepting his jury trial waiver. The Warden counters by stating that only portions of this claim were raised on appeal. On direct appeal, Fitzpatrick claimed that his jury waiver was not intelligent, knowing, or voluntary; he did not however, raise the argument that he was incompetent. *Fitzpatrick*, 102 Ohio St. 3d at 325-28 ¶¶ 34-50. Fitzpatrick did raise this claim in terms of competence on post-conviction relief. (Apx. Vol. 5 at 340.) The trial court found the claim to be barred by *res judicata*. (*Id.*) The appeals court again held the claim was barred by *res judicata* as Petitioner failed to support the claim with proper evidence outside the record. *Fitzpatrick*, 2004 WL 2367987, at *8 ¶ 34. As per the discussion in the First Ground for Relief, this claim is procedurally defaulted.

In the alternative, the Court turns to the merits. The right to trial by jury is a fundamental right. *Duncan v. La.*, 391 U.S. 145, 154 (1968). Similar to the right to plead guilty discussed above, a defendant may waive his right to a jury trial providing that the waiver is valid in that it was made knowingly, intelligently, and voluntarily. *Brady v. United States*, 397 U.S. 742, 748 (1970); *Haliym v. Mitchell*, 492 F.3d 680, 698 (6th Cir. 2007). The Sixth Circuit instructed as follows in *Haliym*:

Although this Circuit has not stated the precise formula for what constitutes the constitutionally minimum understanding that a defendant must possess in order to

validly waive his right to a jury, a waiver [is intelligent, knowing, and voluntary] if the defendant understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.

492 F.3d at 698 (internal quotations and citations omitted). Furthermore, the waiver, in addition to reflecting the defendant's "express and intelligent consent," must be consented to by the government and permitted by the court. *Patton v. United States*, 281 U.S. 276, 312 (1930), *overruled on other grounds by*, *Williams v. Fla.*, 399 U.S. 78 (1970); *see also Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 281 (1942); O.R.C. § 2945.05;[6] Ohio Crim. R. 23(A).[7]

---

[6] The statute provides:

Defendant May Waive Jury Trial

In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I _____, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

O.R.C. § 2945.05.

[7] The rule provides:

Trial by Jury
In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the

In arguing that his decision to waive trial by jury was not competent or intelligent, knowing, and voluntary, Petitioner cites to several factors. He argues both trial court and counsel failed to advise him of his right to trial by jury, that his medications affected his rational decision making, and that his one-word answers given during the colloquy did not establish a knowing and intelligent waiver. Regarding the first portion of this claim, whether Fitzpatrick was legally competent to waive his right to a jury trial, the Court reiterates its analysis from the First Ground for Relief supporting the conclusion that Fitzpatrick was competent to plead guilty.

In turning to whether the waivers were intelligent, knowing, and voluntary, Petitioner makes the argument that counsel failed to fully discuss the jury waiver with him. To the contrary, however, both counsel and Fitzpatrick represented to the court that they had discussed the right to a jury trial and the ramifications of a waiver. (Tr. Vol. 10 at 888, 910-13.) Petitioner has not offered any additional information to show that counsel failed to inform him of this right.

While the Constitution does provide for a trial by jury, it "does not require the trial court to explain the jury system and its method of obtaining a verdict to constitute a knowing and intelligent waiver." *Otte*, 2008 WL 408525 at *23 n.10 (citing *Haliym* , 492 F.3d at 680); *see also United States v. Martin*, 704 F.2d 267, 274 (6th Cir. 1983) ("There is no constitutional requirement that a court conduct an on the record colloquy with the defendant prior to the jury trial waiver." In this case, the trial court preserved the record with a colloquy as follows:

> The Court: Please be seated. Thank you.

For the record, State of Ohio versus Stanley Fitzpatrick. Case Number

---

consent of the prosecuting attorney. . . . .

Ohio Crim. R. 23(A).

B0104117.

For the record, obviously, Mr. Cutcher, Mr. Wenke, you represent Mr. Fitzpatrick; is that correct?

Mr. Wenke:  Yes, your Honor.

Mr. Cutcher:  Yes, your Honor.

The Court:  Sir, you're Stanley Fitzpatrick; is that correct, sir?

The Defendant:  Yes.

The Court:  Okay.  Sir, I'm holding in my hand an entry which is captioned, "Entry on Waiver of Trial by Jury."  Do you recognize that form, sir?

The Defendant:  Yes.

The Court:  You've seen that before; is that correct?

The Defendant:  Yes.

The Court: Have you read it over, sir. [*sic*]

The Defendant:  Yes.

The Court:  Do you have any questions about anything that's on this?

The Defendant: No.

The Court:  I'm sure your attorney went over it with you; is that correct?

The Defendant:  Yes.

The Court:  Do you have any questions of them about anything that's on this form, sir?

The Defendant:  No.

The Court:  Okay.  Do you have any questions of me about anything that's on that form?

The Defendant:  No.

The Court:  Okay.  And, sir, there is a line that says "Stanley Fitzpatrick," and above that line there is a signature.  Is that, in fact, your signature?

The Defendant:  Yes.

The Court:  Okay.  Did you put that signature on there voluntarily?

The Defendant:  Yes.

The Court: Nobody made you sign it; is that correct?

The Defendant:  No.

The Court:  Okay.  That's what you want to do; is that correct?

The Defendant:  Yes.

The Court:  All right.  So what you're telling me, Mr. Fitzpatrick, is that you knowingly, intelligently, and voluntarily waive your right to a trial by jury, and you want this case tried to a three-judge-panel; is that correct?

The Defendant:  Yes.

The Court:  You talked to your attorneys about that situation?

The Defendant:  Yes.

The Court:  And after doing that, you're telling me here in open court, without any duress that that's what you want to do; is that correct?

The Defendant:  Yes.

The Court:  Do you have any questions at this point, of myself or your attorneys, in regard to this situation?

The Defendant:  No.

The Court:  Okay.  Is it your understanding then, Counsel, that that's what he wishes to do at this time? Mr. Wenke?

Mr. Wenke:  Yes, your Honor.

The Court:  Okay.  Mr. Cutcher?

33

Mr. Cutcher: Yes, your Honor.

The Court: All right. Thank you. Is there anything you want to put on the record at this point, Mr. Wenke?

Mr. Wenke: Judge, that he's taken [*sic*] medication right now, respidol, which helps him actually to think more clearly and to sleep better.

So, I know the Court sometimes asks whether or not that would affect his decision. In my communications with Stan, I don't think that it has, but I just wanted to bring that to this Court's attention as well.

The Court: I appreciate that. In the form of plea, I always do that. Perhaps with this situation, you're right, maybe I should do that. You understand what your attorney just said?

The Defendant: Yes.

The Court: Okay. Is there anything about the medication that you're taking while you're in the Justice Center, that has caused you to not be able to understand what's going on here today?

The Defendant: No.

The Court: Okay. And I'm not trying to put you on the spot, Mr. Fitzpatrick, but what you're telling me, everything that we've gone over, whatever you've read on this form, you understand all that; is that correct?

The Defendant: Yes.

The Court: And the medication does not interfere with that in any way?

The Defendant: No.

The Court: Thank you. I appreciate that, Mr. Wenke.

(Tr. Vol. 10 at 910-14.) The trial court inquired as to whether or not he understood his rights and if he had any questions. Before accepting his guilty plea, the trial court again explained Fitzpatrick's constitutional rights in-depth, including the ramifications of waiving his rights, including trial by jury. (*Id.* Vol. 12 at 967-74.) Again, when asked if he understood, Petitioner

answered in the affirmative.  (*Id*. Vol. 12 at 967.)

In an effort to further advance this claim, Petitioner argues that he was not able to waive this right due to the large amount of medications he was taking and their possible side effects. As discussed in regards to the First Ground for Relief, evidence that a defendant is taking medication does not make him incompetent or invalidate his waiver of rights *per se*.  *See Filaggi*, 445 F.3d at 855, 858-59; *Otte*, 2008 WL 408525, at *23 n.9; *Hoffman*, 159 F. Supp. 2d at 650-53; *cf.* O.R.C. § 2945.37(F).[8]  Petitioner has failed to meet his burden that the medication affected him.

Fitzpatrick argues in the next subclaim that his one-word answers during the exchange with the court prior to his waiver did not sufficiently demonstrate that his waiver was intelligently, knowing, or voluntary.  This Court already stated in the First Ground for Relief that a defendant's answers need not be lengthy to bind him to a waiver.  *See Jones*, 403 F.3d at 823; *Walker*, 160 F.3d at 1096.  No further analysis is needed.

Finally, it should be noted that prior to waiving his right to a jury, Fitzpatrick did in fact exercise his right to participate in the selection of a jury made up of twelve members of the

---

[8] The Ohio Revised Code provides regarding competency hearings:

> The court shall not find a defendant incompetent to stand trial solely because the defendant is receiving or has received treatment as a voluntary or involuntary mentally ill patient under Chapter 5122. or a voluntary or involuntary mentally retarded resident under Chapter 5123. of the Revised Code or because the defendant is receiving or has received psychotropic drugs or other medication, even if the defendant might become incompetent to stand trial without the drugs or medication.

O.R.C. § 2945.37(F).

community.  In so far as he participated in this aspect, it can be inferred that he was aware of his

right to jury trial when he choose to waive the right after voir dire, seating a jury, and the

commencement of his trial.  Petitioner's Second Ground for Relief is without merit.  The state

court's decision was neither unreasonable nor contrary in its application of federal law.

**C.      Third Ground for Relief**

> The excessive security measures used throughout Mr. Fitzpatrick's Trial violated his
> right to a fair and impartial trial, due process, the presumption of innocence, and the right
> to Trial Counsel.  U.S. Const. Amends. V, VI, VIII, IX, and XIV.

(Doc. 22 at 41.)

Petitioner Fitzpatrick asserts in this Ground for Relief that his rights were violated

because he was forced to wear a stun belt at trial in front of the jury.  The stun belt that

Fitzpatrick wore during at least some of the trial court proceedings contained 50,000 volts of

electricity and could cause immobilization, self-defecation, and self-urination.  (Apx. Vol. 4 at

133.)

**1.      Factual Background of Claim**

On July 20, 2001, Fitzpatrick filed a Motion to Appear at All Proceedings Without

Restraints.  (Apx. Vol. 1 at 252.)  The trial court discussed the motion with the parties at a

pretrial hearing held on September 21, 2001.  (Tr. Vol. 5 at 222-24.)  A discussion was held in

court during which counsel for both sides and the judge addressed this issue:

> The Court:  As long as the defendant is behaving in a fashion that
> complies with the sheriff's security needs, certainly I believe it's appropriate for
> him to appear at all proceedings without restraints.
>
> Now, if he does things upstairs or over in the jail that causes the sheriffs to have
> some concern, then I will, quite frankly, comply with them, because they are the
> ones that have to throw out security.

I have no problem granting the motion appearing at all proceedings without restraints as long as it coincides with the sheriff's security needs.

Any problem with that, Mr. Wenke? Mr. Krumpelbeck?

      Mr. Wenke: No, Judge.

      The Court:  Mr. Krumpelbeck?

Mr. Dressing?

      Mr. Krumpelbeck:  Your Honor, I agree with everything you said except the final ruling.  I think the best procedure is to overrule it, certainly, if there is any question.

Again, I also concur with the defendant shouldn't be seated here in restraints unless something occurred.  But I believe that's the sheriff's policy.  That's what our concern is.  I don't know if for security purposes.  The sheriff's kind of got to make that call.

      The Court:  Well.

      Mr. Krumpelbeck:  I'm just asking you overrule it with the understanding that we're going to try to comply with it.

Thank you.

      Mr. Cutcher:  I do think, your Honor, that if the sheriff has concerns, that he could address those to the Court, and the Court should make a ruling at that time rather than just saying hey, whatever you guys want to do is all right.

      The Court:  But in a sense, I mean, I do have to defer to a certain degree to whatever you guys say is all right.  Because not only am I concerned about his safety, your safety, my staff's safety, and everybody else, including the deputies.

I think the law is pretty clear though, and the deputies are really — I've never had any problem with the deputies as far as if they have a security problem they can come to me.  But the law is pretty clear, also, that he's not supposed to be seen in restraints unless there is a situation that he has to be in restraints.

I'm going to grant the motion. Number 17 is granted.

If — again, if you all want to go back and tell your supervisors, really not a change in any policy.  It's the policy you have right now.  If you need to put a belt

on him, put a belt on him.  If you need to put shackles on him, put shackles on him.  I'm not changing your policy.

If, in fact, he's doing fine, you don't have a security situation, he can sit there without restraints.  Your normal procedure is what I'm asking you to follow.  All right.

(*Id.*)  The trial court issued an order granting the motion on September 28, 2001.  (Apx. Vol. 2 at 139.)  Fitzpatrick insists, that despite trial court's order granting the motion, the trial court during September 21 hearing as excerpted above impermissibly gave officers from the Hamilton County Sheriff's Office the final authority as to whether to restrain Fitzpatrick.

Fitzpatrick also points out that there is an indication in the pretrial transcript that Fitzpatrick was restrained in some manner during the September 21 pretrial hearing.  Fitzpatrick told his trial counsel, and trial counsel reported to the judge, that Fitzpatrick was having trouble breathing and that he believed his belt was too tight.  (Tr. Vol. 5 at 202.)  The trial court convened a short rest to permit the Sheriff's deputy to fix Fitzpatrick's belt.  (*Id.*)  The transcript does not indicate whether the belt was a belt for shackles or a stun belt.

Likewise, there is no indication in the trial court transcript whether Fitzpatrick was restrained at all for jury selection or opening statements at his criminal trial.  (*Id.* Vol. 7 at 295; *Id.* Vol. 10 at 823.)  However, the transcript does demonstrate that Fitzpatrick was wearing the stun belt by late in morning session on February 6, 2002.  (*Id.* Vol. 10 at 889.)  The events earlier in the morning session on February 6 are relevant.

That morning counsel for the State and for Fitzpatrick gave their opening statements to the jury.  (*Id.* Vol. 10 at 832, 861.)  Fitzpatrick then informed his trial counsel that he wanted to plead guilty and trial counsel relayed that request to  Judge Dinkelacker.  (*Id.* Vol. 10 at 869.)  Judge Dinkelacker next excused the jury.  (*Id.* Vol. 10 at 872.)  Outside the presence of the jury,

Fitzpatrick accused his trial counsel of lying about the crimes during opening statements and accused the trial court of lying about whether trial proceedings could be halted immediately. (*Id.* Vol. 10 at 875-76.) He also behaved in such a manner as to warrant admonishments from Judge Dinkelacker to behave appropriately and not to "mess with the deputies." (*Id.* at 877.) Following a break, the proceedings reconvened without the jury. (*Id.* Vol. 10 at 881.) Fitzpatrick complained to the trial court that he did not want to participate in proceedings and would not be able to behave in a proper manner in the courtroom because "I have got 50,000 volts attached to me [and] I have got this guy playing with the remote control." (*Id.* Vol. 10 at 889.) He stated further that he was "shackled up" and that he "already looked bad to the jury." (*Id.* Vol. 10 at 890.)

The parties disagree whether this record establishes that Fitzpatrick was restrained in front of the jury on February 6, 2002 before he was permitted to enter the guilty plea. Fitzpatrick contends that his complaint to the trial court that he "already looked bad to the jury" establishes that he had been restrained in at least handcuffs, and possibly in the stun belt, on the morning of February 6, 2002 when the jury was present in the courtroom. The Court finds that the record is inconclusive. Fitzpatrick did not complain that he looked bad to the jury *because* he was shackled. Rather, he made the statements about wearing the stun belt, being "shackled up," and looking bad to the jury all in explaining why he would not control his behavior in the courtroom. (*Id.* Vol. 10 at 889-90.) Fitzpatrick could have believed he looked bad to the jury for reasons unrelated to his wearing restraints, including for the reason that he believed that his trial counsel had lied about his role in the murders during opening statements. (*Id.* Vol. 10 at 875-76.)

Relatedly, Fitzpatrick also asserts that the record establishes that he wore the stun belt in

front of the jury on the morning of opening statements because the trial court had deferred to the Sheriff's office on the issue of the use of restraint. (*Id.* Vol. 5 at 222-24.) Fitzpatrick contends that the Sheriff had a policy that every capital defendant wear the stun belt. Fitzpatrick based his understanding of the Sheriff's policy on a written document submitted as evidence at the state court post-conviction relief proceedings. (Apx. Vol. 4 at 134-38.) The Court has read the written policy and it does not explicitly require all capital defendants to wear the stun belt. Rather, it states that the belt be worn for "high-risk defendants" and "combative prisoners or prisoners who may attempt escape." (*Id.*)

The next reference in the trial record to the use of restraints appears during the transcript of the guilty plea hearing before the three-judge panel. Fitzpatrick complained that his wrists were starting to hurt and his trial counsel asked to have his handcuffs removed. (Tr. Vol. 12 at 971.) Judge Dinkelacker refused to have them removed, but he did instruct the Sheriff's deputy to loosen the cuffs. (*Id.* Vol. 12 at 971-72.) The final reference to the use of restraints occurs at the mitigation evidence hearing. Fitzpatrick requested as the hearing began "that his cuffs be removed from the ring that's at his waist, for comfort reasons." (*Id.* Vol. 13 at 1131.) Judge Dinkelacker, on behalf of the three-judge sentencing panel, granted the request and had the cuffs removed entirely after confirming with the Sheriff's deputy that it would not create a safety issue. (*Id.*)

## 2. Procedural Posture and Default

Fitzpatrick first asserted this claim in his petition for post-conviction relief. *Fitzpatrick*, 2004 WL 2367987, at *3 ¶ 10. The Ohio appeals court held that the claim was barred by *res judicata* to the extent that Fitzpatrick asserted that the use of restraints so tainted Fitzpatrick's

decision to plead guilty such that the plea could not be considered voluntary. *Id.* at \*5 ¶ 21. The appeals court found that Fitzpatrick could have raised that claim on direct appeal and that the evidence *de hors* the record which Fitzpatrick submitted had been available to defense counsel on appeal. *Id.* at ¶¶ 20-21. Additionally, the appeals court found that Fitzpatrick's guilty plea waived his right to challenge that the use of restraints violated his constitutional rights other than the voluntariness of his guilty plea (i.e., the right to a fair trial, due process, the presumption of innocence, and effective assistance of counsel). *Id.* at \*3 ¶ 10, \*5 ¶ 19. Finally, as to the use of restraints during the sentencing proceedings, the appeals court held that Fitzpatrick had not established with evidence that his appearance in restraints "infringed upon his right to be present at trial or his right to participate in his defense" nor had he established "a reasonable probability that, but for his counsel's failure to request removal of the restraints or a hearing on the need for restraints, the results of the penalty phase of the trial would have been different." *Id.* at \*6 ¶ 24.

This Court concurs that the claim is barred by *res judicata* to the extent that Fitzpatrick is challenging the voluntary nature of his guilty pleas on the basis of the use of restraints against him.

### 3.     Merits

The Supreme Court has long held that the use of visible restraints on a criminal defendant during a trial, absent special need, violates the defendant's constitutional rights. *See*, *e.g.*, *Deck v. Mo.*, 544 U.S. 622, 626 (2005); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Ill. v. Allen*, 397 U.S. 337, 343-44 (1970).[9] "[T]he Fifth and Fourteenth Amendments prohibit the use of

---

[9] While *Deck v. Missouri* post-dates Fitzpatrick's trial and his alleged violation, the *Deck* court clearly held that the rule against visibly shackling a defendant in front of a jury without an extraordinary circumstance is premised on long established precedent. 544 U.S. at 626-29; *see*

physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. The concern is that a defendant may suffer prejudice if forced to appear in shackles in that it compromises the physical semblance of innocence, may undermine the defendant's ability to participate in his own defense and to confer with his legal counsel, and may impair the "dignity and decorum of the judicial process." *Kennedy v. Cardwell*, 487 F.2d 101, 105-06 (6th Cir. 1973); *see also Deck*, 544 U.S. at 630-31 (stating same concerns). Furthermore, the Supreme Court has held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest — as the interest in courtroom security — specific to the defendant." *Deck*, 544 U.S. at 624; *see also Earhart v. Konteh*, No. C-1-06-62, 2007 WL 2492307, at *8 (S. D. Ohio Aug. 29, 2007). The Sixth Circuit has stated that the use of a stun belt implicates the "same fundamental issues" as the use of shackles and has applied the same analysis. *United States v. Miller*, 531 F.3d 340, 345 (6th Cir. 2008) *cert. denied* 129 S.Ct. 307 (2006).

Extraordinary situations, such as a possible danger of violence or escape, may necessitate the use of physical restraints even if such security measures may infringe on and/or deprive the defendant of a portion of his physical indicia of innocence. *Kennedy*, 487 F.2d at 109. Due to the nature and inherent prejudice of shackling, "where a court, without adequate justification orders a defendant to wear shackles *that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635

---

*also Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005).

(emphasis added).  In such situations, the State must prove "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained."  *Id.* (internal quotation and citation omitted); *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005).  The State can meet its burden in appropriate cases with overwhelming evidence of the defendant's guilt.  *Id.*

The use of and degree of security restraints exercised over the defendant, if deemed necessary, is within the trial judge's discretion.  *Deck*, 544 U.S. at 633; *Payne v. Smith*, 667 F.2d 541, 544 (1981).  The Sixth Circuit has identified multiple factors to be considered by trial courts in making decisions about the use of shackles or a stun belt:

> (1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security.

*Lakin*, 431 F.3d at 964 (shackles).  A trial court's exercise of discretion must involve a "more individualized determination" than simply rubber stamping the preference of a corrections officer as to the use of restraints.  *Lakin*, 431 F.3d at 964.  Additionally, "a per se rule that permitted shackling those defendants merely charged with certain crimes such as escape or murder would run afoul of the individualized determination that the due process clause requires."  *Id.* at 965.

Turning now to the physical restraints used against Fitzpatrick, the Court first examines the use of restraints in the guilt phase of trial.  As explained above, it is not clear from the record whether Fitzpatrick was placed in shackles or a stun belt in the presence of the jury during the guilt phase.  This Court agrees with Magistrate Judge Merz that the trial court had an objectively reasonable basis to have Fitzpatrick physically restrained during the morning session on February 6, 2002 after Fitzpatrick made several outbursts during which he accused his attorneys

43

and Judge Dinkelacker of lying and after he "messed with" the deputies. Likewise, even if Fitzpatrick had been restrained prior to the outbursts in violation of his constitutional rights, Fitzpatrick suffered no prejudice. Fitzpatrick waived his trial rights and pleaded guilty. The State presented overwhelming evidence of Fitzpatrick's guilt at the plea hearing. *See Lakin*, 431 F.3d at 966 (stating that strong evidence of guilt can help the government establish that shackling error did not contribute to the guilty verdict). Fitzpatrick has not established that the use of physical restraints impacted the voluntariness of his plea. Rather, he told the trial court that he wanted to plead guilty because he "killed" the victims and to avoid putting his family and the jury through the ordeal of a trial. (Tr. Vol. 10 at 869, 874-77.)

Next, the Court must examine the constitutionality of the use of physical restraints during the guilty plea and penalty phases of the trial outside the presence of the jury, before Judge Dinkelacker and the three-judge panel. Even assuming the use of restraints was erroneous, Fitzpatrick "is not entitled to habeas corpus relief unless such error had a 'substantial and injurious effect or influence in determining the [sentencers'] verdict.'" *Earhart*, 2007 WL 2492307, at *11 (quoting *Calderon v. Coleman*, 525 U.S. 141, 145 (1998)). Fitzpatrick has not established that the restraints used interfered with his ability to confer with his counsel or participate in his own defense. In the absence of evidence to the contrary, this Court, like Magistrate Judge Merz, presumes that the judges were able to separate the facts of the crime from the appearance of Fitzpatrick in shackles.

The Sixth Circuit and other courts have ruled similarly in analogous cases. In *Fautenberry v. Mitchell*, 515 F.3d 614 (6th Cir. 2008), the Sixth Circuit held that a petitioner's appellate counsel did not render ineffective assistance of counsel by failing to raise four claims

44

on his appeal, including one that Fautenberry was forced to wear shackles in the presence of the trial court. *Id.* at 642. The court stated that the omitted claim "would not have had any merit on direct appeal because under Ohio law the appellate court 'presum[es] that in a bench trial in a criminal case[,] the court consider[s] only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'" *Id.* at 642-43 (quoting *Ohio v. Post*, 32 Ohio St. 3d 380, 513 N.E.2d 754, 759 (1987)). Similarly, the Ninth Circuit in a post-*Deck* case upheld as valid a court policy requiring criminal defendants to wear leg restraints at their initial appearance. *United States v. Howard*, 480 F.3d 1005, 1012 (9th Cir. 2007). The court stated that "fear of prejudice is not at issue, as a judge in a pretrial hearing presumably will not be prejudiced by seeing defendants in shackles." *Id.* Finally, at least one district court has held that "there is no clearly established Supreme Court precedent against shackling a defendant during sentencing when only a judge, not a jury, is present." *Keck v. Luna*, No. 06-00571, 2007 WL 2263060, at *3 (D. Haw. Aug. 7, 2007).[10]

For all these reasons, the Third Ground for Relief is **DENIED**.

---

[10] The case to which Fitzpatrick cites to the contrary of these authorities is factually distinguishable. The Ninth Circuit in *Comer v. Schriro*, 480 F.3d 960 (2007), held that a defendant who was presented before his sentencing judge bleeding, nearly naked, exhausted, and shackled did not need to prove actual prejudice. *Id.* at 990-93. The circumstances in that case were extreme. The court explained:

> [T]he appearance of this naked, bleeding, shackled man was a severe affront to the dignity and decorum of the judicial proceedings. We have never before read of a man being sentenced to death, or even presented to a court, under such circumstances.

*Id.* at 992. The defendant in *Comer* was denied his "humanity and dignity" in a manner in which Fitzpatrick was not. This Court will not presume prejudice in the factual circumstances of Fitzpatrick's case.

**D.    Fourth Ground for Relief**

> The errors and omissions of Trial Counsel at Guilt Phase violated Mr. Mr. [sic]
> Fitzpatrick's constitutional right to the effective assistance of Trial Counsel. U.S. Const.
> Amend. VI and XIV.

(Doc. 22 at 45.)

Petitioner Fitzpatrick's Fourth Ground for Relief consists of multiple subclaims: (1) Trial

counsel permitted impermissible and unconstitutional waivers of Fitzpatrick's constitutional

rights; (2) Trial counsel failed to recognize Fitzpatrick's documented history of hallucinations,

delusions, paranoia and related psychiatric issues; (3) Trial counsel ignored Hamilton County

Justice Center medical records regarding Fitzpatrick; (4) Trial counsel engaged in a pattern of

prioritizing obtaining waivers from Fitzpatrick rather than taking into account his severe

confusion and compromised psychiatric state, including (a) obtaining a speedy trial waiver over

Fitzpatrick's objection that he did not understand the matter before him, (b) challenging the

prosecutor's suggestion that trial counsel file a competency motion, (c) accepting Fitzpatrick's

jury waiver, and (d) securing Fitzpatrick's guilty plea in an outcome determinative manner;

(5) Trial counsel rendered ineffective assistance of counsel relative to the use of a stun belt on

Fitzpatrick; and (6) Trial counsel rendered ineffective assistance of counsel relative to

Fitzpatrick's waiver of his right to a speedy trial.

The governing standard for effective assistance of counsel is found in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or death sentence has two components. First, the
> defendant must show that counsel's performance was deficient. This requires
> showing that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must show that the
> deficient performance prejudiced the defense. This requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Under the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A reasonable probability is one that "is sufficient to undermine confidence in the outcome." *Id.* The Supreme Court further explained that when a defendant challenges a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Strategic decisions of defense counsel are "virtually unchallengeable." *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001) (citation omitted). However, an attorney's strategy must be "reasonable" and must be "within the range of logical choices an ordinarily competent attorney" would consider "as reasonable to achieve a 'specific goal.'" *Cone v. Bell*, 243 F.3d 961, 968 (6th Cir. 2001), *overturned on other grounds*, *Bell v. Cone*, 525 U.S. 685 (2002).

1.  **Subclaims: (1) Trial Counsel permitted impermissible and unconstitutional waivers of Fitzpatrick's constitutional rights; (2) Trial counsel failed to recognize Fitzpatrick's documented history of hallucinations, delusions, paranoia and related psychiatric issues; (3) Trial counsel ignored Hamilton County Justice Center medical records regarding Fitzpatrick; and (4) Trial counsel engaged in a pattern of prioritizing obtaining waivers from Fitzpatrick rather than take into account his severe confusion and compromised psychiatric state, including (a) obtaining speedy trial waiver over Fitzpatrick's objection that he did not understand the matter before him, (b) challenging the prosecutor's suggestion that trial counsel file a competency motion, (c) accepting Fitzpatrick's jury waiver, and (d) securing**

**Fitzpatrick's guilty plea in an outcome determinative manner.**

Petitioner Fitzpatrick raised at least some aspects of these subclaims on direct appeal and again in post-conviction relief proceedings. *Fitzpatrick*, 2004 WL 2367987, at *8 ¶¶ 35-38. The court of appeals found in the post-conviction relief proceedings as follows:

> The record of proceedings at trial . . . disclosed rational reasons for Fitzpatrick's waiver of a trial before a jury. Nothing in the outside evidence offered in support of the fifth, seventh, and eighth claims demonstrated a reasonable probability that, but for counsel's failure to insist on, or to secure, a competency hearing, Fitzpatrick would not have waived his speedy-trial or jury rights or pleaded guilty or would have been found incompetent to do so. Thus, Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief.

*Id.* at *8 ¶ 38. The court denied Fitzpatrick's claims related to his competency and to the knowing, intelligent, and voluntary nature of his waivers and pleas. (*Id.*) The discussion that follows focuses principally on Fitzpatrick's jury waiver and the guilty plea. The Court will address Fitzpatrick's waiver of his speedy trial separately in another subclaim.

The Court incorporates its substantive analysis of the First and Second Claims for Relief — claiming that the trial court violated Fitzpatrick's rights by accepting his jury waiver and guilty plea without holding a competency hearing and without ensuring that the waivers were intelligent, knowing, and voluntary — as if fully restated herein.

The Court also offers the following observations and analysis, much echoing the analysis offered by Magistrate Judge Merz in the R&R. Trial counsel represented to the trial court that they had considered the issue of Fitzpatrick's competency through the beginning of Fitzpatrick's trial. (Tr. Vol. 10 at 881-85, 903-04.) Trial counsel told Judge Dinkelacker that they talked to Dr. Cooper, Dr. Hawkins, and Dr. Tureen, as well as reviewing the medical records of Dr. Dunsieth and Dr. Newton. (*Id.* at 903-04) Later, Dr. Cooper himself testified that Fitzpatrick

appeared competent each time Dr. Cooper had contact with him. (Tr. Vol. 13 at 1240.) Trial counsel reiterated at the evidentiary hearing held by Magistrate Judge Merz that they believed at the time of trial that Fitzpatrick was competent. Trial counsel testified at that hearing that they chose not to pursue a competency hearing as a strategic matter because they believed that Fitzpatrick would be found competent and they did not want to have to share the results with the State prosecutors. (Doc. 75 at 149-51; Doc. 76 at 22-25, 39-45.) Trial counsel feared that a competency examination might provide evidence that Fitzpatrick was malingering or raise other issues which would be unfavorable to Fitzpatrick. (*Id.*)

Two factors that warrant additional consideration are that the trial attorneys were unaware at the time of trial that Fitzpatrick had scored a 69 — a borderline mental-retardation score — on an abbreviated Wexler Intelligence Scale test administered by Dr. Tureen and that they misrepresented to the trial court the types and amounts of medication that Fitzpatrick was taking. (Tr. Vol. 10 at 913; Doc. 75 at 76-81, 119-20.) Mr. Cutcher testified that if he had known about the IQ test score, it would have raised a red flag regarding Fitzpatrick's competency, but he later testified that the IQ test score would not have changed his belief that Fitzpatrick was competent. (*Id.* at 153-54.) Moreover, as discussed in the analysis of the First Ground for Relief, trial counsel based their evaluation of Fitzpatrick on their numerous and on-going personal interactions with him outside of court, his behavior and decision-making at trial, a review of medical records, and consultations with Fitzpatrick's physicians.

Even if the Court were to find that trial counsel's representation was constitutionally deficient in regards to securing the waiver of the right to jury trial and the guilty plea, Fitzpatrick has not established prejudice. He has offered insufficient proof to overcome the trial court's

finding that his pleas were competent, intelligent, knowing, and voluntary. Finally, to the extent that Fitzpatrick challenges his trial counsel's effectiveness in regards to his waiver of his speedy trial rights, the Court discusses that subclaim in subsection D.3. below.

## 2. Subclaim: (5) Trial counsel rendered ineffective assistance of counsel relative to the use of a stun belt on Fitzpatrick.

Petitioner Fitzpatrick raised this claim in the state court proceedings for post-conviction relief. *Fitzpatrick*, 2004 WL 2367987, at *5 ¶ 22. As to the merits, the appeals court held that Fitzpatrick waived the subclaim with his guilty plea except to the extent that his pleas were the involuntary product of being restrained. *Id.* at *5 ¶ 19. Moreover, the state appeals court held that the subclaim was barred by *res judicata* insofar as he alleged "his guilty pleas were the involuntary product of his counsel's failure to insist on removal of the restraints or on a hearing." *Id.* at *5 ¶ 22. The state appeals court stated that the involuntariness subclaim could have been raised on direct appeal because Fitzpatrick had new counsel on the appeal and sufficient evidence in the record to make the argument. *Id.* Accordingly, the state appeals court held that part of the subclaim was barred on the merits and part was barred by *res judicata*.

Based on the state court record, this Court holds that the subclaim is procedurally defaulted. Fitzpatrick could have raised this issue on appeal. Moreover, the evidence *de hors* the record submitted by Fitzpatrick was available to counsel at the time of Fitzpatrick's trial and appeal and therefore does not defeat the finding of *res judicata*. *See Ohio v. Vinson*, No. 2007-L-088, 2008 WL 2485164, at *6 ¶ 37 (Ohio App. June 20, 2008); *Ohio v. Coleman*, No. C-900811, 1993 WL 74756, at *8 (Ohio App. Mar. 17, 1993).

Additionally, the subclaim fails on the merits for the same reasons the Third Claim for Relief failed on the merits. The trial court did not violate Fitzpatrick's rights, and trial counsel

50

did not render ineffective assistance of counsel, insofar as Fitzpatrick was placed in restraints on the morning of February 6, 2002 after multiple outbursts and after he was warned not to "mess with" the deputies. Also, Fitzpatrick was not prejudiced by the use of restraints. Fitzpatrick's guilty plea waived his trial rights except to the extent that the restraints impaired the voluntariness of the plea. Fitzpatrick did not establish that the use of restraints impaired the voluntariness of his plea. Therefore, his attorneys did not render ineffective assistance of counsel relative to the use of the stun belt.

### 3. Subclaim: (6) Trial counsel rendered ineffective assistance of counsel relative to Fitzpatrick's waiver of his right to a speedy trial.

Fitzpatrick did not challenge the knowing, intelligent, and voluntary nature of his waiver of the right to speedy trial on direct appeal to the Ohio Supreme Court. *Fitzpatrick*, 2004 WL 2367987, at *8 ¶ 36. He did raise the issue in the post-conviction relief proceedings. *Id.* The Ohio court of appeals held in the post-conviction relief proceedings that the trial court record "confirmed defense counsel's need for substantial preparation time" and that the *de hors* evidence did not demonstrate a reasonable probability that Fitzpatrick would not have waived his speedy trial rights absent counsel's failure to insist on a competency hearing. *Id.* at *8 ¶ 38.

This Court concurs with the Ohio court of appeals that the ineffective assistance of counsel subclaim involving the waiver of speedy trial rights fails on the merits. Trial counsel and the trial court ensured that Fitzpatrick's waiver was intelligent, knowing, and voluntary. (Tr. Vol. 3 at 27-31.) Trial counsel provided two reasons for waiving right to a trial within 90 days. First, trial counsel needed time to prepare for trial. (*Id.* at 28.) Second, trial counsel intended to file approximately fifty pretrial motions. (*Id.*) Judge Dinkelacker engaged in a colloquy with Fitzpatrick in which the judge explained that Fitzpatrick had a right to be tried within ninety

days of his arrest, which date was September 10, 2001, that Fitzpatrick's attorneys sought additional time in order to prepare a defense, conduct an investigation, and file motions, and that trial was being set for October 1, 2001. (*Id.* at 29-31.) Fitzpatrick verified that he had discussed these rights and the trial date with his attorneys, that he agreed with the waiver, and that he signed the waiver. (*Id.*) The Court finds that trial counsel did not render ineffective assistance of counsel as to the speedy trial waiver.[11]

### 4.    Summary of Fourth Ground for Relief

The Court **DENIES** the Fourth Ground for Relief on the merits for the foregoing reasons.

---

[11] In related arguments concerning Fitzpatrick's competency, Fitzpatrick contends that the trial court should have conducted a competency hearing before accepting the speedy trial waiver because Fitzpatrick responded negatively when asked if he felt all right at that pretrial hearing:

> The Court: * * * *  I don't want to go to far into this, but, Mr. Fitzpatrick, sir, if you don't mind just – okay.

Are you all right, sir?

> The Defendant: No.

> The Court: Okay.  I can appreciate that.  But at this point, sir, all we are concerned about is, we've set a trial date of October 1st.

Do you understand that?

> The Defendant: Yes.

(Tr. Vol. 3 at 29.)  This limited discussion in which Fitzpatrick indicates that he is not feeling well provides an insufficient basis for the Court for the to conclude that he was not competent or that a competency hearing was needed.  Moreover, Fitzpatrick's ability to participate in the colloquy with the trial court about his speedy trial waiver undercut the competency concern.  Additionally, immediately after the speedy trial colloquy, the trial court permitted the parties to take the testimony of Sergeant Boeing regarding Fitzpatrick's competency.  Sergeant Boeing testified that, although Fitzpatrick seemed depressed, he had no concerns about Fitzpatrick's ability to understand what had happened the evening he was arrested.  (*Id.* Vol. 3 at 39-40.)

E.	**Fifth Ground for Relief**

The errors and omissions of Trial Counsel during the Penalty Phase of Trial Violated Mr. Fitzpatrick's right to the effective assistance of Trial Counsel. U.S. Const. Amend. VI and XIV.

(Doc. 22 at 56.)

The *Strickland* standard for evaluating the effectiveness of trial counsel applies to the penalty phase of trial as well as to the guilt phase. To establish constitutionally ineffective assistance of counsel, a petitioner must show "(1) that his counsel rendered deficient performance, and (2) that this deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable." *Hawkins v. Coyle*, 547 F.3d 540, 548 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687). The Court is mindful in its analysis to examine the adequacy of counsel's representation in light of "counsel's perspective at the time" and to give a "heavy measure of deference to counsel's judgments." *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691). The Supreme Court has explained guidelines for examining purported tactical decisions to not present mitigating evidence at sentencing:

Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland*, 466 U.S. at 690-91). In the context of a death sentence, the question of prejudice turns on "whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it

independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005) (quoting Strickland, 466 U.S. at 695).

1.      **Subclaim: Trial counsel rendered ineffective assistance of counsel relative to the use of stun belt at the penalty phase.**

The Ohio appeals court denied this subclaim on the merits during the post-conviction relief proceedings. *Fitzpatrick*, 2004 WL 2367987, at *6 ¶¶ 23-26. This Court, in agreement with Magistrate Judge Merz, does the same. As stated above in reference to the Third Ground for Relief, Fitzpatrick has not established that the use of restraints interfered with his ability to confer with counsel or to participate in his own defense. As such, even if trial counsel were deficient in not objecting to the use of restraints during the penalty phase, Fitzpatrick has not established prejudice. He has not established a reasonable probability that but for trial counsel's performance the result of the sentencing proceeding would have been different. *See Strickland*, 466 U.S. at 694 (explaining prejudice standard).

The Court, nonetheless, will address two particular arguments made by Fitzpatrick. First, Fitzpatrick asserts that the use of the stun belt created a risk that the Court would consider an invalid factor, future dangerousness, in rendering the sentence. O.R.C. § 2929.04(A) provides a list of the aggravating circumstances, at least one of which must be proven beyond a reasonable doubt, to support the imposition of a death sentence. Future dangerousness is not a statutory aggravating circumstance. However, the trial court record belies Fitzpatrick's concern. The three-judge panel in their sentencing opinion specified the aggravating circumstances which they considered. (Apx. Vol. 2 at 316, 325.) The three-judge panel did not consider future dangerousness as an aggravating factor. Nor did the Ohio Supreme Court consider future

dangerousness as an aggravating circumstance when it performed its independent sentencing review pursuant to O.R.C. § 2929.05. *Fitzpatrick*, 102 Ohio St. 3d at 334-35 ¶¶ 83-86, at 339-340 ¶¶ 115-18.

Second, Fitzpatrick asserts that the use of the stun belt deprived Fitzpatrick of a possible mitigating factor, *i.e.* the possibility he could adjust to incarceration. Fitzpatrick is correct to suggest that neither the three-judge panel nor the Ohio Supreme Court expressly considered Fitzpatrick's potential adjustment to incarceration as a mitigating factor. *Id.* at 335-40 ¶¶ 87-118; Apx. Vol. 2 at 326-28. However, even if trial counsel had objected to the use of the stun belt at sentencing and/or if the three-judge panel had weighed Fitzpatrick's potential to adjust to incarceration as a mitigating factor, Fitzpatrick has not established a reasonable probability that the result of the sentencing proceeding would have been different. *See Strickland*, 466 U.S. at 694 (explaining prejudice standard).

### 2. Subclaim: Trial counsel rendered ineffective assistance of counsel relative to Fitzpatrick's partial waiver of mitigation without a hearing.

Fitzpatrick alleges in this subclaim that trial counsel rendered ineffective assistance of counsel when they honored Fitzpatrick's waiver of the right to present mitigation testimony from his family members without insisting upon a competency hearing. The Court will not reiterate again why trial counsel were not ineffective in regard to their decision, generally, to not request a competency hearing. As to the partial waiver of mitigation, Fitzpatrick identifies two potential witnesses who were available on his behalf: his mother and Tracy Bailey, a close friend. Fitzpatrick does not specify the nature of testimony they would have provided except to state that they would have informed the three-judge panel about Fitzpatrick's upbringing and life. The two potential witnesses, however, did speak to Dr. Cooper, Fitzpatrick's mitigation expert

witness.  (Tr. Vol.13 at 1200.)

This Court indulges a "strong presumption" that trial counsel's conduct fell within a wide range of professional competency.  *Johnson v. Bell*, 344 F.3d 567, 573 (6th Cir. 2003) (citation omitted).  Defense counsel are not ineffective solely because they follow a competent defendant's instruction to forego the investigation or presentation of some possible mitigating evidence.  *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001).  Fitzpatrick has not established that his trial counsel rendered ineffective assistance when they followed his instructions not to present testimony from family members.  Moreover, Fitzpatrick has not established prejudice.  Fitzpatrick has not established a reasonable probability that the result of the sentencing proceeding would have been different had the witnesses testified.

> **3.     Subclaim: Trial counsel rendered ineffective assistance of counsel when they failed to hire or present testimony of a mitigation specialist or an addictions expert.**

Magistrate Judge Merz found that the subclaim related to the failure to hire a mitigation specialist was barred by *res judicata* and that both subclaims failed on the merits.  (Doc. 85 at 85-86.)  This Court incorporates his analysis of the claim as if fully rewritten herein.

Fitzpatrick first raised the mitigation specialist subclaim in the proceedings for post-conviction relief.  The trial court in the post-conviction relief proceedings held that the claim could have been raised on direct appeal and was barred by *res judicata*.  (Apx. Vol. 5 at 346-47.)  The trial court also held that the trial counsel's mean of presenting mitigation evidence was an acceptable tactical decision.  (*Id.*)  The court of appeals in post-conviction affirmed.  The court of appeals held that Fitzpatrick "failed to sustain his initial burden of demonstrating substantive grounds for relief" in that he failed to establish a reasonable probability that but for his counsel's

failure to hire a mitigation specialist the outcome of his sentencing would have been different. *Fitzpatrick*, 2004 WL 2367987 at *11 ¶ 55.

Turning to the merits, the record reveals that the mitigation specialist retained by trial counsel for the trial, James Crates, was able to render services on Fitzpatrick's behalf for only a single day due to a scheduling conflict. *Id.* at *9-10 ¶¶ 42-44. Crates suggested to trial counsel that they explore Fitzpatrick's psycho-social history because of Fitzpatrick's evident mental health issues. *Id.* at *9 ¶ 42. Crates averred in the post-conviction proceedings that he had not been provided with Fitzpatrick's incarceration records or his employment history records at the time of trial and that the records would have supported unspecified mitigation factors. *Id.* at *9 ¶ 43.

"[T]he ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003). The Guidelines in effect at the time of Fitzpatrick's trial stated as follows:

> Counsel should secure the assistance of experts where it is necessary or appropriate for:
>
> * * * *
>
> D. presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law.

(American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases 1989 at Guideline 11.4.1(D)(7).)[12]

---

[12] The revised 2003 ABA Guidelines were more explicit in requiring death penalty trial counsel to retain a mitigation specialist:

Fitzpatrick asserts in this subclaim two types of mitigation evidence which a mitigation specialist would have presented (or assisted in presenting) to the sentencing panel. First, he asserts that a mitigation specialist would have presented evidence concerning Fitzpatrick's history of gainful employment prior to the crimes. Fitzpatrick concedes that his friend and former co-worker, Eric Mitchell, testified at the sentencing hearing that Fitzpatrick had been employed at Formica Corporation for approximately five years. In fact, the Ohio Supreme Court in its sentencing review specifically noted that Fitzpatrick had been employed at a Formica plant since 1996. *Fitzpatrick*, 102 Ohio St. 3d at 339 ¶ 113.[13] Nonetheless, Fitzpatrick asserts that Mitchell failed to present specific details regarding his employment at Formica such that he worked overtime hours and had completed training courses. Fitzpatrick has not cited to any authority suggesting a reasonable probability that the results of the sentencing hearing would have been different had trial counsel retained a mitigation specialist and presented this additional evidence.

A similar analysis applies to Fitzpatrick's argument that a mitigation specialist would

_____

The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.

1. The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.

2. The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

(American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition February 2003 at Guideline 4.1(A).)

[13] The Ohio Supreme Court's reweighing of aggravating circumstances and mitigating factors can cure any error by the trial court. *See Clemons v. Mississippi*, 494 US. 738, 745-49 (1990); *Cooey v. Coyle*, 289 F.3d 882, 888-90 (6th Cir. 2005).

have presented (or assisted in presenting) evidence concerning Fitzpatrick's positive adjustment to incarceration. A defendant's ability to positively adjust to incarceration is a mitigating factor under Ohio law. *Ohio v. Simko*, 71 Ohio St. 3d 483, 497, 644 N.E.2d 345 (1994). In this instance, Fitzpatrick states that the prison records show that he had not been involved in any physical altercations and that he had utilized grievance procedures when he had problems in the prison. This evidence is insufficient to establish prejudice. Fitzpatrick has not cited to any authority suggesting a reasonable probability that the results of the sentencing hearing would have been different had trial counsel retained a mitigation specialist and presented this additional evidence.

Turning to the subclaim regarding the failure to hire an addiction specialist, Fitzpatrick asserts that an addiction specialist could have explained Fitzpatrick's cocaine addiction was not voluntary, enabling the sentencing panel to give greater weight to Fitzpatrick's history of cocaine abuse. Trial counsel did present evidence concerning Fitzpatrick's cocaine use at the sentencing hearing through the testimony of Fitzpatrick's co-worker and through the expert testimony of Dr. Cooper. (Apx. Vol. 2 at 323-24.) As summarized in the sentencing opinion, Fitzpatrick's co-worker testified that Fitzpatrick had been acting in an abnormal manner and had talked about "fighting the devil" on the morning of June 9, 2001, the day he killed Elton Rose. (*Id.* Vol. 2 at 323.) Dr. Cooper testified that he had diagnosed Fitzpatrick with "substance-induced psychotic disorder and major depression disorder with psychotic features." (*Id.* Vol. 2 at 324.) He also stated that Fitzpatrick had "acute cocaine intoxication of cocaine delirium during the alleged offenses." (*Id.*) Dr. Cooper testified that at the time of the offenses Fitzpatrick "would go in and out of consensual reality." (*Id.*)

Despite Dr. Cooper's testimony, the three-judge sentencing panel gave little weight to Fitzpatrick's potential mental defect caused by the cocaine abuse because "the Court is hard-pressed to find and award mitigation to a defendant who increases his problems by the voluntary ingestion of illegal substances." (*Id.* Vol. 2 at 326-27.)  The Ohio Supreme Court, likewise, stated that Fitzpatrick's cocaine use was entitled to "little weight."  *Fitzpatrick*, 102 Ohio St. 3d at 338-39 ¶ 111.  "A [preexisting mental] disorder both caused and exacerbated by the voluntary ingestion of drugs deserves minimal weight in mitigation."  *Id.* at 339 ¶ 111.

This Court agrees with the Ohio courts that the testimony which Fitzpatrick purports an addiction specialist could have provided would have been largely cumulative to the testimony provided by Fitzpatrick's co-worker and by Dr. Cooper.  Additionally, the *de hors* evidence offered by Fitzgerald to explain chemical addiction generally is not direct evidence regarding the voluntariness of his cocaine use.  Fitzpatrick does not present evidence from an addiction specialist who would testify that Fitzpatrick's use of cocaine prior to the murders was not voluntary.   Finally, Fitzpatrick has not established a reasonable probability that the outcome of the sentencing would have been different had an addictions expert testified because the evidence of Fitzpatrick's guilt was strong and the sentencing three-judge panel had knowledge of Fitzpatrick's drug use.  In *Hill v. Mitchell*, a jury sentenced the defendant to death despite hearing testimony from an addiction specialist that the defendant was addicted to cocaine at the time of the murders and such addiction could lead to mental confusion, paranoia, and violent and aggressive behavior.  400 F.3d at 315-16.  The Court finds that Fitzpatrick has not established the *Strickland* prong of prejudice.

**4.      Subclaim: Trial counsel rendered ineffective assistance of counsel in regard**

**to their alleged failure to carry out a mitigation investigation.**

The Court understands this subclaim to be repetitive of the previous subclaims in this Ground for Relief. The Court finds that the subclaims lack merit whether considered individually or cumulatively.

### 5.    Summary of Fifth Ground for Relief

The Court **DENIES** the Fifth Ground for Relief for the foregoing reasons.

## F.    Sixth Ground for Relief

The Trial Court's failure to conduct a competency hearing concerning Mr. Fitzpatrick's waiver of his Sixth Amendment right to Trial by Jury, his Guilty Plea, and his waiver of his Sixth Amendment right to a Speedy Trial deprived Mr. Fitzpatrick of his constitutional rights. Const. Amends. V, VI, VIII, and XIV.

(Doc. 22 at 69.)

The subclaims regarding the waiver of trial by jury and the guilty plea are procedurally defaulted for the reasons discussed in the First and Second Grounds for Relief. Similarly, Fitzpatrick raised the issue concerning his waiver of speedy trial rights in the state court post-conviction proceedings. The state appeals court held that the claims were barred by *res judicata* as they could have been raised at trial or on appeal. *Fitzpatrick*, 2004 WL 2367987, at *8 ¶ 34. Magistrate Judge Merz, likewise, recommended that this claim be held barred by *res judicata,* and alternatively, that the claim should be denied on the merits. This Court agrees with Magistrate Judge Merz on both bases.

Fitzpatrick's only objection to the *res judicata* finding is that the procedural bar should not be enforced here because Ohio courts fail to apply *res judicata* evenhandedly. However, that argument already has been rejected. *Frazier*, 343 F.3d at 805 (Batchelder, J., concurring) (stating that Ohio's *res judicata* policy is an adequate and independent basis for barring habeas review);

*Buell*, 274 F.3d at 349 (same).  The Court holds that the claim is barred by *res judicata*.

Alternatively, the claim fails on the merits.  The competency issue as to the speedy trial waiver, jury trial waiver, and guilty plea were discussed at length in the analysis of First Ground for Relief, the Second Ground for Relief, and the sixth subclaim of the Fourth Grounds for Relief.  The Court holds based on its earlier analysis that the trial court's failure to hold a competency hearing did not violate Fitzpatrick's rights.

## G.     Seventh Ground for Relief

The trial court's acceptance of Mr. Fitzpatrick's partial waiver of mitigation without ensuring that it was made knowingly, intelligently, and voluntarily and that Mr. Fitzpatrick was competent to waive that right violated his constitutional rights. Const. Amends. V, VI, VIII, XIV[.]

(Doc. 22 at 75.)

Petitioner Fitzpatrick raised this claim for the first time as the Fourth Proposition of Law in an Application for Reopening in the Ohio Supreme Court.  (Apx. Vol. 3 at 327, 332.)  The Ohio Supreme Court denied the Application summarily, without any discussion of Fitzpatrick's asserted bases for the Application or the reasons for the denial.  *Fitzpatrick*, 105 Ohio St. 3d at 1436.  Magistrate Judge Merz both found that the Ground for Relief was barred by *res judicata* and that it failed on the merits.

Petitioner Fitzpatrick contends on the basis of *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), that the Ohio Supreme Court decision denying the Application for Reopening constituted a denial on the merits because the Ohio Supreme Court did not explicitly assert a procedural bar. In *Maupin*, the Sixth Circuit stated that in order for a state procedural bar to preclude federal habeas corpus review, the state court must have "actually enforced the state procedural sanction."  *Id.* at 138.  A merits review by the last state court to have considered an issue

removes any procedural bar which otherwise might have existed. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).[14] Neither *Maupin* nor *Ylst*, however, are directly controlling on the matter of whether a procedural bar precludes Fitzpatrick's claim here.

A denial of the Application for Reopening does not constitute a denial on merits of the underlying claim. In the Application, Fitzpatrick applied for the Ohio Supreme Court to reopen his direct appeal on the basis that his appellate counsel had rendered ineffective assistance of counsel during his appeal in five discrete aspects. An application for reopening of direct appeal only raises the claim of ineffective assistance of appellate counsel and does not present the underlying claims for merit review, unless of course the appeal is reopened. *Freeman v. Moore,* 303 F. App'x 285, 289 n.4 (6th Cir. 2008) *cert. denied* 129 S. Ct. 2398 (2009); *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005); *Moore v. Mitchell,* 531 F. Supp. 2d 845, 862 (S.D. Ohio 2008). The Ohio Supreme Court denied the Application concerning the effectiveness of appellate counsel without addressing at all the merits of the underlying claim concerning Fitzpatrick's partial waiver of mitigation. Fitzpatrick has not asserted a claim in the Amended Petition concerning the effectiveness of his appellate counsel. This Court agrees with Magistrate Judge Merz that the partial waiver of mitigation claim is procedurally barred.

As to the merits, Magistrate Judge Merz recommended that the claim be denied to the extent Fitzpatrick asserts that the trial court erred by not ensuring that he was competent to waive mitigation. Magistrate Judge Merz did not specifically discuss whether the trial court

---

[14] The question in *Ylst*, as here, was whether an unexplained order dismissing or denying an appeal or motion for post-conviction review is presumed to be on the merits. The Supreme Court established the following presumption in *Ylst*: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." 501 U.S. at 803. The *Ylst* presumption is inapplicable here because no state court issued a reasoned decision on this claim.

erred by not ensuring that his waiver was made intelligently, knowingly, and voluntarily.  It can

be inferred, however, that he recommended denying that portion of the Ground for Relief as

well.

The trial transcript regarding Fitzpatrick's decision to partially waive his right to present

mitigation evidence is limited.  The first discussion was as follows:

> Mr. Wenke:  We've had substantial discussion with our client this
> weekend, and he's given us instructions with regard to his family members.  He
> did not want them called.

> Judge Dinkelacker: Okay.

> Mr. Wenke:  Also, as to some other witnesses.  We anticipate that we
> would have a total of three witnesses, and then we believe Mr. Fitzpatrick will
> give an unsworn statement.  So we do not anticipate any further time, at this
> juncture, to prepare.

> Judge Dinkelacker: All right. Thank you, Mr. Wenke.

(Tr. Vol. 13 at 1130.)  Later, before Fitzpatrick gave his unsworn statement, trial counsel again

stated that Fitzpatrick did not want certain witnesses called:

> Mr. Wenke: Judge, just a matter of making a record at this time, we did
> have a number of other witnesses, family members and other witnesses, and our
> client had given us instructions not to call those people.

> I just wanted to make that a matter of record.  We've had numerous discussions
> with him regarding that, and that was his decision at this point.

> Judge Dinkelacker: Okay.

(Tr. Vol. 14 at 1254.)  Also, at the earlier guilty plea hearing, the trial court had explained to

Fitzpatrick that he could be sentenced to death if he was found guilty of one or more counts of

aggravated murder and one or more death specifications.  (Tr. Vol. 12 at 958, 973-74.)  The trial

court also had informed him that he had the right to present mitigating evidence before the three-

judge sentencing panel issued their sentence.  (*Id.* Vol. 12 at 966, 968-74.)

The standard used to determine whether a defendant is competent to stand trial is also appropriate to determine whether a defendant is "competent enough to instruct his counsel as the appropriate strategy to pursue at sentencing."  *Coleman v. Mtichell*, 244 F.3d 533, 545 (6th Cir. 2001).  Therefore, a defendant is competent to make a partial waiver of mitigation if he has "sufficient ability to consult with his lawyers and a reasonable degree of rational and factual understanding of the proceedings against him."  *Coleman*, 244 F.3d at 545 (citation omitted).

Fitzpatrick does not assert any bases upon which the trial court should have determined that Fitzpatrick was incompetent or that a competency hearing was needed other than those he asserts in regards to his waiver of speedy trial, waiver of jury trial, and guilty plea.  Accordingly, the competency subclaim is denied for the same reasons that the previous competency-related Grounds for Relief were denied.

"The determination of whether a waiver was knowing, intelligent, and voluntary is to be made by assessing the totality of the circumstances."  *Cowans*, 624 F. Supp. 2d at 745.  Petitioner Fitzpatrick is critical of the fact that the trial court did not conduct a detailed colloquy with Fitzpatrick to determine that he understood the types of mitigation evidence, the purpose of mitigation, the potential consequences of the partial waiver, and that his waiver was voluntary.[15]

---

[15] The Ohio Supreme Court has imposed a state requirement that trial courts conduct a detailed colloquy with a defendant who seeks to waive all mitigation evidence:

> We now hold that in a capital case, when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary.  The trial court must decide whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings.  The trial court must inform the defendant of the right to present mitigating evidence and explain what mitigating evidence is.  The court

However, the United States Supreme Court has stated in a decision involving a defendant's decision to present no mitigating evidence that "[w]e never have imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." *Schriro v. Landrigan*, 550 U.S. 465, 479 (2007). The Supreme Court further stated that "we have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id.*[16]

Fitzpatrick has provided no basis for the Court to determine that his partial waiver of mitigation was not intelligent, knowing, and voluntary. Trial counsel twice represented to the trial court that they had had multiple discussions with Fitzpatrick concerning potential mitigation witnesses. Fitzpatrick did not object or disagree with trial counsel's representation that he did not want the witnesses presented. His failure to object or disagree is significant given that he had not hesitated to disagree with his counsel or the trial court during the trial proceedings when he wanted to stop the trial and plead guilty. Additionally, the trial court had explained to

---

must then inquire of the defendant, and make a determination on the record, whether the defendant understands the importance of mitigating evidence, the use of such evidence to offset the aggravating circumstances, and the effect of failing to present that evidence. After being assured that the defendant understands these concepts, the court must inquire whether the defendant desires to waive the right to present mitigating evidence, and, finally, the court must make findings of fact as to the defendant's understanding and waiver of rights.

*Ohio v. Ashworth*, 85 Ohio St. 3d 56, 62, 706 N.E.2d 1231 (1999) (citations omitted and emphasis in the original). Importantly, Fitzpatrick did not waive the presentation of all mitigation evidence here. The *Ashworth* colloquy is not required when a defendant waives only limited mitigation evidence. *Ohio v. Bethel*, 110 Ohio St. 3d 416, 439 ¶¶ 148-49, 854 N.E.2d 150 (2006).

[16] In *Schriro*, the Court also noted that the petitioner could not establish even a colorable claim of prejudice based on his counsel's failure to present mitigating evidence on his behalf. *Id.* at 480-81.

Fitzpatrick during the guilty plea hearing his right to present mitigation and the potential for a

death sentence to be imposed.  Given these circumstances, and the Supreme Court's statement in

*Shriro* that a specific colloquy was not mandated, the Court holds that the trial court did not

violate Fitzpatrick's rights by failing to ensure that his waiver was intelligent, knowing, and

voluntary.

**H.      Eighth Ground for Relief**

>  The trial court's erroneous weighing of aggravating circumstances against the mitigating factors and consideration of the nature and circumstances of the offense as an aggravating circumstance deprived Mr. Fitzpatrick of his right to due process and a fair sentencing proceeding under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

(Doc. 22 at 79.)

>  The Court herein adopts and restates almost verbatim the decision of Magistrate Judge

Merz as to the Eighth Ground for Relief.   Petitioner argues that the weighing process of the trial

court was erroneous under O.R.C. § 2929.03(F).  Specifically, he argues that the written opinion

failed to set out reasons why the aggravating circumstances outweigh the mitigating factors.

Additionally, he argues that the trial court improperly considered the nature and circumstances of

the crime as an aggravating factor.  As a result of these errors, he argues he was denied his

constitutional right to a fair, reliable, and individualized sentencing determination as guaranteed

by the Eighth and Fourteenth Amendments and due process of law.  Respondent does not assert

procedural default.  This Court now turns to the merits.

>  Upon addressing this claim on direct appeal, the Ohio State Supreme Court held:

>  B. Sentencing Opinion

>  In his sixth proposition of law, Fitzpatrick contends that the trial court's sentencing opinion fails to explain why the panel found that the aggravating circumstances outweigh the mitigating factors.  We disagree.

67

The opinion contains extensive discussion of the aggravating circumstances and the mitigating factors, as well as the following passage:

> "When weighing the aggravating circumstances as previously stated versus the mitigating factors which the Court noted and considered, the Court finds the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt separately as to Counts One, Two, and Three.

> "A death penalty assessment is the ultimate resolution for the most serious of crimes. It is, as it should be, reserved only for the most heinous aggravated murder cases and for the most vicious acts against common decency and mankind. In this case, Stanley L. Fitzpatrick qualifies in both respects."

Fitzpatrick also contends that the trial court considered the nature and circumstances of the offense as a nonstatutory aggravating circumstance. The panel's discussion of the aggravating circumstances appears under the heading, "Facts Constituting Aggravating Circumstances." This may suggest that the panel believed that the circumstances of the murders were aggravating circumstances. If the panel so believed, it was in error. However, any such error in the trial court's sentencing opinion can be corrected by our independent review in Part VI, below. See State v. Bey (1999), 85 Ohio St. 3d 487, 506, 1999 Ohio 283, 709 N.E.2d 484. Fitzpatrick's sixth proposition is therefore overruled.

*Fitzpatrick*, 102 Ohio St. 3d at 331-32 ¶¶ 68-72.

This Court agrees. The trial court opinion was thorough in its discussion of aggravating circumstances and mitigating factors. (Apx. Vol. 2 at 308-28.) The trial court summarized the facts constituting the aggravating circumstances, which included: purposely and with prior calculation and design causing the death of Shenay Hayes, who was under thirteen years of age at the time of the commission of the offense; being the principal offender in the commission of the offense against Shenay Hayes; purposely and with prior calculation and design causing the death of Doreatha Hayes as part of a course of conduct involving the purposeful killing of two or more persons; and purposely and with prior calculation and design causing the death of Elton Rose as part of a course of conduct involving the purposeful killing of two or more persons.

(Apx. Vol. 2 at 321-22, 325.)

In addition, the trial court thoroughly addressed the mitigation evidence. (*Id.* Vol. 2 at 323-27.) It summarized the testimony from Detective Dilbert, Dr. Cooper, and Eric Mitchell as to Petitioner's mental state at the time of the murders. The court described hallucinations and delusions of interactions with the devil, substance abuse problems including acute cocaine intoxication at the time of the events, and a diagnosis of his mental state as being substance induced psychotic disorder with major depression. Additionally, the court considered Fitzpatrick's unsworn statement.

The trial court specifically considered three mitigation factors in its weighing process: lack of significant history of prior convictions; whether at the time of committing the offense, the offender, because of a mental disease or defect lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law; and any other factors that are relevant to the issue of whether the offender should be sentenced to death.

The court found as the first mitigation factor that Fitzpatrick had no criminal history with the exception of a minor misdemeanor traffic citation. (*Id.* Vol. 2 at 326.) As the second factor, the court considered the fact that Fitzpatrick may have or did consume a large amount of crack cocaine prior to the murders which may have affected his mental status. (*Id.*) Additionally, the court considered the testimony of Dr. Cooper, in which he stated that it was his professional opinion that Fitzpatrick was suffering from a serious mental defect of substance induced psychotic disorder and major depression disorder with psychotic features. (*Id.*) He further testified it was his opinion that Petitioner was acutely intoxicated with cocaine and other

69

substances and as a result was going in and out of consensual reality.  (*Id.*)  Finally, the court

considered Dr. Cooper's assertion that Petitioner was suffering from hallucinations and delusions

but was still able to function and carry on with activities such as going to work.  (*Id.*)  The court

gave only limited weight to Dr. Cooper's assessment as to Fitzpatrick's mental state because

Fitzpatrick voluntarily ingested the cocaine which produced this acute intoxication that led to his

behavior.  (*Id.* Vol. 2 at 327.)  Finally, in the third "catch-all" mitigating factor the court took

into consideration Fitzpatrick's plea of guilty and his remorse and apology to the victims'

families.  (*Id.*)

After a lengthy discussion of the facts supporting the aggravating circumstances, a

summary of the mitigation evidence, the trial court issued the following decision:

<u>Decision</u>

When weighing the aggravating circumstances as previously stated versus the
mitigating factors which the Court noted and considered, the Court finds the
aggravating circumstances outweigh the mitigating factors beyond a reasonable
doubt separately as to Counts One, Two and Three.

A death penalty assessment is the ultimate resolution for the most serious of
crimes.  It is, as it should be, reserved only for the most heinous aggravated
murder cases and for the most vicious acts against common decency and
mankind.  In this case, Stanley L. Fitzpatrick qualifies in both respects.

This panel of Judges has presided over these proceedings, carefully reviewed the
facts presented and followed the law in arriving at its decision.  This panel has
made every effort to effectuate justice.

In this particular case, the evidence warrants it, the law requires it and justice
demands this defendant, Stanley L. Fitzpatrick be sentenced to death with respect
to the capital offenses set forth in Counts One, Two and Three of the Indictment.

(*Id.* Vol. 2 at 328.)

Petitioner argues that the trial court at sentencing "failed to delineate the reasons why the

aggravating circumstances outweighed the mitigating factors" and that the only factor cited by

the trial court is the "heinous nature of the crimes." (Doc. 30 at 160.) He argues that the use of

the phrase "the death penalty is reserved only for the most heinous aggravated murder cases and

for the most vicious acts against common decency and mankind" shows that the court considered

an invalid non-statutory aggravating circumstance. (*Id.*) He argues that the heinous nature of a

crime is not one of the statutorily permissible aggravating circumstances that make an individual

eligible for the death penalty. (*Id.* citing O.R.C. § 2929.04(A).) The panel of judges was clear in

its written decision as to which aggravating circumstances they considered in the weighing

process. Those aggravating circumstances were: purposely causing the death of someone under

the age of 13;[17] and the purposeful killing of, or attempt to kill two or more persons.[18] (Apx.

Vol. 2 at 325.) These aggravating circumstances are clearly enumerated under the death penalty

eligible aggravating circumstances under Ohio Revised Code § 2929.04(A).

Furthermore, it should be noted, that even if this had constituted error, errors by the

sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in

the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738, 748-50, 754 (1990).

Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle*,

289 F.3d 882, 888-92 (6th Cir. 2002); *see also Baston v. Bagley*, 420 F.3d 632, 636-38 (6th Cir.

---

[17] "The offender, in the commission of the offense, purposely caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design." O.R.C. § 2929.04(A)(9).

[18] "Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." O.R.C. § 2929.04(A)(5).

2005). As suggested by the excerpt above, the Ohio Supreme Court independently reweighed

the aggravating circumstances against the mitigating factors. *Fitzgerald*, 102 Ohio St. 3d at 334-

40 ¶¶ 81-118. The Ohio Supreme Court held that aggravating circumstances outweighed the

mitigating factors for each count. *Id.* at 339-40 ¶¶ 115-18.

For the reasons stated above, the Eighth Ground for Relief is **DENIED**.

I.      **Ninth Ground for Relief**

> Ohio Rev. Code § 2929.04(A)(9) as an aggravating circumstance to Ohio Rev.
> Code § 2903.01(C) is unconstitutional as it repeats an element of the underlying
> aggravated murder. U.S. Const. Amend. VIII, XIV.

(Doc. 22 at 82.)

Fitzpatrick contends that the statutes pursuant to which he was convicted and sentenced

to death are unconstitutional because the aggravating circumstances of the offense of aggravated

murder of a child do not narrow the class of offenders eligible for the death penalty. Fitzpatrick

raised this claim on direct appeal and the Ohio Supreme Court denied the claim on the merits.

*Fitzpatrick*, 102 Ohio St. 3d at 332-33 ¶¶ 73-76. Magistrate Merz also denied the claim on the

merits. This Court, likewise, will examine the claim on the merits.

Ohio's aggravated murder statute, O.R.C. § 2903.01(C), prohibits multiple discrete acts

each of which constitute aggravated murder, including the following: "(C) No person shall

purposely cause the death of another who is under thirteen years of age at the time of the

commission of the offense." O.R.C. § 2903.10(C). Similarly, Ohio's sentencing laws provide:

> (A) Imposition of the death penalty for aggravated murder is precluded unless one
> or more of the following is specified in the indictment or count in the indictment
> pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable
> doubt:
>
> * * * *

72

> (9) The offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design.

O.R.C. § 2929.04(A)(9). The statute defining the offense and the sentencing statute are identical to the extent that they prohibit and punish purposely causing the death of a child who was under the age of thirteen at the time of the commission of the offense. However, the crime defined in the sentencing statute is narrower in that a person who murders a child under the age of thirteen is eligible for the death penalty only if he "was the principle offender" or if he "committed the offense with prior calculation and design." *Id.*

The United States Supreme Court has held that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 876 (1983); *see also Jamison v. Collins*, 100 F. Supp. 2d 647, 762 (S.D. Ohio 2000). However, the Supreme Court clarified that the use of the term "aggravating circumstance" was not intended to make the use of statutorily-defined aggravating circumstances the key to passing constitutional muster. *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). The specific use of aggravating circumstances in a sentencing scheme is merely a means to an end. *Id.* at 244-45. The narrowing function required of a capital punishment system can be accomplished in two ways: (1) creating a narrow class of offenses eligible for capital punishment or (2) creating a broader class of capital offenses, but providing for narrowing by jury findings of aggravating circumstances at the sentencing phase. *Id.* at 246; *see also Jamison*, 100 F. Supp. 2d at 762 (quoting *Lowenfield*). Therefore, "an aggravating factor that repeats an element of the

crime is constitutional as long as the jury's discretion is sufficiently narrowed." *Jamison*, 100 F. Supp. 2d at 762.

Applying these precedents, Ohio's statutory scheme is sufficient on two grounds. First, the statutory aggravating circumstance in O.R.C. § 2929.04(A)(9) does define the category of offenders eligible for the death penalty more narrowly than the aggravated murder statute, O.R.C. § 2929.10(C). Moreover, the Sixth Circuit has held that it is permissible for aggravating circumstance defined in O.R.C. § 2929.04(A) to repeat the elements of an offense of aggravated murder defined in O.R.C. § 2903.10. *See Cooey*, 289 F.3d at 901. "What matters is that Ohio has, in the first instance, narrowed the class of those eligible for the death penalty by requiring some aggravated form of murder." *Id.* Accordingly, Ohio's sentencing scheme as applied to persons who commit aggravated murder of a child under the age of thirteen is constitutional. The Court **DENIES** Fitzpatrick's Ninth Claim for Relief on the merits.

## J.      Tenth Ground for Relief

> Execution by lethal injection violates Petitioner's constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law.

(Doc. 22 at 84.)

Petitioner Fitzpatrick has withdrawn this ground for relief. (Doc. 22 at 84; Doc. 87 at 61-62).

## IV.    CONCLUSION

Based on the foregoing analysis, Petitioner's Objections (docs. 87, 91) are **OVERRULED**

and Magistrate Judge Merz's R&R (doc. 85) and Supplemental R&R (doc. 90) are **ADOPTED**.

The Amended Petition (doc. 22) is **DENIED**.

IT IS SO ORDERED.


___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court